UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | |
|---|---|
| POKARNA ENGINEERED STONE LIMITED,    ) | |
| ) | |
| Plaintiff,   ) | |
| ) | |
| and    ) | |
| ) | |
| M S INTERNATIONAL, INC.,    ) | |
| ) | |
| Consolidated Plaintiff,   ) | |
| ) | |
| v.    ) | Consol. Court No. 20-00127 |
| ) | |
| UNITED STATES,    ) | |
| ) | |
| Defendant,   ) | |
| ) | |
| and    ) | |
| ) | |
| CAMBRIA COMPANY LLC,    ) | |
| ) | |
| Defendant-Intervenor.   ) | |
| ) | |

## **<u>ORDER</u>**

Upon consideration of the motions for judgment upon the administrative record filed by plaintiffs, the responses thereto, plaintiffs' replies, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motions are DENIED;

ORDERED that the Department of Commerce's determination is affirmed in all respects;

and it is further

ORDERED that judgment is entered in favor of the United States.

_____
SENIOR JUDGE

Dated: _____, 2021
      New York, N.Y.

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | |
|---|---|
| POKARNA ENGINEERED STONE LIMITED, )<br><br>Plaintiff, )<br><br>and )<br><br>M S INTERNATIONAL, INC., )<br><br>Consolidated Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>CAMBRIA COMPANY LLC, )<br><br>Defendant-Intervenor. ) | Consol. Court No. 20-00127<br><br>**<u>PUBLIC VERSION</u>**<br><br>Business Proprietary Information (BPI) Denoted by Brackets [ ] on Page 22. |

---

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD**

---

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:                              JOSHUA E. KURLAND
VANIA WANG                               Trial Attorney
W. MITCH PURDY                           U.S. Department of Justice
Attorneys                                Civil Division
Office of the Chief Counsel              Commercial Litigation Branch
for Trade Enforcement and Compliance     P.O. Box 480, Ben Franklin Station
U.S. Department of Commerce              Washington, D.C. 20044
Washington, D.C.                         Telephone: (202) 616-0477
                                         E-mail: Joshua.E.Kurland@usdoj.gov

May 26, 2021                             *Attorneys for Defendant United States*

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ................................................................2

    I.    Administrative Determination Under Review ............................................2

    II.    Issues Presented For Review .....................................................................2

ARGUMENT ..........................................................................................................2

    I.    Standard of Review ...................................................................................2

    II.    Commerce's Industry Support Determination Is Lawful............................5

        A.    Relevant Background ......................................................................5

        B.    Legal Framework And Commerce's Statutory Interpretation ..........6

        C.    The Statute Is Silent Regarding Who Constitutes A "Producer" For
            Industry Support Purposes .............................................................9

        D.    Commerce's Interpretation Is Reasonable .....................................13

    III.    Commerce's Determination That Fabricators Are Not "Producers" For Industry
         Support Purposes Is Supported By Substantial Evidence............................17

        A.    Commerce's Determination That Fabricators Do Not Perform Sufficient
            Production-Related Activities Is Supported By Substantial Evidence ...........17

        B.    Commerce And The ITC May Come To Different Conclusions....................23

        C.    Commerce Made Its Determination Within The Statutory Deadline .............26

    IV.    Commerce's Determination To Include Pokarna's Paid Sample Sales In The
         Margin Calculation Is Lawful....................................................................27

    CONCLUSION...........................................................................................34

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Apex Frozen Foods Priv. Ltd. v. United States*,
   37 F. Supp. 3d 1286, 1303 (Ct. Int'l Trade 2014) *aff'd*, 862 F.3d 1322 (Fed. Cir. 2017).........34

*Algoma Steel Corp., Ltd. v. United States*,
   688 F. Supp. 639 (Ct. Int'l Trade 1988) *aff'd,* 865 F.2d 240 (Fed. Cir. 1989) .........................24

*Am. Silicon Techs. v. United States,*
   261 F.3d 1371 (Fed. Cir. 2001)...................................................................................................18

*Asociacion Colombiana de Exportadores de Flores v. United States*,
   693 F. Supp. 1165 (Ct. Int'l Trade 1988) ................................................................................23

*Atl. Sugar, Ltd., v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984)....................................................................................................3

*Bell Supply v. United States*,
   888 F.3d 1222 (Fed. Cir. 2018)..................................................................................................16

*Brother Indus. (USA), Inc. v. United States*,
   801 F. Supp. 751 (Ct. Int'l Trade 1992) .........................................................................9, 10, 11

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)............................................................................................... *passim*

*Cleo Inc. v. United States*,
   501 F.3d 1291 (Fed. Cir. 2007).............................................................................................3, 18

*Consol. Edison Co. of N.Y. v. NLRB*,
   305 U.S. 197 (1938)......................................................................................................................3

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966)......................................................................................................................3

*Co-Steel Raritan, Inc. v. Int'l Trade Comm'n*,
   357 F.3d 1294 (Fed. Cir. 2004)..................................................................................................25

*Elkem Metals Co. v. United States*,
   468 F.3d 795 (Fed. Cir. 2006)....................................................................................................13

*Essar Steel Ltd. v. United States*,
   678 F.3d 1268 (Fed. Cir. 2012)..................................................................................................25

*Eurodif S.A. v. United States*,
    411 F.3d 1355 (Fed. Cir. 2005) .................................................................. passim

*Floral Trade Council v. United States*,
    41 F. Supp. 2d 319 (Ct. Int'l Trade 1999) ............................................... 13

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996) ............................................................... 2, 4

*Goldlink Indus. Co. v. United States*,
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ............................................ 3

*Haixing Jingmei Chem. Prod. Sales Co. v. United States*,
    335 F. Supp. 3d 1330 (Ct. Int'l Trade 2018) .......................................... 18

*Huzhou Muyun Wood Co. v. United States*,
    324 F. Supp. 3d 1364 (Ct. Int'l Trade 2018) .......................................... 32

*INS v. Elias-Zacarias*,
    502 U.S. 478 (1992) ................................................................................. 3

*Jacobi Carbons AB v. United States*,
    422 F. Supp. 3d 1318 (Ct. Int'l Trade 2019) .......................................... 21

*JBF RAK LLC v. United States*,
    790 F.3d 1358 (Fed. Cir. 2015) ............................................................... 4

*Nan Ya Plastics Corp., Ltd. v. United States*,
    810 F.3d 1333 (Fed. Cir. 2016) ............................................................. 31

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ............................................................... 3

*Novolipetsk Steel Public Joint Stock Co. v. United States*,
    483 F. Supp. 3d 1281 (Ct. Int'l Trade 2020) ............................... 30, 31, 32

*Novosteel SA v. U.S., Bethlehem Steel Corp.*,
    284 F.3d 1261 (Fed. Cir. 2002) ............................................................. 16

*NSK Ltd. v. United States*,
    115 F.3d 965 (Fed. Cir. 1997) ............................................................... 27

*Ragsdale v. Wolverine World Wide, Inc.*,
    535 U.S. 81 (2002) ................................................................................. 13

*Shandong Rongxin Imp. & Exp. Co. v. United States*,
    203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ............................................ 3

*Timken Co. v. United States*,
   354 F.3d 1334 (Fed. Cir. 2004)................................................................4

*Torrington Co. v. United States*,
   68 F.3d 1347 (Fed. Cir. 1995)..............................................................4, 8

*U.S. Steel Group v. United States*,
   998 F. Supp. 1151 (Ct. Int'l Trade 1998) ................................................13

*Union Steel v. United States*,
   713 F.3d 1101 (Fed. Cir. 2013)..................................................11, 13, 24

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009)........................................................................3, 4, 8

*USEC Inc. v. United States*,
   259 F. Supp. 2d 1310 (Ct. Int'l Trade 2003) .................................. *passim*

*USEC Inc. v. United States*,
   281 F. Supp. 2d 1334 (Ct. Int'l Trade 2003) ) ................................ *passim*

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
   435 U.S. 519 (1978)..............................................................................25

*Windmill Int'l Pte., Ltd. v. United States*,
   193 F. Supp. 2d 1303 (Ct. Int'l Trade 2002) .....................................30, 32

**Statutes**

19 U.S.C. § 1673................................................................................6, 27

19 U.S.C. § 1673a........................................................................ *passim*

19 U.S.C. § 1673b..................................................................................24

19 U.S.C. § 1675.......................................................................28, 29, 30

19 U.S.C. § 1677...........................................................................2, 7, 10

19 U.S.C. § 1677b..................................................................................27

Pub. L. No. 114-125 § 433.....................................................................29

**Commerce Administrative Determinations**

*Calcium Hypochlorite from the People's Republic of China*,
   79 Fed. Reg. 2,410 (Dep't of Commerce Jan. 14, 2014), ..........................................................15

*Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from Switzerland,*
   83 Fed. Reg. 16,293 (Dep't of Commerce Apr. 16, 2019) ........................................................28

*Certain Quartz Surface Products From India and the Republic of Turkey*,
   84 Fed. Reg. 25,529 (Dep't of Commerce June 3, 2019) ..........................................................5

*Certain Quartz Surface Products From India*,
   85 Fed. Reg. 25,391 (Dep't of Commerce May 1, 2020) ..........................................................2

*Certain Quartz Surface Products From India and Turkey*,
   85 Fed. Reg. 37,422 (Dep't of Commerce June 22, 2020) ........................................................2

*Certain Quartz Surface Products From the People's Republic of China*,
   83 Fed. Reg. 22,613 (Dep't of Commerce May 16, 2018) ........................................................26

*Chlorinated Isocyanurates from the People's Republic of China*,
   78 Fed. Reg. 59,001 (Dep't of Commerce Sept. 25, 2013) ..................................................15, 23

*Honey from the People's Republic of China*,
   85 Fed. Reg. 45,187 (Dep't of Commerce July 27, 2020)................................................29, 30, 31

*Large Diameter Welded Pipe from Canada, Greece, Korea, and Turkey*,
   84 Fed. Reg. 6,378 (Dep't of Commerce Feb. 27, 2019) ..........................................................33

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's*
*Republic of China*,
   85 Fed. Reg. 9,459 (Dept' of Commerce Feb. 19, 2020)   ....................................29, 30, 31, 32

*Melamine From the People's Republic of China*,
   86 Fed. Reg. 13,528 (Dep't of Commerce Mar. 9, 2021)..........................................................32

*Uncovered Innerspring Units from the People's Republic of China*,
   73 Fed. Reg. 79,443 (Dep't of Commerce Dec. 29, 2008)........................................................33

**ITC Administrative Determinations**

*Chlorinated Isocyanurates from China and Japan*,
   Inv. Nos. 701-TA-501, 731-TA-1226, USTIC Pub. 4431 (Nov. 2013) ............................. 23-24

*Chlorinated Isocyanurates from China and Japan*,
   Inv. Nos. 701-TA-501, 731-TA-1226, USTIC Pub. 4494 (Nov. 2014) ...................................24

*Multilayered Wood Flooring from China*,
Inv. No. 731-TA-1179 (Final), USITC Pub. 4278 (Nov. 2011) ................................................18

*Quartz Surface Products from China*, Inv.,
Nos. 701-TA-606 and 731-TA-1416, USITC Pub. 4794, at 15 (June 2018)...........................25

*Raw Flexible Magnets from China and Taiwan*,
Inv. Nos. 701-TA-452, 731-TA-1129-1130 (Final), USITC Pub. 4300 (Aug. 2008) ..............18

**Legislative Materials**

S. Rep. No. 249, 96th Cong., 1st Sess. (1979),
*reprinted in* 1979 U.S.C.C.A.N. 381 ........................................................................ 7-8, 10, 14

Statement of Administrative Action accompanying the Uruguay Round Agreements Act,
H.R. Doc. 103-316(1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ............................... 14, 24, 26

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE LEO M. GORDON, SENIOR JUDGE

———————————————————————

|  |  |
|---|---|
| POKARNA ENGINEERED STONE LIMITED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| M S INTERNATIONAL, INC., | ) |
| | ) |
| Consolidated Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| CAMBRIA COMPANY LLC, | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

Consol. Court No. 20-00127

**<u>PUBLIC VERSION</u>**

Business Proprietary Information
(BPI) Denoted by Brackets [ ]
on Page 22.

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**<u>MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD</u>**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States,
respectfully submits this response to the motions for judgment upon the agency record filed by
plaintiff Pokarna Engineered Stone Limited (PESL) and consolidated plaintiff M S International,
Inc. (MSI).  Because the Department of Commerce's final determination in its antidumping duty
investigation of certain quartz surface products from India is supported by substantial evidence
and otherwise lawful, we respectfully request that the Court reject plaintiffs' challenges and
sustain Commerce's determination.

### STATEMENT PURSUANT TO RULE 56.2

**I.     Administrative Determination Under Review**

The administrative determination under review is *Certain Quartz Surface Products From India,* 85 Fed. Reg. 25,391 (Dep't of Commerce May 1, 2020) (Final Determination), and the accompanying Issues and Decision Memorandum, P.D. 367 (IDM).  Following an affirmative injury determination by the U.S. International Trade Commission (ITC), Commerce published an antidumping duty order on June 22, 2020.  *Certain Quartz Surface Products From India and Turkey,* 85 Fed. Reg. 37,422 (Dep't of Commerce June 22, 2020).  The investigation period covers April 1, 2018, through March 31, 2019.

**II.    Issues Presented For Review**

1.      Whether Commerce's interpretation of the term "producer" for industry support purposes under 19 U.S.C. §§ 1673a and 1677 lawfully allows Commerce to evaluate the sufficiency of a fabricator's production-related activities.

2.      Whether Commerce's determination that quartz surface product fabricators do not perform sufficient production-related activities to be considered "producers" for industry support purposes is supported by substantial evidence.

3.      Whether Commerce's determination to refrain from applying a *bona fide* sales analysis with respect to PESL's paid sample sales is lawful.

### ARGUMENT

**I.     Standard of Review**

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial record evidence, or otherwise unlawful.  *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)); *see United*

*States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009) (*Eurodif II*) ("The specific factual findings

on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by

substantial evidence.").  "Substantial evidence" connotes "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of N.Y. v. NLRB*,

305 U.S. 197, 229 (1938).  Substantial evidence may be "less than the weight of the evidence,"

and the possibility of drawing inconsistent conclusions from the record does not render findings

unsupported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Indeed, when Congress entrusts an agency to administer a statute that demands inherently

fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling

that no reasonable factfinder" could reach the same conclusion.  *INS v. Elias-Zacarias*, 502 U.S.

478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327,

1338 (Ct. Int'l Trade 2017) (recognizing tremendous deference to Commerce's factual findings).

It is thus improper to overturn a determination "simply because the reviewing court would have

reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d

1291, 1296 (Fed. Cir. 2007) (citations omitted), and the Court will not substitute its judgment for

Commerce in choosing between two fairly conflicting views, even if it could justifiably have

made a different choice had the matter been before it *de novo*.  *Goldlink Indus. Co. v. United

States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006).  Hence, a party challenging

Commerce's determination under the substantial evidence standard "has chosen a course with a

high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir.

2006) (citation omitted), and the Court sustains Commerce's factual determinations if they are

reasonable and supported by the record as a whole, even if evidence detracts from them.  *See Atl.

Sugar, Ltd., v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

PUBLIC VERSION

When the Court examines Commerce's interpretations of the statute it administers, the Court employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  First, the Court examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency and Court must comply with Congress's clear intent.  *Id.* at 842-43.  If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id.* at 843.  If so, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous."  *Eurodif II*, 555 U.S. at 316 (citation omitted).  Indeed, "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency."  *Id.* (citation omitted); *see Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995) (recognizing Commerce as "master" of antidumping laws).

Finally, the Court affords Commerce especially great deference "{w}hen a statute fails to make clear any Congressionally mandated procedure or methodology for assessment of the statutory tests."  *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (citation and quotation marks omitted).  In that circumstance, "Commerce may perform its duties in the way it believes most suitable."  *Id.* (citation omitted).  Consequently, Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and to apply methodologies to implement the trade statute.  *Fujitsu*, 88 F.3d at 1039.

## II.      **Commerce's Industry Support Determination Is Lawful**

Contrary to MSI's claims, Commerce's interpretation of the industry support portion of the statute is lawful.  The statute does not define who constitutes a "producer" of subject merchandise.  Accordingly, Commerce has looked to the legislative history and concluded that, to qualify as a "producer" for industry support purposes, a company must have sufficient production-related activities.  As this Court and the Court of Appeals for the Federal Circuit have already recognized, Commerce's interpretation is reasonable and therefore should be sustained under the second prong of *Chevron*.

### A.      **Relevant Background**

In May 2019, Cambria Company LLC (Cambria) filed a petition for imposition of antidumping duties on certain quartz surface products from India.  Petition, P.D. 1-5; C.D. 1-5 (May 8, 2019).  MSI, a United States importer of quartz surface products, filed comments challenging Cambria's standing to file the petition, alleging that Cambria failed to include quartz surface product fabricators as domestic industry "producers" in its industry support calculation. MSI Standing Comments, P.D. 39-40; C.D. 18-30 at 2-6 (May 24, 2019).  Cambria responded with comments supporting its standing to file the petition.  Petitioner Standing Comments, P.D. 42; C.D. 33 at 1-18 (May 28, 2019).

In accordance with the twenty-day statutory deadline, Commerce on May 28, 2019 initiated an investigation.  *Certain Quartz Surface Products From India and the Republic of Turkey*, 84 Fed. Reg. 25,529 (Dep't of Commerce June 3, 2019) (*Initiation*), and accompanying Initiation Checklist, P.D. 46; C.D. 34 at Attachment II (May 28, 2019) (Initiation Checklist). After reviewing the record evidence relating to fabricators, Commerce found that fabricators did not perform sufficient production-related activities, and thus were not "producers" for purposes of determining industry support.  *Id.* at Att. II, pp. 1, 9-16.  Commerce explained that the detailed

PUBLIC VERSION

information Cambria had submitted made it "clear that there are significant differences in the level of complexity and capital investment, employment, training and technical expertise, production processes, and type of equipment, between quartz surface product slab producers and fabricators." *Id.* at Att. II, pg. 14 (citing Petitioner Standing Comments, P.D. 42; C.D. 33 at 4-18 & Exs. 2-8); *see also id.* at 10-12 (detailing evidentiary arguments).  In particular, Commerce found that "fabricators simply convert an existing slab into a geometrical form for its end use or application" and noted that "many fabricators rely on imported slabs to produce final fabricated products." *Id.* (citations omitted).

Hence, consistent with other cases involving companies that perform processing on merchandise, Commerce did not include the fabricators MSI identified in the domestic industry for the industry support calculation. *Id.* at 16 (citations omitted).  Commerce nonetheless observed that, even if it had included the fabricators' data, it still would have found that Cambria's petition had the requisite level of industry support. *Id.* at 16 n.129.

Commerce, as required, notified the ITC of its decision to initiate an investigation. Initiation Notification Letter, P.D. 47 (May 28, 2019).  MSI subsequently submitted a case brief challenging Commerce's industry support determination.  MSI Case Br., P.D. 355 at 6-11 (Mar. 27, 2020).  In its final determination, Commerce explained that the statute did not allow it to reconsider its industry support determination after initiation.  IDM at 37-38.

### B.      Legal Framework And Commerce's Statutory Interpretation

To initiate an antidumping duty investigation, Commerce must, within 20 days after the date on which a petition is filed and "after examining, on the basis of sources readily available to {Commerce}, the accuracy and adequacy of the evidence provided in the petition," "determine whether the petition alleges the elements necessary for the imposition of a duty under {19 U.S.C.

PUBLIC VERSION

§ 1673} and contains information reasonably available to the petitioner supporting the

allegations," as well as "determine if the petition has been filed by or on behalf of the industry."

19 U.S.C. § 1673a(c)(1)(A).  The term "industry" means "the *producers*, as a whole, of a

domestic like product, or those *producers* whose collective output of a domestic like product

constitutes a major proportion of the total domestic production of the product."  19 U.S.C.

§ 1677(4)(A) (emphasis added).

For the petition to be filed by or on behalf of the domestic industry, the statute requires:

(1) the domestic *producers* or workers who support the petition to account for at least 25 percent

of the total production of the domestic like product, and (2) the domestic *producers* or workers

who support the petition to account for more than 50 percent of the production of the domestic

like product produced by the portion of the industry expressing support for or opposition to the

petition.  19 U.S.C. § 1673a(c)(4)(A).  "Domestic producers or workers" for these purposes is

defined as "interested parties who are eligible to file a petition under subsection (b)(1) {19

U.S.C. § 1673a(b)(1)}."  19 U.S.C. § 1673a(c)(5).  Section 1673a(b)(1), in turn, describes

interested parties who are eligible to file a petition as those described in paragraphs (C), (D), (E),

(F), and (G) of 19 U.S.C. § 1677(9).  These interested parties include "a manufacturer, producer,

or wholesaler in the United States of a domestic like product . . . ."  19 U.S.C. § 1677(9)(C).  The

terms "manufacturer, producer, or wholesaler" are not defined by the statute.

Faced with statutory silence on the meaning of "manufacturer, producer, or wholesaler,"

Commerce has considered legislative history for guidance in evaluating petitions like the one in

this case.  The legislative history explains that Congress intended the standing requirement "to

provide an opportunity for relief for an adversely affected industry and to prohibit petitions filed

by persons with no stake in the result of the investigation."  S. Rep. No. 249, 96th Cong., 1st

PUBLIC VERSION

Sess., at 47 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 433; *see also Torrington*, 68 F.3d at

1352 ("The purpose underlying the antidumping laws is to prevent foreign manufacturers from

injuring domestic industries by selling their products in the United States at less than 'fair value,'

*i.e.*, at prices below the prices the foreign manufacturers charge for the same products in their

home markets.").

Consequently, Commerce has determined for industry support purposes "that in order to

be a producer, an entity must have a 'stake' in the domestic industry in question." *Eurodif S.A.*

*v. United States*, 411 F.3d 1355, 1360 (Fed. Cir. 2005) (*Eurodif I*).  This requires a company to

"perform some important or substantial manufacturing operation." *Id.* at 1361 (citation and

quotation marks omitted).  Therefore, Commerce evaluates whether an entity is a "producer" for

industry support purposes based on the overall nature of the entity's production-related activities

in the United States, to determine whether the entity's production operations are sufficient for it

to be considered part of the domestic industry.  *See* Initiation Checklist, Att. II, pg. 14; *see also*

*USEC Inc. v. United States*, 259 F. Supp. 2d 1310, 1327 (Ct. Int'l Trade 2003) (*USEC I*); *USEC*

*Inc. v. United States*, 281 F. Supp. 2d 1334, 1345-46 (Ct. Int'l Trade 2003) (*USEC II*), *aff'd in*

*relevant part*, *Eurodif I*, 411 F.3d at 1360-61 (sustaining Commerce interpretation of producer).[1]

To determine whether a company engages in sufficient production-related activities,

Commerce considers the six factors that the ITC similarly (but separately) examines to evaluate

whether an entity is part of the domestic industry for purposes of determining injury:  (1) the

source and extent of the firm's capital investment; (2) the technical expertise involved in the

United States production activities; (3) the value added to the product in the United States; (4)

---

[1]  A separate aspect of the Federal Circuit's decision resulted in further litigation and was later
reversed in *Eurodif II*, 555 U.S. 305.

employment levels; (5) the quantity and type of parts sourced in the United States; and (6) any other costs and activities in the United States directly leading to production of the like product. *See USEC I*, 259 F. Supp. 2d at 1327; Initiation Checklist, Att. II, pg. 10.  MSI calls this the "sufficient production-related activities" test.  *See*, *e.g.*, MSI Br. 2.

This Court and the Federal Circuit have previously sustained, as lawful, Commerce's interpretation of "producer" in the context of Commerce's industry support determination.  *See USEC II*, 281 F. Supp. 2d at 1345-46; *Eurodif I*, 411 F.3d at 1360-61, 1365-66 (affirming this aspect of *USEC II*).  In particular, the Courts upheld Commerce's different interpretations of the term "producer" in different contexts as reasonable in light of the industry support provision's purpose.  *See id.*  The Federal Circuit's *Eurodif I* decision remains binding on this issue.  The Court should thus sustain Commerce's permissible, and therefore reasonable, interpretation.

**C.    The Statute Is Silent Regarding Who Constitutes A "Producer" For Industry Support Purposes**

Commerce's use of the sufficient production-related activities test to determine who is a "producer" is lawful because it is a reasonable interpretation of an ambiguous statutory term. Indeed, this Court (affirmed by the Federal Circuit) has already recognized that the statutory term "producer" is undefined and sustained Commerce's determination under the sufficient production-related activities test as reasonable and consistent with the statute's legislative history.  *See USEC I*, 259 F. Supp. 2d at 1327-28 (discussing Commerce's application of sufficient production-related activities test and observing that "producer" is undefined); *USEC II*, 281 F. Supp. 2d at 1345-46 (sustaining Commerce's determination); *Eurodif I*, 411 F.3d at 1360-61, 1365-66 (affirming this aspect of Commerce's determination as reasonable and lawful); *see also Brother Indus. (USA), Inc. v. United States*, 801 F. Supp. 751, 757 (Ct. Int'l Trade 1992) (recognizing "producer" as undefined statutory term), *cited in Eurodif I*, 411 F.3d at 1361.

Nonetheless, MSI portrays the matter as a *Chevron* step one issue by arguing that the statute defines the domestic industry to include all producers of the domestic like product and that both fabricated and unfabricated quartz surface materials are included in Commerce's investigation.  *See* MSI Br. 5-16.  The fundamental flaw in MSI's reasoning is that it elides the question of whether entities that perform processing on a pre-existing product—such as the fabricators at issue in this case—have a sufficient stake in the domestic industry to be considered "producers" for industry support purposes.  *See* S. Rep. 96-249, at 47; *Eurodif I*, 411 F.3d at 1360-61 (upholding Commerce's interpretation of "having a 'stake' as requiring that a company 'perform some important or substantial manufacturing operation'") (citation omitted).

MSI thus fails to grapple with an important aspect of the problem.  *See*, *e.g.*, MSI Br. 6-7 (asserting that statute requires support from "**producers of the domestic like product** (not a selected subset of producers)" without addressing issue).  Commerce's interpretation addresses the question MSI sidesteps:  which entities constitute domestic "producers" under the statute. The statute at 19 U.S.C. § 1673a(c)(5) defines domestic producers as interested parties eligible to file a petition under 19 U.S.C. § 1673a(b)(1), a provision that in turn cross-references 19 U.S.C. § 1677(9)(C), which lists "manufacturers, producers, and wholesalers."  This Court has observed (accurately) that the statute does not define the terms "manufacturers, producers, and wholesalers."  *See USEC I*, 259 F. Supp. 2d at 1328 ("the definition of 'producer,' a term that is not statutorily defined"); *Brother Indus.*, 801 F. Supp. at 757 ("To have standing to file a petition, a party must be a 'manufacturer, producer, or wholesaler.' . . . These terms are not defined in the statute.").  Likewise, the Federal Circuit has recognized the ambiguity by analyzing—and ultimately upholding—the reasonableness of Commerce's approach, consistent

10

with *Chevron* step two.  *See Eurodif I*, 411 F.3d at 1360-61, 1365-66.  MSI does not articulate

any basis for this Court to ignore the Federal Circuit's binding decision on this issue in *Eurodif I*.

Consequently, MSI's contentions that the question of whether to include fabricators is a

*Chevron* step one issue, and that the statute correspondingly prohibits Commerce from applying

the sufficient production-related activities test to address it, lack merit.  *See USEC II*, 281 F.

Supp. 2d at 1345-46 (sustaining Commerce's approach as reasonable and lawful); *Eurodif I*, 411

F.3d at 1360-61, 1365-66 (same).  Even if the courts had not already resolved the issue, it is clear

that the statute does not address how and where to draw the line regarding who constitutes a

domestic industry "producer" for industry support purposes.

Nor does MSI's argument that both unfabricated and fabricated materials are included in

the investigation alter the analysis.  *See*, *e.g.*, MSI Br. 5-6.  Clearly, there are entities who

perform processing or some form of further manufacturing on a product whose activities do not

rise to the level of being a "producer" of the underlying product—even if the end-product would

still be covered by the investigation.  Given, however, that the statute neither defines the term

"producer" nor instructs Commerce on how to determine who qualifies, *see USEC I*, 259 F.

Supp. 2d at 1328; *Brother Indus.*, 801 F. Supp. at 757, Commerce has filled the statutory gap by

analyzing the extent of entities' production-related activities.  The mere fact that fabricated

products are included in the investigation does not resolve whether the fabricators should be

considered "producers" of domestic like product for industry support purposes.  *See USEC II*,

281 F. Supp. 2d at 1346; *Eurodif I*, 411 F.3d at 1361 (sustaining Commerce's different

interpretations of "producer" for determining industry support and export price as lawful); *cf.*

*Union Steel v. United States*, 713 F.3d 1101, 1107-10 (Fed. Cir. 2013) (sustaining Commerce's

different interpretations of antidumping statute concerning zeroing in different contexts).

PUBLIC VERSION

Further, contrary to MSI's claims, Commerce did not acknowledge that fabricators are producers of domestic like product for industry support purposes.  *See* MSI Br. 8, 9.  This claim results from MSI conflating the questions of what qualifies as domestic like product for purposes of calculating a dumping margin and who constitutes a "producer" of the product.  Commerce, by contrast, examined whether fabricators' activities were sufficient to consider them domestic producers and concluded, based on its examination, that "fabricators do not perform sufficient production-related activities to be included in the domestic industry for industry support purposes."  Initiation Checklist, Att. II, pg. 14; *id.* at 16 (containing similar language).[2]

MSI additionally argues that the maxim of *expressio unius est exclusio alterius* precludes Commerce's use of the sufficient production-related activities test because the statutes identifies only two specific kinds of "producers" who may be excluded for industry support purposes.  *See* MSI Br. 11-16.  This claim, however, suffers from the same fundamental flaw as MSI's earlier arguments because it skips over the key question of whether fabricators should be considered "producers" in the first place.  The provision that MSI cites in support of its *expressio unius* argument, 19 U.S.C. § 1673a(c)(4)(B), does not address that question because it only applies to companies that are otherwise domestic producers.  Hence, notwithstanding this provision, courts have treated the interpretation of "producer" as a matter of reasonableness under *Chevron* step two.  *See USEC II*, 281 F. Supp. 2d at 1345-46; *Eurodif I*, 411 F.3d at 1360-61.

---

[2]  MSI also criticizes Commerce's word choice for using the term "processing" to describe the fabricators' activities in its determination in this case, compared to "production" terminology Commerce used in previous proceedings concerning quartz surface products from China.  *See* MSI Br. 9-10.  Each proceeding stands on its own, however, and Commerce's passing use of terminology in a previous proceeding is not a basis to overturn Commerce's determination here.  Moreover, Commerce's statutory interpretation has not changed, and there is nothing improper about Commerce finding more apt language to describe activities that it has consistently determined *do not* rise to the level of turning fabricators of finished quartz surface products into "producers" of the underlying merchandise.  *See* Initiation Checklist, Att. II, pp. 14-16.

PUBLIC VERSION

Moreover, to the extent that MSI argues that section 1673a(c)(4)(B) implicitly means that Congress intended for Commerce to interpret "producer" in the context of industry support differently, the "Supreme Court has observed . . . that '{b}ecause of the deference given to agencies on matters about which the statutes they administer are silent, . . . *expressio unius* ought to have somewhat reduced force in this context.'"  *Elkem Metals Co. v. United States*, 468 F.3d 795, 801 (Fed. Cir. 2006) (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 102 (2002) (O'Connor, J., dissenting)).  In *Elkem*, the Federal Circuit declined to use the *expressio unius* maxim to interpret the antidumping statute's constructed value provisions to impose an implied restriction upon Commerce.  *See id.*  Instead, the Court found that it was appropriate to read the statute literally when the statute imposed a restriction on a term but otherwise left the term undefined.  *See id.*; *cf. U.S. Steel Group v. United States*, 998 F. Supp. 1151, 1157-59 (Ct. Int'l Trade 1998) (discussing problematic issues surrounding use of *expressio unius est exclusio alterius* to discern Congress's intent under *Chevron* step one).

In short, because the statute is silent regarding the meaning of "producer" and Congress has not directly spoken upon the precise issue, this issue is not resolved at *Chevron* step one.

### D.   Commerce's Interpretation Is Reasonable

If the Court determines that the statute is silent or ambiguous, the Court must sustain Commerce's interpretation so long as it is reasonable.  *See*, *e.g.*, *Union Steel*, 713 F.3d at 1107; *Floral Trade Council v. United States*, 41 F. Supp. 2d 319, 323 (Ct. Int'l Trade 1999) ("Because Congress intended to delegate policymaking to Commerce, the Court must defer to Commerce's reasonable interpretation.") (citation omitted).  Commerce's interpretation is consistent with the legislative history of the industry support requirement and is reasonable because it ensures that Commerce considers entities that have a sufficient stake in the investigation.

PUBLIC VERSION

Congress intended that the standing requirement "provide an opportunity for relief for an adversely affected industry and to prohibit petitions filed by persons with no stake in the result of the investigation." S. Rep. No. 96-249, at 47; *see also* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, at 811 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4162 (SAA) (explaining, despite changes to standing requirement, that "{t}he definition of domestic industry in Article 4 is virtually identical to that in the 1979 Code and current U.S. law."). In other words, the legislative history indicates that Congress intended the requirement to ensure that petitions are filed by adversely affected domestic industries with an appropriate stake in the result of the investigation.

Commerce's approach comports with this intent. Commerce interprets a "producer" having a "stake" in the domestic industry as requiring an entity to "perform some important or substantial manufacturing operation" with respect to the product in question. *Eurodif I*, 411 F.3d at 1361 (citation omitted); *see* Initiation Checklist, Att. II, pg. 14 (discussing need for "sufficient production-related activities to be included in the domestic industry"). To make that determination, Commerce analyzes the six factors under the sufficient production-related activities test. *See* Initiation Checklist, Att. II, pg. 10; *USEC I*, 259 F. Supp. 2d at 1327.

Both this Court and the Federal Circuit have sustained Commerce's interpretation and approach as reasonable. *See USEC II*, 281 F. Supp. 2d at 1345-46, *aff'd in relevant part and rev'd on other grounds*, *Eurodif I*, 411 F.3d at 1360-61, 1365-66. The *USEC/Eurodif* litigation involved Commerce's antidumping and countervailing duty investigations of low enriched uranium from France, Germany, the Netherlands, and the United Kingdom. Commerce, in those investigations, determined that utility companies were not domestic industry "producers" for industry support purposes by analyzing the six factors that the ITC had articulated for examining

whether a company may be considered a "member of the domestic industry" (*i.e.*, the sufficient production-related activities test).  *See USEC I*, 259 F. Supp. 2d at 1327.  The *USEC/Eurodif* plaintiffs, like MSI, challenged the lawfulness of Commerce's industry support determination, citing a now-defunct tolling regulation that suggested a different interpretation of "producer." *See id.* at 1327-28; *USEC II*, 281 F. Supp. 2d at 1334.  On remand, Commerce explained that its determination was rooted in the statute's legislative history and its corresponding interpretation of "producer" as requiring an entity to have a "stake" in the industry through some important or substantial manufacturing operation.  *Eurodif I*, 411 F.3d at 1360.  This Court and the Federal Circuit both concluded that Commerce's focus on the sufficiency of an entity's production-related activities was a reasonable interpretation of "producer" and therefore lawful.  *See USEC II*, 281 F. Supp. 2d at 1334; *Eurodif I*, 411 F.3d at 1360, 1365-66.

Further, Commerce's determination in this case is consistent with its practice following the uranium investigations.  In subsequent proceedings, Commerce has continued to evaluate the sufficiency of companies' production-related activities when identifying domestic producers for industry support purposes.  *See, e.g., Calcium Hypochlorite from the People's Republic of China*, 79 Fed. Reg. 2,410 (Dep't of Commerce Jan. 14, 2014), at accompanying Initiation Checklist, Att. II (*Calcium Hypochlorite Initiation*) (Attached as Addendum A) (finding, after evaluating sufficiency of production-related activities, that repackers/private label marketers were not producers and thus not part of domestic industry); *Chlorinated Isocyanurates from the People's Republic of China*, 78 Fed. Reg. 59,001 (Dep't of Commerce Sept. 25, 2013), at accompanying Initiation Checklist, Att. II (*Chlorinated Isocyanurates Initiation*) (Attached as Addendum B) (finding tableters not domestic industry producers because "tableting does not require significant capital investment, technical production expertise, or employment levels when compared to the

PUBLIC VERSION

capital investment, technical expertise, and employment levels required to establish an integrated chlorinated isos operation"); *see also* Initiation Checklist, Att. II, pp. 12 & n.95, 16 & n.128.[3]

Because MSI solely contends that Commerce's interpretation is impermissible because the statute speaks directly to the definition of "producer," its opening brief does not address the reasonableness of Commerce's interpretation. Thus, MSI provides no basis for this Court to depart from the prior rulings sustaining Commerce's approach as reasonable. *See Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1273 (Fed. Cir. 2002) (plaintiff waives arguments not raised in opening brief).

Extending its *expressio unius* argument, MSI does assert that Commerce's exclusion of fabricators does not meet either criterion of 19 U.S.C. § 1673a(c)(4)(B)—the provision providing specific instances in which Commerce may disregard the positions of domestic producers if they are related to foreign producers or are themselves importers of subject merchandise. *See* MSI Br. 12-13. As we explained above, however, this provision would only apply to companies that are otherwise domestic producers. Here, by contrast, Commerce analyzed the record evidence and found that fabricators are *not* domestic producers. *See* Initiation Checklist, Att. II, pp. 9-16. Hence, the section 1673a(c)(4)(B) criteria for disregarding the opposing positions of domestic producers do not apply. Commerce lawfully did not invoke section 1673a(c)(4)(B) because there were no *bona fide* domestic producers opposing Cambria's petition. *Cf. Bell Supply v. United States*, 888 F.3d 1222, 1229 (Fed. Cir. 2018) (holding that it was permissible for Commerce to apply substantial transformation analysis *without* resorting to anticircumvention analysis).

---

[3] The determinations Commerce cited are available through Commerce's ACCESS system, and we provide them here for the Court's convenience.

**III.    Commerce's Determination That Fabricators Are Not "Producers" For Industry Support Purposes Is Supported By Substantial Evidence**

Commerce's determination that fabricators are not producers for industry support purposes is well-grounded in the record evidence that was presented to Commerce on the issue. Commerce reviewed this evidence for the sufficiency of the fabricators' domestic production-related activities using the following six factors: (1) the source and extent of the firm's capital investment; (2) the technical expertise involved in the United States production activities; (3) the value added to the product in the United States; (4) employment levels; (5) the quantity and type of parts sourced in the United States; and (6) any other costs and activities in the United States directly leading to production of the like product.  *See* Initiation Checklist, Att. II, pp. 10, 14-16. The record evidence showed that significant differences existed between the level of complexity, investment, training and expertise, number of employees, and type of equipment required for the fabrication process compared to quartz slab production.  *Id.* at 14; *see also id.* at 10-12 (detailing Cambria's evidentiary arguments on issue).  Thus, substantial evidence supports Commerce's conclusion not to treat fabricators as producers for industry support purposes.

**A.    Commerce's Determination That Fabricators Do Not Perform Sufficient Production-Related Activities Is Supported By Substantial Evidence**

MSI criticizes Commerce's determination, but its arguments boil down to disagreement with Commerce's weighing of the record evidence, which is not a basis to overturn Commerce's determination.  *See* MSI Br. 21-23.  For example, MSI criticizes multiple exhibits that Cambria submitted to illustrate differences it identified between quartz slab production and fabrication, asserting that each is an example of only one slab producer's or fabricator's experience.  *See* MSI Br. 21-22.  However, Cambria's exhibits encompass the experiences of multiple different companies, and as a result, constitute multiple illustrative examples of differences between

producers and fabricators.  Among other things, they substantiate Cambria's assertion of a

significant difference in the size of the capital investment required for quartz slab production

versus fabrication operations.  *See* Initiation Checklist, Att. II, pp. 11 & nn.84-85 (discussing

Petitioner Standing Comments, P.D. 42; C.D. 33 at 7-9 & Exs. 2-5).  Yet, by way of further

example, MSI disagrees with the exhibits illustrating this difference by incongruously attempting

to compare the size of individual slab producer investments to the collective size of investments

by fabricators, in effect comparing apples and oranges.  *See* MSI Br. 21.

In short, just because Commerce evaluated and weighed the evidence differently than

MSI does not mean Commerce's determination is unsupported by substantial evidence.  *See*

*Cleo*, 501 F.3d at 1296 (citing *Am. Silicon Techs. v. United States,* 261 F.3d 1371, 1376 (Fed.

Cir. 2001) ("Even if it is possible to draw two inconsistent conclusions from evidence in the

record, such a possibility does not prevent Commerce's determination from being supported by

substantial evidence")); *Haixing Jingmei Chem. Prod. Sales Co. v. United States*, 335 F. Supp.

3d 1330, 1346 (Ct. Int'l Trade 2018) ("mere disagreement with Commerce's weighing of the

evidence" insufficient basis for legal challenge).  Moreover, contrary to MSI's claims, it is clear

that Commerce reviewed and compared the record evidence regarding the production processes

for quartz slab producers and fabricators.  *See* Initiation Checklist, Att. II, pp. 9-12, 14-15.

In previous cases, both Commerce and the ITC have considered companies that engage in

processing such as finishing, cutting, and slitting not to be part of the domestic industry.  *See id.*

at 15 (citing *Multilayered Wood Flooring from China*, Inv. Nos. 701-TA-476 and 731-TA-1179

(Final), USITC Pub. 4278, at 8 (Nov. 2011); *Raw Flexible Magnets from China and Taiwan*, Inv.

Nos. 701-TA-452 and 731-TA-1129-1130 (Final), USITC Pub. 4300, at 7-9 (Aug. 2008)).  After

reviewing the evidence, consistent with these cases, Commerce determined that the fabrication

PUBLIC VERSION

process at issue here essentially processed subject merchandise and fell under this processing

category.  *See id.* at 15-16.  Specifically, the evidence demonstrated that "the fabrication process

does not change the fundamental physical characteristics imparted during the slab production

process, as fabricators simply convert an existing slab into a geometrical form for its end use or

application."  *Id.* at 14 (citing Petitioner Standing Comments, P.D. 42; C.D. 33 at 6 & Ex. 2).

Indeed, as Commerce noted, any domestically-produced slab that fabricators further processed is

already accounted for in Cambria's industry support reporting.  *See id.* at 16.

     Further, based upon information in the petition, Commerce observed that the production

process for quartz surface product slab involves seven steps: "(1) mixing raw materials, (2)

combining, (3) dispensing and molding, (4) pressing, (5) curing, (6) cooling, and (7) polishing."

Initiation Checklist, Att. II, pg. 15 (citing Petition Volume 1, P.D. 1; C.D. 1 at 7).  By contrast,

evidence regarding the fabricators' production process identified only four steps: "(1) consult

with customers, (2) develop engineering diagrams, (3) perform intricate cutting, and (4) perform

various edge and surface finishing operations."  *Id.* (citing MSI Standing Comments, P.D. 39-40;

C.D. 18-30 at 5).  Commerce likewise considered the evidence showing that fabricators used

different, more broadly available equipment compared to the specialized equipment used in the

production of quartz surface product slabs.  *See id.* at 15 (citing Petitioner Standing Comments,

P.D. 42; C.D. 33 at 8-9, 11-12, Exs. 2, 5, 6, 7).  Consequently, Commerce found that, because

the quartz slab production process involves highly complex and interconnected machinery and

engineering processes, it "requires specialized equipment dedicated to quartz surface products

production and a significantly greater amount of capital investment, training and technical

expertise, and number of employees than the fabrication process."  *Id.* at 14 (citing Petitioner

Standing Comments at 6-12, Exs. 2-8).  Conversely, Commerce found that "the fabrication

process requires limited equipment that is not dedicated solely to quartz surface products, fewer employees, much less technical expertise, and significantly less capital investment." *Id.*

Overall, based on its examination of the record evidence, Commerce determined that "there are significant differences in the level of complexity and capital investment, employment, training and technical expertise, production processes, and type of equipment, between quartz surface product slab producers and fabricators." *Id.* at 14 (citation omitted).  Commerce additionally concluded that many fabricators rely on imported quartz slabs to produce final fabricated products.  *Id.*; Petitioner Standing Comments, P.D. 42; C.D. 33 at 13, 20, and Exs. 7, 9.[4]  Moreover, Commerce observed that because "the petitioner's industry support calculation properly accounts for all production of the domestic like product in the United States," the industry support calculation necessarily accounts for all United States-produced quartz surface products that were further processed by fabricators.  Initiation Checklist, Att. II, pg. 16.  In fact, as we noted above, Commerce explained that, even if it had included the fabricators MSI had identified in the industry support calculation, the domestic producers and workers supporting the petition still had the requisite level of industry support under the statute.  *See id.* at 16 n.129.

The foregoing demonstrates that Commerce's determination is supported by substantial evidence.  MSI nonetheless faults Commerce for citing record evidence to support its analysis without explicitly analyzing each fact.  *See* MSI Br. 20-21.  The law, however, does not require

---

[4]  MSI criticizes the evidence supporting this finding as amounting to the profile of a single fabricator.  *See* MSU Br. 13 n.4, 22 (discussing Petitioner Standing Comments at Ex. 7).  But, in reality—aside from the fact that the article does indicate that the fabricator being profiled uses imported slabs—the evidence was more extensive.  In addition to Cambria's representations, which themselves are record evidence, Cambria cited information circulated among fabricators opposing the petition, as well as information MSI itself had submitted evidencing how fabricators described themselves, all further indicating that fabricators rely on imported quartz slabs to produce final fabricated products.  *See* Petitioner Standing Comments at 13, 20, and Ex. 9 (also citing and discussing MSI Standing Comments, P.D. 39-40; C.D. 18-30 at Ex. 6).

Commerce to go into detail about each piece of evidence: "{A}bsent a showing to the contrary, the court presumes that Commerce has considered all of the record evidence." *Jacobi Carbons AB v. United States,* 422 F. Supp. 3d 1318, 1325 n.10 (Ct. Int'l Trade 2019) (citation and bracketing omitted).   Commerce in this case documented its consideration of the parties' evidence and arguments, explained the conclusions it drew from the record, and cited evidence supporting its findings.   *See* Initiation Checklist, Att. II, pp. 9-16.

MSI also claims that the information it placed on the record demonstrates that fabricators had sufficient production-related activities.   *See* MSI Br. 16-17.   To the contrary, none of the exhibits that MSI proffered demonstrate that fabricators perform sufficient production-related activities to be considered producers.   Indeed, MSI's submission did not analyze the issue in terms of the six-factor production-related activities test.   *See generally* MSI Standing Comments, P.D. 39-40; C.D. 18-30.   In any event, Commerce considered MSI's evidentiary arguments and reasonably disagreed.   *See* Initiation Checklist, Att. II, pp. 9, 15 (documenting Commerce's consideration of MSI's comments).   We discuss each of MSI's exhibits below.

MSI's Exhibit 1 consists of screen shots from Cambria's website, showing that Cambria has experience dealing with fabricators and a fabricator log-in portal for business purposes.   MSI Standing Comments at Ex. 1.   If anything, this suggests that Cambria's experience makes it well-positioned to explain the differences between quartz surface product production and fabrication; it certainly does not establish that fabricators are producers.   MSI's Exhibits 2 and 3 consist of ITC questionnaires regarding quartz surface products from China and from India and Turkey, respectively, showing that at the time the ITC was also considering whether fabricators perform sufficient production-related activities for its own purposes.   *Id.* at Exs. 2-3.   Again, these do not establish that Commerce must treat fabricators as producers.   MSI's Exhibit 4 is a transcript from

21

an episode of the television show PBS Hometime, which shows that fabrication can be one step in the process of making a quartz countertop, but does not show its significance compared to overall quartz slab production.  *Id.* at Ex. 4.  MSI's Exhibit 5 is an affidavit filed in a lawsuit against Cambria by one of its former fabricators, indicating that investment in the fabricator shop was around six million dollars.  *Id.* at Ex. 5.  That is a fraction of the estimated forty to hundreds of millions in investment required for quartz slab production facilities.  *See* Initiation Checklist, Att. II, pg. 11 (citing Petitioner Standing Comments, P.D. 42; C.D. 33 at 7 & Exs. 2-4).  There is also record evidence that a fabricator shop can be established with significantly less investment than the six million figure.  *See id.*; Petitioner Standing Comments at 7-9 & Exs. 2, 5.

MSI's Exhibit 6 contains fabricator declarations that MSI obtained or solicited [


]  MSI Standing Comments, P.D. 39-40; C.D. 18-30 at Ex. 6.  Although these declarations show that [                                              ], they do not support MSI's claim that the information it placed on the record demonstrates that fabricators perform sufficient production-related activities.  Indeed, Cambria cited information contained in these declarations as further evidence that fabricators rely on imported quartz slabs to produce final fabricated products.  *See* Petitioner Standing Comments, P.D. 42; C.D. 33 at 20.  MSI's Exhibit 7 consists of product brochures that do not provide further insight into the fabrication process.  *See* MSI Standing Comments at Ex. 7.  Finally, to the extent that MSI relies on its own statements regarding the fabrication process, Commerce found that the activities MSI described were not sufficient to make fabricators "producers" for industry support purposes.  *See* Initiation

Checklist, Att. II, pp. 9, 15 & nn.63, 122, 124-25 (illustrating Commerce's consideration of MSI's arguments in ultimately finding fabricators' activities insufficient).

Thus, based on the record created by the parties, it was reasonable for Commerce to determine that fabricators do not perform sufficient production-related activities to be considered domestic producers of quartz surface product for industry support purposes.

### B.    Commerce And The ITC May Come To Different Conclusions

MSI contends that later-released ITC reports contradict Commerce's determination.  *See* MSI Br. 24-25.  However, the ITC and Commerce maintain separate records, have different statutory roles, and although both consider each other's decisions as they are available throughout their separate processes, they make their determinations based on the evidence from their respective records.  *See Asociacion Colombiana de Exportadores de Flores v. United States*, 693 F. Supp. 1165, 1168 n.4 (Ct. Int'l Trade 1988) ("For administrative ease and to avoid complications it would be helpful if the decisions of ITC and ITA were coterminous, but they are separate decisions that ultimately are made on separate bases.").

It is not unprecedented for Commerce and the ITC to reach different determinations regarding composition of the domestic industry for their respective purposes of determining industry support and injury.  For example, based on the record in *Chlorinated Isocyanurates from China*, Commerce determined that tableters did not perform sufficient production-related activities and were not producers for purposes of determining industry support.  *See Chlorinated Isocyanurates Initiation*, Att. II (Addendum B).  The ITC, by contrast, found both in its preliminary and final reports that tableters did perform sufficient production-related activities to be considered producers for purposes of determining injury.  *Chlorinated Isocyanurates from China and Japan*, Inv. Nos. 701-TA-501 and 731-TA-1226, USITC Pub. 4431, at 10-12 (Nov.

PUBLIC VERSION

2013) (prelim.); *Chlorinated Isocyanurates from China and Japan*, Inv. Nos. 701-TA-501 and

731-TA-1226, USITC Pub. 4494, at 8-10 (Nov. 2014) (final).

As Commerce explained, although Commerce and the ITC may apply the same statutory

term, such as "domestic like product," they do so for different purposes and pursuant to separate

and distinct authority.  *See Initiation*, 84 Fed. Reg. at 25,531; Initiation Checklist, Att. II, pg. 1.

This may result in different definitions, but such differences do not render the decision of either

agency contrary to law.  *See, e.g., Algoma Steel Corp., Ltd. v. United States*, 688 F. Supp. 639,

642, 644 (Ct. Int'l Trade 1988) (discussing potential inconsistencies between Commerce and

ITC), *aff'd*, 865 F.2d 240 (Fed. Cir. 1989); *cf. USEC II*, 281 F. Supp. 2d at 1345-46 (sustaining

Commerce's different interpretation of "producer" in different contexts as reasonable and

therefore lawful), *aff'd in relevant part*, *Eurodif I*, 411 F.3d at 1360-61; *Union Steel*, 713 F.3d at

1107-10 (sustaining Commerce's different interpretations of statute in different contexts).

Moreover, the statute requires Commerce to make its industry support determination

*before* it initiates an investigation and notifies the ITC.  19 U.S.C. § 1673a(c)(2), (d)(2).  The

ITC then makes its preliminary determination forty-five days after the petition is filed.  19

U.S.C. § 1673b(a)(2).  The statute also prohibits Commerce from reconsidering its industry

support determination after initiation.  19 U.S.C. § 1673a(c)(4)(E).  In other words, Commerce

cannot reconsider its initial industry support decision—irrespective of any new or additional

information.  Congress made that restriction on Commerce clear.  *See* SAA at 862 ("{T}he

question of industry support will be resolved conclusively at the outset of a proceeding, thereby

eliminating the burden on petitioners under current law of potentially rearguing this issue after

initiation.").  Here, Commerce analyzed the evidence and information on the record at the time

of initiation, including the most recently available ITC report regarding quartz surface products,

*i.e.*, the ITC preliminary report for the investigation of quartz surface products from China.  *See* Initiation Checklist. Att. II, pp. 14-15.  Given the nature of the industry support determination, and Commerce's clear restriction, it was appropriate for Commerce to do so.

The Court should equally evaluate Commerce's decision based on the evidence available at initiation.  *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 554-55 (1978) (If "litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening."); *Co-Steel Raritan, Inc. v. Int'l Trade Comm'n*, 357 F.3d 1294, 1316 (Fed. Cir. 2004) (same); *cf. Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012) (holding that trial court exceeded its authority by requiring Commerce to consider later-discovered evidence bearing on issue in dispute).

The ITC's preliminary report for the investigation of quartz surface products from China found that "the operations of stand-alone fabricators are insufficient to constitute domestic production of {quartz surface products}."  *Quartz Surface Products from China*, Inv. Nos. 701-TA-606 and 731-TA-1416, USITC Pub. 4794, at 15 (June 2018) (prelim.).  The ITC explained that the degree of capital investment necessary to fabricate quartz surface products was far below that required to produce quartz slab and that, although the expertise required of fabricators is not necessarily low, the quartz slab production process appears to involve considerably more specialized knowledge and employees.  *See id.*  The ITC also found that "quartz slab constitutes the bulk of the value of the fabricated product."  *Id.*  Finally, the ITC considered the fact that "{f}abricators of {quartz surface products} also appear to some degree to rely on imported quartz slab as an input in their production activities."  *Id.*  Commerce considered these findings

25

from the ITC, which were available at the time of initiation, and reasonably found that these findings further supported the conclusion that fabricators do not perform sufficient production-related activities to be considered domestic producers for purposes of determining industry support. *See* Initiation Checklist, Att. II, pg. 15. MSI's arguments that the ITC subsequently determined to include fabricators in the domestic industry for purposes of evaluating injury does not alter the reasonableness of Commerce's determination based on the record at initiation.

### C.    Commerce Made Its Determination Within The Statutory Deadline

MSI faults Commerce for not extending the deadline for determining whether to initiate an investigation based on Cambria's petition because, in its view, there was insufficient record evidence on industry support. MSI Br. 25-26. The statute, however, does not require Commerce to extend the initiation deadline. It authorizes Commerce to extend the deadline if "exceptional circumstances" exist. 19 U.S.C. 1673a(c)(1)(B) ("In any case in which the administering authority is required to poll or otherwise determine support for the petition by the industry under paragraph (4)(D), the administering authority *may*, in exceptional circumstances, apply subparagraph (A) by substituting 'a maximum of 40 days' for '20 days.'") (emphasis added).

Congress intended that "Commerce {would} use this extension authority only in exceptional circumstances where the industry support issue cannot be decided in twenty days." SAA at 863. Here, Commerce found sufficient evidence of the requisite support from domestic producers and workers, such that the petition requirements to initiate an investigation were met. *See generally* Initiation Checklist, Att. II. Moreover, Commerce had already considered whether to include fabricators as quartz surface product producers in its previous initiation determination regarding quartz surface products from China and found that it was inappropriate to do so. *See Certain Quartz Surface Products From the People's Republic of China*, 83 Fed. Reg. 22,613

PUBLIC VERSION

(Dep't of Commerce May 16, 2018), and accompanying Initiation Checklist (Petitioner Standing

Comments, P.D. 42; C.D. 33 at Ex. 1, Att. II).  Thus, there were no exceptional circumstances to

warrant extension of the initiation decision deadline.  This is especially so when Commerce

indicated that including the fabricators MSI identified would not have altered the ultimate

determination of industry support.  *See* Initiation Checklist, Att. II, pg. 16 n.129.

## IV.  Commerce's Determination To Include Pokarna's Paid Sample Sales In The Margin Calculation Is Lawful

Commerce's decision to include PESL's paid United States sample sales in its calculation

is lawful because there is no legal requirement that Commerce exclude them in an investigation

and Commerce's practice is not to do so.  In an investigation like this one, Commerce makes a

final determination regarding whether the subject merchandise is being, or is likely to be, sold in

the United States at less than its fair value.  19 U.S.C. § 1673.  In doing so, Commerce may

analyze and exclude sample sales made in the *home market*.  This flows from the dictates of the

statute.  For example, under 19 U.S.C. § 1677b(a)(1)(B), Commerce looks solely at prices for

sales made in the "ordinary course of trade" to determine normal value, and may exclude sales

that do not fall within the ordinary course of trade for that purpose.  *See* IDM at 14.  However, as

PESL acknowledges, this "ordinary course of trade" analysis is only relevant to *home market*

sales and does not apply to sales made to the United States.  *See* PESL Br. 13 n.2; IDM at 14.

When it comes to sales to the United States in an investigation, consistent with the statute

and relevant jurisprudence, Commerce reviews paid sample sales to determine if they are "sold"

—meaning that they consist of a "transfer of ownership to an unrelated party and consideration."

IDM at 14 (quoting *NSK Ltd. v. United States*, 115 F.3d 965, 975 (Fed. Cir. 1997)).  If a paid

sample sale to the United States market meets these criteria, Commerce includes it in the margin

calculation for the investigation.  *See id.*  Commerce here carried out that analysis, investigated

and verified that PESL's paid sample sales to the United States involved a "transfer of ownership to an unrelated party and consideration," and thus appropriately determined that PESL's paid sample sales should be included in the margin calculation.  *See id.*  That decision is consistent with Commerce's past practice.  *See id.* (citing *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from Switzerland,* 83 Fed. Reg. 16,293 (Dep't of Commerce Apr. 16, 2019) (final determ.), at IDM Cmt. 1 (finding that home market sample sales were "sold" under *NSK* definition, while excluding certain sales as outside "the ordinary course of trade")).

Indeed, we are not aware of any instance in which Commerce has excluded paid United States sample sales in an antidumping duty investigation.  As PESL acknowledges, in the only two instances PESL identifies in which a party has even raised the possibility of Commerce doing so, Commerce never reached the issue.  *See* PESL Br. 15.

Also consistent with the statute, Commerce's practice regarding United States sales in *reviews* differs from its practice regarding such sales in investigations.  In reviews, pursuant to 19 U.S.C. § 1675(a)(2)(B)(iv), Commerce may evaluate whether a sample sale is *bona fide* for purposes of calculating the dumping margin.  *See* IDM at 14.  Performing a *bona fides* analysis in reviews enables Commerce to identify sales that may be fraudulent or otherwise manipulative with respect to an existing order.  *See id.*  Because the *bona fide* sales provision is contained within 19 U.S.C. § 1675 governing reviews, not investigations, Commerce does not exclude paid sample sales that meet the criteria of a "transfer of ownership to an unrelated party and consideration" or otherwise perform a *bona fide* sales analysis in investigations.  *See id.*  Further, even assuming that PESL is correct in the sense that there theoretically may be cases in which Commerce would find it appropriate to apply a *bona fide* sales analysis in an investigation, PESL fails to demonstrate that the law requires Commerce to do so.

As PESL acknowledges, in an administrative review or new shipper review, "Commerce has the discretionary authority to exclude certain U.S. sales from its analysis if such sales are atypical or unrepresentative."  PESL Br. 14.  Commerce's authority derives from section 1675(a)(2)(B)(iv), which governs how Commerce carries out its duties in new shipper reviews. The subsection, which Congress inserted in the overarching statutory section governing administrative reviews, instructs Commerce to base its findings in new shipper reviews solely on *bona fide* sales to the United States.  19 U.S.C. § 1675(a)(2)(B)(iv).  Although this provision contains an explicit reference to new shipper reviews, Commerce has interpreted its inclusion in the section governing administrative reviews as evidence that it can also apply *bona fide* sales analysis in administrative reviews, as it had already been Commerce's practice to do so.  *See* IDM at 14; *see also Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China*, 85 Fed. Reg. 9,459 (Dep't of Commerce Feb. 19, 2020) (final admin. review), at IDM Cmt. 1 (*TRBs from China*); *Honey from the People's Republic of China*, 85 Fed. Reg. 45,187 (Dep't of Commerce July 27, 2020), at IDM Cmt. 1 (*Honey from China*).

Prior to the 2016 amendment enacting 19 U.S.C. 1675(a)(2)(B)(iv), in fact, Commerce's longstanding practice had been to apply a *bona fides* analysis in both new shipper reviews and administrative reviews.  *See Honey from China*, 85 Fed. Reg. 45,187, at IDM Cmt. 1.  The 2016 amendment codified Commerce's practice by making a *bona fides* analysis mandatory in new shipper reviews, *without* adding a similar obligation for administrative reviews or investigations. *See* Trade Facilitation and Enforcement Act of 2015, Pub. L. No. 114-125 § 433, 130 Stat. 122, 171 (2016).  Thus, as PESL readily acknowledges, the statute is silent with respect to whether Commerce must apply a *bona fides* test in investigations.  *See* PESL Br. 7-12.

Given Congress's silence regarding application of a *bona fide* sales test in administrative reviews and investigations, Commerce has determined that it is not required to apply a *bona fide* sales test in circumstances outside of a new shipper review, but may do so in circumstances the agency finds appropriate.  *See TRBs from China*, 85 Fed. Reg. 9,459 at IDM Cmt. 1; *Honey from China*, 85 Fed. Reg. 45,187, at IDM Cmt. 1.  This Court has held that Commerce's interpretation is reasonable, that Commerce is neither precluded from nor required to apply the *bona fide* sales test in an administrative review, and that Congress's presumed knowledge of Commerce's administrative practice when it amended 19 U.S.C. § 1675 "lends force to the notion that Congress's amendments do not speak to Commerce's practice within the context of an administrative review."  *Novolipetsk Steel Public Joint Stock Co. v. United States*, 483 F. Supp. 3d 1281, 1286-87 (Ct. Int'l Trade 2020), *appeal docketed* No. 21-1622 (Fed. Cir. Apr. 21, 2021); *see also Windmill Int'l Pte., Ltd. v. United States*, 193 F. Supp. 2d 1303, 1312-14 (Ct. Int'l Trade 2002) (ruling that Commerce reasonably applied *bona fide* sales test in administrative review based on its practice prior to 2016 amendment).

PESL takes this principle one step further, arguing that, because Commerce has the authority to exclude certain United States sales from its analysis in new shipper reviews or administrative reviews, Commerce *must* exclude such sales from the margin calculation in investigations.  *See* PESL Br. 13-15.  This argument creates a legal obligation where none exists, seeking to turn Commerce's discretionary authority to exclude sales into an affirmative duty. Despite its admission that the statute is silent, PESL attempts to justify its advocacy for an affirmative statutory obligation by claiming that accuracy and fair comparison concerns render Commerce's practice of not employing *bona fides* analysis in investigations unreasonable.  *See* PESL Br. 12-14.  The Federal Circuit has clarified, however, that "a Commerce determination

(1) is 'accurate' if it is correct as a mathematical and factual matter, thus supported by substantial evidence; and (2) reflects 'commercial reality' if it is consistent with the method provided in the statute, thus in accordance with law." *Nan Ya Plastics Corp., Ltd. v. United States*, 810 F.3d 1333, 1343-44 (Fed. Cir. 2016).  PESL cannot credibly claim that Commerce's practice, which relies on the actual sale prices for PESL's paid sample sales, is inaccurate in this sense or inconsistent with any statutory method.  Likewise, contrary to PESL's invocation of "fair comparison" considerations, Commerce explained that it verified that PESL's paid sample sales were valid "sales" (as court have defined that term) because they consisted of a "transfer of ownership to an unrelated party and consideration."  IDM at 14 (quoting *NSK*, 115 F. 3d at 975).  And as the Court recognized in *Novolipetsk*, Congress easily could have amended the statute in 2016 to provide the affirmative obligation PESL advocates, but did not do so.  *See* 483 F. Supp. 3d at 1287.  Although a *bona fide* sales test may be preferable for PESL's interests, in the absence of expressed intent from Congress, the discretion regarding whether to apply a *bona fide* sales test in this instance ultimately lies with Commerce, not PESL.

Moreover, there are good reasons for Commerce to apply *bona fides* analysis in reviews, but not investigations.  As Commerce explained in its determination, "section 751(a)(2)(B)(iv) of the Act, which provides for determinations based on *bona fide* sales, pertains to administrative reviews."  IDM at 14.  Given the need to identify sales that may be fraudulent or otherwise manipulative with respect to an existing order, Commerce applies the *bona fide* sales test in both administrative reviews and new shipper reviews.  *See id.*; *TRBs from China*, 85 Fed. Reg. 9,459 at IDM Cmt. 1; *Honey from China*, 85 Fed. Reg. 45,187, at IDM Cmt. 1.  Commerce performs a *bona fide* sales test in these proceedings to "ensure that a producer does not unfairly benefit from an atypical sale to obtain a lower dumping margin than the producer's usual commercial practice

PUBLIC VERSION

would dictate." *Huzhou Muyun Wood Co. v. United States*, 324 F. Supp. 3d 1364, 1376 (Ct. Int'l Trade 2018). Additionally, although Commerce is required to perform a *bona fide* sales test in all new shipper reviews, Commerce's practice in exercising its discretion to apply the *bona fide* sales test in reviews is only to apply the test in some, rather than all, administrative reviews. *See*, *e.g.*, *TRBs from China*, 85 Fed. Reg. 9,459 at IDM Cmt. 1. Situations in which it is appropriate to apply the *bona fide* sales test in an administrative review may include, for example, instances in which the review is based on a single entry or transaction, warranting further scrutiny because there are fewer transactions from which to draw conclusions about the respondent's selling practices. *See Novolipetsk*, 483 F. Supp. 3d at 1288; *Windmill*, 193 F. Supp. 2d at 1313-14.

Unlike investigations, both new shipper reviews and administrative reviews involve reviewing exporters and producers under an existing antidumping duty order. Because the exporter or producer in question has notice that it is subject to the discipline of an existing order and potential duty liability, Commerce performs a *bona fide* sales test to ensure that the exporter or producer has not manipulated their sales in light of the existing order to receive a lower individual rate or margin. *See*, *e.g.*, *Huzhou*, 324 F. Supp. 3d at 1376; *Novolipetsk*, 483 F. Supp. 3d at 1287 ("The legislative history indicates that Congress was driven by concerns that exporters and producers were abusing the ability to obtain a new shipper rate on an expedited basis in order to circumvent antidumping and countervailing duties."). In an investigation, however, where an order is not yet in place and the exporter or producer is not yet subject to its discipline, the same incentive does not exist for a producer to make atypical sales to receive a lower dumping rate or margin. *See Melamine From the People's Republic of China*, 86 Fed. Reg. 13,528 (Dep't of Commerce Mar. 9, 2021) (final sunset review), and accompanying IDM at 4 ("Generally, Commerce selects the dumping margins from the final determination in the

original investigation, as these rates are the only calculated rates that reflect the behavior of exporters without the discipline of an order in place.") (citations omitted).

Consequently, as we noted above, PESL fails to point to a single past instance in which Commerce has applied a *bona fide* sales analysis in an investigation (and we are not aware of any). Instead, PESL relies heavily on case law discussing application of Commerce's *bona fide* sales test in administrative or new shipper reviews. *See* PESL Br. 13-15. But as we explained, those proceedings following issuance of an order present different concerns about potential manipulation than those present in an investigation when no order exists. Similarly, the only two investigations PESL cites as support for its argument are ones in which Commerce never addressed the appropriateness of applying a *bona fide* sales analysis. *See id.* at 15 (citing *Large Diameter Welded Pipe from Canada, Greece, Korea, and Turkey*, 84 Fed. Reg. 6,378 (Dep't of Commerce Feb. 27, 2019) (final determ.), at IDM Cmt. 2; *Uncovered Innerspring Units from the People's Republic of China*, 73 Fed. Reg. 79,443 (Dep't of Commerce Dec. 29, 2008) (final determ.), at IDM Cmt. 2. In both determinations, Commerce made no finding regarding whether or not it was appropriate to apply a *bona fide* sales test because doing so was unnecessary. Here, by contrast, Commerce acted within its statutory discretion to determine that PESL's paid sample sales consist of a "transfer of ownership to an unrelated party and consideration," that satisfy the criteria for inclusion in the margin calculations, and that a *bona fide* sale test was not appropriate in an investigation. *See* IDM at 14.

Finally, PESL incongruously draws a comparison between Commerce's exercise of its statutory discretion here *not to employ* a *bona fides* analysis that the statute does not otherwise require, and decisions upholding Commerce's exercise of discretion *to employ* methods of analysis that the statute does not otherwise require. *See* PESL Br. 11. The opposite nature of

PUBLIC VERSION

these cases makes the comparison inapt.  Statutory silence does not preclude Commerce from

employing *bona fides* analysis in investigations, but it surely does not require it either.  A more

apt comparison is to decisions sustaining as *lawful* Commerce's practice of *declining* to apply its

now-withdrawn "Limiting Rule" regulation in administrative reviews, when the regulation by its

terms only applied to investigations.  *See Apex Frozen Foods Priv. Ltd. v. United States*, 37 F.

Supp. 3d 1286, 1303 (Ct. Int'l Trade 2014), *aff'd*, 862 F.3d 1322, 1335-36 (Fed. Cir. 2017).

Similarly, given that there is no statutory requirement to perform a *bona fide* sales analysis on

otherwise paid United States sales in an investigation, Commerce has no obligation to do so.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court deny plaintiffs' motions and

sustain Commerce's final determination.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:                                          /s/ Joshua E. Kurland
VANIA WANG                                        JOSHUA E. KURLAND
W. MITCH PURDY                                  Trial Attorney
Attorneys                                                U.S. Department of Justice
Office of the Chief Counsel                      Civil Division
for Trade Enforcement and Compliance   Commercial Litigation Branch
U.S. Department of Commerce               P.O. Box 480, Ben Franklin Station
Washington, D.C.                                     Washington, D.C. 20044
                                                               Telephone: (202) 616-0477
                                                               E-mail: Joshua.E.Kurland@usdoj.gov

May 26, 2021                                          *Attorneys for Defendant United States*

Addendum A

Barcode:3172929-01 A-570-008 INV - Investigation   -

A-570-008
Investigation
POI: 4/1/2013-9/30/2013
~~Proprietary Document~~
E&C/V:  KJA
Public Version

January 7, 2014

---

### ENFORCEMENT AND COMPLIANCE[1]
### OFFICE OF AD/CVD ENFORCEMENT
### AD INVESTIGATION INITIATION CHECKLIST

---

**SUBJECT:**     Calcium Hypochlorite from the People's Republic of China ("PRC")
**CASE NUMBER:**     A-570-008

---

**PETITIONER:**

Arch Chemicals, Inc.
5660 Northside Parkway
Suite 1100
Atlanta, GA 30328
Tel: 678-627-2494

**COUNSEL TO PETITIONER:**

Peggy A. Clarke
Law Offices of Peggy A. Clarke
1325 G Street, NW
Suite 500
Washington, DC 20005
Tel:  202-552-7407

---

**POTENTIAL RESPONDENTS:**

A list of the producers of calcium hypochlorite in the PRC identified by Arch Chemicals, Inc.
("Petitioner") can be found in the "Petition for the Imposition of Antidumping Duties on Imports
of Calcium Hypochlorite from the People's Republic of China," dated December 18, 2013
("Petition").[2]

---

[1] Formerly, Import Administration.
[2] See Volume I of the Petition, at 4 and Exhibit GEN-3.

**SCOPE:** <u>See</u> Attachment I – Scope of the Investigation, to this checklist.

## IMPORT STATISTICS:

| PRC | 2010 | 2011 | 2012 | YTD 2012 (Jan-Sept) | YTD 2013 (Jan-Sept) |
|---|---|---|---|---|---|
| Quantity (1,000 pounds) | 6,707 | 9,481 | 10,626 | 9,509 | 12,037 |
| Value (USD) | 4,439,894 | 6,531,531 | 7,797,883 | 6,912,716 | 8,423,997 |

Source:  United States International Trade Commission ("ITC") Dataweb, available at http://dataweb.usitc.gov/. Petitioner reported the volume (converted from kilograms to pounds) and landed duty-paid value of imports of calcium hypochlorite using Harmonized Tariff Schedule of the United States ("HTSUS") subheading 2828.10.0000.[3]

## APPROXIMATE CASE CALENDAR:

| Event | No. of Days | Date of Action | Day of Week |
|---|---|---|---|
| | | **Antidumping Duty Investigation** | |
| Petition Filed | 0 | December 18, 2013 | Wednesday |
| Initiation Date | 20 | January 7, 2014 | Tuesday |
| ITC Preliminary Determination | 45 | February 3, 2014 | Monday* |
| ITA Preliminary Determination†** | 160 | May 27, 2014 | Tuesday |
| ITA Final Determination† | 235 | August 11, 2014 | Monday* |
| ITC Final Determination*** | 280 | September 24, 2014 | Wednesday |
| Publication of Order**** | 287 | October 1, 2014 | Wednesday |

* Where the deadline falls on a weekend/holiday, the appropriate date is the next business day.
† These deadlines may be extended under the governing statute.
** This will take place only in the event of a preliminary affirmative determination from the ITC.
*** This will take place only in the event of a final affirmative determination from the International Trade Administration ("ITA").
**** This will take place only in the event of a final affirmative determination from the ITA and the ITC.
<u>Note</u>:  The ITC final determination will take place no later than 45 days after a final affirmative ITA determination.
<u>Note</u>:  Publication of order will take place approximately 7 days after an affirmative ITC final determination.

---

[3] <u>See</u> Volume I of the Petition, at 17 and Exhibit INJ-2.

**INDUSTRY SUPPORT:**

Do Petitioner and those expressing support for the Petition account for more than 50% of production of the domestic like product?

| | |
|---|---|
| ☒ | Yes |
| ☐ | No |

If No, do those expressing support account for the majority of those expressing an opinion and at least 25% of domestic production?

| | |
|---|---|
| ☐ | Yes |
| ☐ | No |
| ☒ | Not Applicable |

Describe how industry support was established - specifically, describe the nature of any polling or other step undertaken to determine the level of domestic industry support.

See Attachment II, Analysis of Industry Support for the Petitions Covering Calcium Hypochlorite from the People's Republic of China, to this checklist.

Was there opposition to the Petition?

| | |
|---|---|
| ☐ | Yes |
| ☒ | No |

Are any of the parties who have expressed opposition to the Petition either importers or domestic producers affiliated with foreign producers?

| | |
|---|---|
| ☐ | Yes |
| ☐ | No |
| ☒ | Not Applicable |

**INJURY ALLEGATION:**

We received a copy of the action notice from the Director of the Office of Investigations at the ITC which was signed on December 18, 2013.  It indicates that the ITC has instituted an investigation to determine whether there is a reasonable indication that the domestic industry

-3-

producing calcium hypochlorite is materially injured or threatened with material injury.[4]

The relevant injury data can be found in Volume I of the Petition, at 17-30 and Exhibits INJ-1 through INJ-8.[5]

Does the Petition contain evidence of causation?  Specifically, does the Petition contain information relative to:

⊠    volume and value of imports (See Volume I of the Petition, at 17-19, 22, 26-27 and Exhibits INJ-1 and INJ-2.)

⊠    U.S. market share (i.e., the ratio of imports to consumption) (See Volume I of the Petition, at 19, 22 and Exhibit INJ-3.)

⊠    actual pricing (i.e., evidence of decreased pricing) (See Volume I of the Petition, at 19-20, 23-24, 28-29 and Exhibits INJ-4 and INJ-6 through INJ-8.)

⊠    relative pricing (i.e., evidence of imports underselling U.S. products) (See Volume I of the Petition, at 23, 28 and Exhibit INJ-4.)

## PETITION REQUIREMENTS:

Does the Petition contain the following?

⊠    the name, address, and telephone number of Petitioner (See Volume I of the Petition, at 2.)

⊠    the names, addresses, and telephone numbers of all domestic producers of the domestic like product known to the petitioning company (See Volume I of the Petition, at 2.)

⊠    the volume or value of the domestic like product produced by Petitioner and each domestic producer identified for the most recently completed 12-month period for which data is available (See Volume I of the Petition, at 3-4 and Exhibit GEN-2.)

Was the entire domestic industry identified in the Petition?

⊠    Yes (See Volume I of the Petition, at 2 and Exhibit GEN-2.)

☐    No

---

[4] See Attachment IV to this checklist.
[5] See Attachment III, Analysis of Allegations and Evidence of Material Injury and Causation for the Petitions Covering Calcium Hypochlorite from the People's Republic of China.



☒  a clear and detailed description of the merchandise to be investigated, including the appropriate Harmonized Tariff Schedule numbers (See Volume I of the Petition, at 4-13 and Exhibits GEN-2 and GEN-5 through GEN-14; see also General Issues Supplement, dated December 30, 2013 ("General Issues Supplement"), at 2-3; and Memo to the File Regarding Revised Scope Language, dated December 31, 2013 ("Scope Memo").)

☒  the name of each country in which the merchandise originates or from which the merchandise is exported (See Volume I of the Petition, at 4.)

☒  the identity of each known exporter, foreign producer, and importer of the merchandise (See Volume I of the Petition, at 4 and Exhibits GEN-3 and GEN-4.)

☒  a statement indicating that the Petition was filed simultaneously with the Department of Commerce and the ITC (See Petition cover letter, at 3.)

☒  an adequate summary of the proprietary data (See public version of the Petition, and public version of the Supplement to the PRC AD Petition, dated December 23, 2013 ("PRC AD Supplement").)

☒  a statement regarding release under administrative protective order (See Petition cover letter, at 1-2, and PRC AD Supplement cover letter, at 1.)

☒  a certification of the facts contained in the Petition by an official of the petitioning firm(s) and its legal representative (if applicable) (See attachments to the Petition cover letter, attachments to the General Issues Supplement, and attachments to the PRC AD Supplement.)

☒  import volume and value information for the most recent two-year period (See Volume I of the Petition, at Volume I of the Petition, at 17-19, 22, 26-27 and Exhibits INJ-1 and INJ-2.)

---

**LESS THAN FAIR VALUE ALLEGATION:**

In accordance with 19 CFR 351.204(b)(1), because the Petition was filed on December 18, 2013, the proposed period of investigation ("POI") is April 1, 2013, through September 30, 2013.

On December 19, 2013, the Department issued supplemental questions to Petitioner regarding Petitioner's less than fair value allegation.  Petitioner responded to the Department's AD Supplement to the Petition on December 23, 2013.

<u>Export Price</u>

Petitioner based its calculation of export price ("EP") on the average unit value ("AUV") of U.S. imports of calcium hypochlorite from the PRC during the POI, under the HTSUS subheading

2828.10.0000.  Based on U.S. imports of calcium hypochlorite for consumption, Petitioner has calculated a POI weighted average U.S. customs price of $1.34/kg.[6]  Petitioner deducted from this POI weighted average an amount for foreign brokerage and handling charges in the PRC, and foreign inland freight from the manufacturing plant to the port of exportation.[7]  As this methodology is consistent with our past practice, we have relied on the POI-weighted average AUV as the basis for EP.

Did the Petition contain the following?

   ☒ support documentation for the alleged prices (See Volume II of the Petition, at 4-5 and Exhibits AD-5 through AD-14; see also PRC AD Supplement, at 2-4 and revised Exhibits AD-9, AD-11, and AD-14 and Exhibits AD-28 and AD-29).

   N/A any market research reports including an affidavit referring to sources and how information was obtained.

   ☒ current price data (See Volume II of the Petition at 4-5 and Exhibits AD-5 and AD-14).

   ☐ price and cost data from contemporaneous time periods.

   ☒ correct currency rates used for all conversions to U.S. dollars (See Volume II of the Petition, at Exhibit AD-13).

   ☒ conversion factors for comparisons of differing units of measure (See Volume II of the Petition, at Exhibit AD-17).

## Normal Value

Petitioner states that the Department has treated the PRC as a non-market economy ("NME") country in every proceeding in which the PRC has been involved, and has continued to do so in all administrative proceedings concluded in recent months.[8]

In accordance with section 771(18)(C)(i) of the Tariff Act of 1930, as amended ("Act"), the presumption of NME status for the PRC has not been revoked by the Department and, therefore, remains in effect for purposes of the initiation of this investigation.  Accordingly, the normal value ("NV") of the product is appropriately based on factors of production ("FOP") valued in a surrogate market-economy country in accordance with section 773(c) of the Act.

Petitioner contends that the Philippines is the appropriate surrogate country for the PRC because: 1) it is at a level of economic development comparable to that of the PRC; and 2) it is a

---

[6] See Volume II of the Petition, at 4 and Exhibits AD-5 and AD-14; see also Supplement to the PRC AD Petition, dated December 23, 2013 ("PRC AD Supplement"), at 2-4 and revised Exhibit AD-14.
[7] See Volume II of the Petition, at 4 and Exhibits AD-6 through AD-14; see also PRC AD Supplement, at 2-4 and revised Exhibits AD-9, AD-11, AD-14, and AD-27.
[8] See Volume II of the Petition, at 1-2.

significant producer of comparable merchandise.[9]  With regard to economic comparability, Petitioner notes that the Department's Office of Policy regularly includes the Philippines in its memoranda identifying market economy countries it has determined to be comparable to the PRC in terms of economic development, and the Philippines was found to be a suitable surrogate country for use in a recent review of a product found by the Department to be comparable to calcium hypochlorite, chlorinated isocyanurates.[10]  Lastly, Petitioner submits that data for valuing FOPs in the Philippines are available and reliable and contends that the aforementioned combination of factors makes the Philippines an appropriate surrogate country for purposes of this investigation.[11]

Valuation of Raw Materials and By-Product

Petitioner based its NV on two different production methods.[12]  For a non-integrated production process, which Petitioner believes to be comparable to some calcium hypochlorite producers in the PRC, Petitioner based NV on its own U.S production experience during the time period January – September 2013.[13]  For the production process of an integrated producer of calcium hypochlorite, Petitioner based NV on a 2009 feasibility study conducted by Petitioner that analyzed the costs associated with setting up a fully integrated facility.[14]  This study was supported by an affidavit from the individual who assisted with the calculation of expected per-kg FOPs.[15]  Petitioner also submitted information indicating that at least one major PRC producer employs an integrated production process.[16]

Petitioner valued all raw material FOPs using publicly available surrogate country data.[17] Specifically, Petitioner used Philippine import statistics from the Global Trade Atlas ("GTA"), which contains a majority of the inputs required to produce calcium hypochlorite.[18]  For two FOPs that did not have imports during the presumptive POI, steam/natural gas and hydrogen, Petitioner relied upon the surrogate values used in the recent preliminary results of review of chlorinated isocyanurates from the PRC.[19]  Petitioner relied on data from GTA for the most recent six-month period for which data was available (i.e., March 2013 through August 2013).[20] Petitioner excluded from these GTA import statistics imports from NME countries, countries that maintain broadly available export subsidies, and any imports from "unspecified" countries.[21]

---

[9] Id., at 2-4 and Exhibits AD-2 and AD-3.
[10] Id., at 2-3.  Petitioner also stated that the Department has found that both calcium hypochlorite and sodium hypochlorite constitute products comparable to chlorinated isocyanurates, citing Chlorinated Isocyanurates From the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2010-2011, 78 FR 4386 (Jan. 22, 2013) and accompanying Issues and Decision Memorandum at Comment 1.
[11] Id., at 4.
[12] Id., at 5-6.
[13] Id., at 5-6 and Exhibits AD-17 and AD-19.
[14] Id., at 6 and Exhibits AD-16, AD-17 and AD-19.
[15] Id., at Exhibit AD-18.
[16] Id., at 5 and Exhibit AD-15.
[17] Id., at Exhibit AD-19.
[18] Id., at 6-7 and Exhibits AD-20 and AD-21.
[19] Id., at 6-7 and Exhibit AD-22.
[20] Id., at 6-7 and Exhibit AD-20.
[21] Id., at 6.

Petitioner calculated a by-product offset for brine and hydrogen produced during the production of calcium hypochlorite using GTA import data.[22]

<u>Valuation of Direct and Indirect Labor</u>

Consistent with the Department's recent practice, Petitioner calculated the labor expense rate using the most recent Chapter 6A International Labor Organization wage data for the Philippines.[23]

<u>Valuation of Electricity and Water</u>

Petitioner valued energy costs using industry rates published by the Manila Electric Company.[24] Petitioner valued water using rates published by Maynilad Water.[25]

<u>Valuation of Packing Materials</u>

Petitioner valued packing materials using GTA data from the Philippines.  Petitioner limited its valuation of packing materials to 45-kg drums, wooden pallet and plastic packaging film because the majority of calcium hypochlorite imported from the PRC is packaged in this manner.[26]

<u>Valuation of Factory Overhead</u>

To calculate factory overhead, Petitioner relied on the financial statements of Mabuhay Vinyl Corporation ("Mabuhay Vinyl"), a Philippine manufacturer of sodium hypochlorite, for the year ending December 31, 2012.[27]  Petitioner asserts that sodium hypochlorite is a product comparable to calcium hypochlorite and notes that Mabuhay Vinyl is the company currently being relied upon for financial ratios in the ongoing administrative review of chlorinated isocyanurates.[28]

Specifically, Petitioner derived Mabuhay Vinyl's total factory overhead cost by summing the values for raw materials, labor and energy.[29]  Petitioner then calculated Mabuhay Vinyl's factory overhead ratio by dividing the total factory overhead cost by the sum of the values calculated for the raw materials, labor and energy.[30]

---

[22] <u>Id.</u>, at 8 and Exhibit AD-19.
[23] <u>Id.</u>, at 7 and Exhibit AD-23.
[24] <u>Id.</u>, at 7 and Exhibit AD-24.
[25] <u>Id.</u>, at 7 and Exhibit AD-25.
[26] <u>Id.</u>, at 8 and Exhibits AD-17, AD-19 and AD-20; <u>see</u> <u>also</u> Volume I of the Petition, at Exhibit GEN-2.
[27] <u>See</u> Volume II of the Petition, at 8 and Exhibit AD-26.
[28] <u>Id.</u>
[29] <u>Id.</u>, at Exhibit AD-26.
[30] <u>Id.</u>

Barcode:3172929-01 A-570-008 INV - Investigation  -

<u>Valuation of Selling, General and Administrative ("SG&A") Expenses</u>

To calculate the SG&A expense ratio, Petitioner relied on Mabuhay Vinyl's financial statements.[31]  Specifically, the ratio was calculated by computing Mabuhay Vinyl's SG&A expenses as a percentage of the net raw materials, labor, energy and manufacturing overhead derived from Mabuhay Vinyl's financial statements.[32]

<u>Valuation of Profit</u>

To calculate the profit ratio, Petitioner relied on Mabuhay Vinyl's financial statements.[33]  The ratio was calculated by computing Mabuhay Vinyl's profit before taxes as a percentage of the total of raw materials, labor, energy, manufacturing overhead, and SG&A and finance costs derived from Mabuhay Vinyl's financial statements.

**ESTIMATED MARGIN:**

The dumping margins (based on comparison of EP and NV for both integrated and non-integrated production processes) for the PRC are 182.51-210.52 percent.[34]

---

**RECOMMENDATION:**

We have examined the accuracy and adequacy of the evidence provided in the Petition as discussed in this checklist and attachments, and recommend determining that the evidence is sufficient to justify the initiation of an antidumping duty investigation with regard to the PRC. We also recommend determining that the Petition has been filed on behalf of the domestic industry.

---

[31] <u>Id.</u>
[32] <u>Id.</u>
[33] <u>Id.</u>
[34] <u>See</u> PRC AD Supplement, at 3-4 and revised Exhibit AD-27.

Filed By: kabir archuletta, Filed Date: 1/10/14 9:01 AM, Submission Status: Approved

Barcode:3172929-01 A-570-008 INV - Investigation  -

**ATTACHMENTS:**

    I.    Scope of the Investigation
    II.   Industry Support
    III.  Analysis of Allegations and Evidence of Material Injury and Causation
    IV.  Action Letter from the ITC

## Attachment I

## Scope of the Investigation

The product covered by this investigation is calcium hypochlorite, regardless of form (e.g., powder, tablet (compressed), crystalline (granular), or in liquid solution), whether or not blended with other materials, containing at least 10% available chlorine measured by actual weight.  The scope also includes bleaching powder and hemibasic calcium hypochlorite.

Calcium hypochlorite has the general chemical formulation $Ca(OCl)_2$, but may also be sold in a more dilute form as bleaching powder with the chemical formulation, $Ca(OCl)_2.CaCl_2.Ca(OH)_2.2H_2O$ or hemibasic calcium hypochlorite with the chemical formula of $2Ca(OCl)_2.Ca(OH)_2$ or $Ca(OCl)_2.0.5Ca(OH)_2$.  Calcium hypochlorite has a Chemical Abstract Service ("CAS") registry number of 7778-54-3, and a U.S. Environmental Protection Agency ("EPA") Pesticide Code ("PC") Number of 014701.  The subject calcium hypochlorite has an International Maritime Dangerous Goods ("IMDG") code of Class 5.1 UN 1748, 2880, or 2208 or Class 5.1/8 UN 3485, 3486, or 3487.

Calcium hypochlorite is currently classifiable under the subheading 2828.10.0000 of the Harmonized Tariff Schedule of the United States ("HTSUS").  The subheading covers commercial calcium hypochlorite and other calcium hypochlorite.  When tableted or blended with other materials, calcium hypochlorite may be entered under other tariff classifications, such as 3808.94.5000 and 3808.99.9500, which cover disinfectants and similar products.  While the HTSUS subheadings, the CAS registry number, the U.S. EPA PC number, and the IMDG codes are provided for convenience and customs purposes, the written description of the scope of this investigation is dispositive.

Barcode:3172929-01 A-570-008 INV - Investigation  -

## Attachment II

### Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Calcium Hypochlorite from the People's Republic of China

**Background**

Sections 702(c)(4)(A) and 732(c)(4)(A) of the Tariff Act of 1930, as amended ("the Act"), state that the administering authority shall determine that a petition has been filed by or on behalf of the industry if the domestic producers or workers who support the petition account for: (1) at least 25 percent of the total production of the domestic like product; and (2) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the petition. The above-referenced Petitions[1] contain data supporting a finding that Petitioner's[2] share is at least 25 percent of total production of the domestic like product and more than 50 percent of the domestic like product production of those producers expressing support for, or opposition to, the Petitions.

Section 771(4)(A) of the Act defines "industry" as the producers of a domestic like product. Thus, to determine whether a petition has the requisite industry support, the Act directs the Department of Commerce ("the Department") to look to producers and workers who produce the domestic like product. The International Trade Commission ("ITC"), which is responsible for determining whether "the domestic industry" has been injured, must also determine what constitutes a domestic like product in order to define the industry. While both the Department and the ITC must apply the same statutory definition regarding the domestic like product (section 771(10) of the Act), they do so for different purposes and pursuant to a separate and distinct authority. In addition, the Department's determination is subject to limitations of time and information. Although this may result in different definitions of the like product, such differences do not render the decision of either agency contrary to law.[3]

Section 771(10) of the Act defines the domestic like product as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle." Thus, the reference point from which the domestic like product analysis begins is "the article subject to an investigation," i.e., the class or kind of merchandise to be investigated, which normally will be the scope as defined in the Petitions. While the Department is not bound by the factors used by the ITC to determine the domestic like product in answering this question, we reviewed these factors as presented by Petitioner. The factors are: (1) physical characteristics and uses; (2) interchangeability; (3) channels of distribution; (4) customer and producer perceptions; (5) common manufacturing facilities,

---

[1] See Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Calcium Hypochlorite from the People's Republic of China, dated December 18, 2013 ("the Petitions"). Petitioner filed the General Issues Supplement to the Petitions, dated December 30, 2013 ("General Issues Supplement"), in response to the Department's request for additional information regarding the Petitions.

[2] Petitioner is Arch Chemicals, Inc. ("Arch Chemicals").

[3] See USEC, Inc. v. United States, 132 F. Supp. 2d 1, 8 (CIT 2001) (citing Algoma Steel Corp. Ltd. v. United States, 688 F. Supp. 639, 644 (CIT 1988), aff'd 865 F.2d 240 (Fed. Cir. 1989)).

*Contains Business Proprietary Information*

processes, and employees; and (6) price.[4]  With regard to the domestic like product, Petitioner does not offer a definition of domestic like product distinct from the scope of the investigations.[5]  For a detailed analysis and discussion, see the "Analysis of Domestic Like Product" section below.

**Analysis of Domestic Like Product**

### A.  Calcium Hypochlorite

Petitioner addresses the six criteria used by the ITC to determine the domestic like product in Volume I of the Petitions, at 13-17.  Petitioner contends that all calcium hypochlorite constitutes a single domestic like product.  Petitioner makes the following arguments:

### 1)  Physical Characteristics and Uses

According to Petitioner, all calcium hypochlorite has similar compositions and is produced by mixing chlorine and lime.[6]  Petitioner notes that, although there are various methods for producing calcium hypochlorite and other ingredients may be involved, the final calcium hypochlorite contains the same chemical compound $(CA(OCl)_2)$.[7]  Petitioner further states that all calcium hypochlorite is typically either a white, solid concentrate in powder, tablet, or crystalline (granular) form or a liquid solution.[8]  Petitioner also notes that calcium hypochlorite has a distinct chlorine odor.[9]  In addition, Petitioner states that calcium hypochlorite "is a chemically stable means of storing and delivering chlorine which is released when the product is introduced into water."[10]  Petitioner notes that all calcium hypochlorite is used significantly in the chlorination of swimming pools and may also be used for the disinfection of water and wastewater and cleaning and sanitizing operations (such as laundry, food and non-food contact surfaces, and fruit and vegetable washing).[11]  While there are other products that may overlap with calcium hypochlorite in terms of uses (such as chlorinated isocyanurates, sodium hypochlorite, lithium hypochlorite, enzymes, sodium percarbonate, bromine, biguanide, salt generators, and polyhexamethylene biguanide), Petitioner contends that those products are produced using different inputs.[12]

### 2)  Interchangeability

Petitioner argues that all calcium hypochlorite must meet customer specifications and must be registered with the Environmental Protection Agency.  As a result, according to Petitioner, "the

---

[4] See Fujitsu Ltd. v. United States, 36 F. Supp. 2d 394, 397-98 (CIT 1999); Torrington Co. v. United States, 747 F. Supp. 744, 748-49 (CIT 1990), aff'd, 938 F.2d 1278 (Fed. Cir. 1991); see also Antidumping and Countervailing Duty Handbook, Twelfth Edition, United States International Trade Commission, Publication 3916 (April 2007), at II-33.
[5] See Volume I of the Petitions, at 13.
[6] Id.
[7] Id., at 14.
[8] Id.
[9] Id.
[10] Id.
[11] Id.
[12] Id., at 15.

*Contains Business Proprietary Information*

imported and domestic {calcium hypochlorite} is generally comparable in quality and customers can use them interchangeably."[13]  In addition, although other products may serve as substitutes for calcium hypochlorite in the pool industry, Petitioner notes that, in investigations concerning chlorinated isocyanurates (a product that is also used in pool chlorination), the ITC "did not consider whether any {potential substitutes} would be considered like products to the subject chlorinated isocyanurates."[14]  Furthermore, Petitioner states that the ITC "has previously found chlorinated isocyanurates to be their own like product, separate from {calcium hypochlorite and other alternatives}."[15]  Petitioner argues that, despite some overlap in terms of uses, "{t}he production processes of these products are substantially different than the processes for {calcium hypochlorite} and each other, providing clear dividing lines."[16]

### 3)  Channels of Distribution

Petitioner states that, in the retail market, calcium hypochlorite is generally sold through six channels of distribution.[17]  In addition, Petitioner notes that calcium hypochlorite "is generally sold on a transaction-by-transaction basis, often tied to an evergreen contract.  Many big retailers and customers seek price quotes for the coming year in the third or fourth quarter of the year.  In many cases, customers procure {calcium hypochlorite} from more than one source."[18]

### 4)  Customer and Producer Perceptions

Petitioner contends that, despite the branding in the industry, calcium hypochlorite is a commodity product and, therefore, customers and producers perceive all calcium hypochlorite to be the same product.[19]

### 5)  Common manufacturing facilities and production employees

Petitioner notes that the domestic industry produces all calcium hypochlorite using the same basic production processes in the same facilities.[20]  Furthermore, Petitioner contends that calcium hypochlorite and substitute products have different production processes, are not produced in the same facilities, and few are even produced by the same manufacturers.[21]

### 6)  Price

---

[13] Id.

[14] Id.; see also General Issues Supplement, at 2 and  Attachment 1, and Chlorinated Isocyanurates from China and Japan, Inv. Nos. 701-TA-501 and 731-TA-1226 (Preliminary), USITC Pub. 4431 (November 2013) ("Chlorinated Isocyanurates from China and Japan"), at II-1.

[15] See Volume I of the Petitions, at 14; see also General Issues Supplement, at 2 and Attachment 1, and Chlorinated Isocyanurates from China and Spain, Inv Nos. 731-TA-1082 and 1083 (Final), USITC Pub. 3782 (June 2005) ("Chlorinated Isocyanurates from China and Spain").

[16] See Volume I of the Petitions, at 15.

[17] Id.

[18] Id., at 16.

[19] Id.

[20] Id.

[21] Id., at 14-15.

3

According to Petitioner, since calcium hypochlorite is a commodity product, all calcium hypochlorite competes primarily on the basis of price.[22]

**Department's Position:**

We analyzed the information provided by Petitioner with regard to the ITC's domestic like product factors.  We agree with Petitioner that calcium hypochlorite, as defined in the scope of the investigations, constitutes a single domestic like product.  All calcium hypochlorite has the same chemical compound that differs from other products that have similar uses.  Although calcium hypochlorite and other substitute products have some of the same end uses in the pool industry, they have different production processes and are produced in different production facilities.  We note that the ITC has previously found that chlorinated isocyanurates, which are also used in pool chlorination, are their own like product, separate from calcium hypochlorite and other alternatives.[23]  Likewise, in the recent chlorinated isocyanurates from China and Japan cases, the ITC again found that chlorinated isocyanurates are their own domestic like product.[24]  Although calcium hypochlorite and other substitute products, such as chlorinated isocyanurates, may overlap in terms of uses in the pool industry, there is precedent for treating them as separate like products due to their substantially different production processes.

Furthermore, unless the Department finds Petitioner's definition of the domestic like product to be inaccurate, we will adopt the domestic like product definition set forth in the Petitions.[25]  While the statute defines the "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation," pursuant to section 771(10) of the Act, Petitioner has presented the Department with information pertaining to the factors the ITC traditionally analyzes.  We analyzed the factors presented by Petitioner and find there is reason to conclude that calcium hypochlorite comprises a single domestic like product.

### B.  Tableting and Repackaging

Petitioner also contends that the domestic industry producing the domestic like product should not include companies that are collectively called "repackers/private label marketers" in the industry.[26]  These companies buy calcium hypochlorite in bulk and 1) repack it (sometimes under private label), 2) compress granular calcium hypochlorite into tablets, and/or 3) blend calcium hypochlorite with other ingredients.[27]  To support this argument, Petitioner contends that less than 25 percent of calcium hypochlorite sold is in tableted form; most calcium hypochlorite is sold and used in granular form.[28]  Moreover, Petitioner notes that, of the tableted calcium hypochlorite sold in the United States, more than 95% of it is produced by Arch Chemicals and

---

[22] Id., at 16.

[23] See General Issues Supplement, at 2 and Attachment 1; see also, Chlorinated Isocyanurates from China and Spain, Inv Nos. 731-TA-1082 and 1083 (Final), USITC Pub. 3782 (June 2005), at 10 and II-8.

[24] See General Issues Supplement, at 2 and Attachment 1; see also Chlorinated Isocyanurates from China and Japan, at II-1.

[25] See Volume I of the Petitions, at 13-16.

[26] Id., at 3.

[27] Id.

[28] Id., at 3 and Exhibits GEN-2 and INJ-3.

Barcode:3172929-01 A-570-008 INV - INVESTIGATION   *Contains Business Proprietary Information*

Axiall Corporation ("Axiall"), the other U.S. producer of bulk calcium hypochlorite.[29]  The remaining tableted calcium hypochlorite is produced by companies that do not make the underlying calcium hypochlorite.  Petitioner contends these companies are essentially distributors.[30]

Furthermore, according to Petitioner, it costs roughly [          ] to build a calcium hypochlorite facility, while a tableting press costs roughly [      ]; therefore, Petitioner argues that the investment in tableting equipment is small compared to the investment required to produce calcium hypochlorite.[31]  In addition, Petitioner notes that the value-added from tableting is only about [          ] of the finished value of the product.[32]  Additionally, Petitioner asserts that "compared to the investment in the facilities to produce Calhypo in its basic forms (powder or granular) the investment by repackers/private label marketers is not sufficient to classify them as members of the domestic industry and a clear line can be drawn between the Calhypo producers and the repackers/private label marketers."[33]  Finally, Petitioner contends that blending calcium hypochlorite with other ingredients (i.e., formulating) does not change the molecular structure of the calcium hypochlorite.[34]  As a result, Petitioner argues that repackers/private label marketers should not be considered part of the domestic industry and Petitioner has not included their production in the industry support calculation.

**Department's Position:**

We have analyzed the criteria presented by Petitioner and have found there is reason to conclude that the domestic industry should not include repackers/private label marketers.  Data provided by Petitioner indicate that 1) calcium hypochlorite is mostly sold and used in granular form, 2) most of the tableted calcium hypochlorite is produced by Arch Chemicals and Axiall, the two U.S. producers of bulk calcium hypochlorite, 3) tableting does not require significant capital investment when compared to the capital investment required to produce bulk calcium hypochlorite, 4) the value-added from tableting is relatively minor when compared to the finished value of the product, and 5) blending (or formulating) calcium hypochlorite with other ingredients does not change the molecular structure of the calcium hypochlorite.[35]

**Industry Support Calculation**

In determining whether Petitioner has standing (i.e., those domestic workers and producers supporting the Petitions account for (1) at least 25 percent of the total production of the domestic like product and (2) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petitions), we conducted the following analysis.

We considered the industry support data contained in the Petitions with reference to the domestic

---

[29] Id., at 3 and Exhibit GEN-2.
[30] Id., at 3.
[31] Id., at 3 and Exhibit AD-18.
[32] Id., at 3.
[33] Id., at 17.
[34] Id., at 3.
[35] See Volume of the Petitions, at 3.

Filed By: kabir archuletta, Filed Date: 1/10/14 9:01 AM, Submission Status: Approved

*Contains Business Proprietary Information*

like product as defined in Attachment I, "Scope of the Investigation," to this Checklist and discussed above. We also considered Petitioner's arguments regarding the definition of the domestic industry, also discussed above. Petitioner states that there are two producers of calcium hypochlorite in the United States: Arch Chemicals and Axiall.[36] To support this claim, Petitioner provided an affidavit from [

] for Arch Chemicals, who has worked for Arch Chemicals since 1990. [          ] states that, based on his knowledge of the market, Arch Chemicals and Axiall were the "only two producers of calcium hypochlorite in the United States throughout the period covered by this petition."[37]

To establish industry support, Petitioner provided its own production of the domestic like product for calendar year 2012.[38] In addition, Petitioner estimated Axiall's 2012 production of the domestic like product.[39]

Petitioner provided an estimate of Axiall's 2012 production of the domestic like product based on [          ] "extensive knowledge of the market for calcium hypochlorite and Axiall's (formerly PPG Industries') role in the market."[40] In addition, [          ] states that [   ] "obtained information regarding Axiall's…sales to customers through conversations with customers, participation in industry events and trade associations, general industry research, and reading industry publications."[41] [          ] estimated Axiall's 2012 production of calcium hypochlorite by estimating Axiall's 2012 sales of calcium hypochlorite in 2012 and adding an estimate for Axiall's inventory. [          ] estimated Axiall's inventory levels, based on [

].[42]

Petitioner compared its own 2012 production volume to the estimated 2012 production volume of the entire domestic industry.[43] Based on information provided in the Petitions, Petitioner accounts for [     ] percent of total production of the domestic like product.

---

[36] Id., at 2.
[37] Id., at Exhibit GEN-2.
[38] Id., at 4.
[39] Id., at 4 and Exhibit GEN-2.
[40] Id., at Exhibit GEN-2.
[41] Id.
[42] Id., at 4.
[43] Id.

Barcode:3172929-01 A-570-008 INV - Investigation *Contains Business Proprietary Information*

**Table 1**
**Calculation of Industry Support**

| Petitioner | 2012 Production of Calcium Hypochlorite (1,000 lbs) |
|---|---|
| Arch Chemicals, Inc. | [      ] |
| **Other U.S. Producers** | |
| Axiall Corporation | [      ] |
| **Total 2012 U.S. Production of Calcium Hypochlorite** | [      ] |
| **Total Industry Support**[44] | [      ]% |

**Challenge to Industry Support**

None.

**Findings**

We relied on information provided by Petitioner, as described above, to establish total 2012 production of calcium hypochlorite. Using these data, as demonstrated above, we find that the domestic producers who support the Petitions account for at least 25 percent of the total production of the domestic like product. We further find that the domestic producers who support the Petitions account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petitions. Therefore, we find that there is adequate industry support within the meaning of sections 702(c)(4)(A) and 732(c)(4)(A) of the Act.

We conducted a search of the internet and have been unable to locate information that contradicts Petitioner's assertions. We find that Petitioner has provided data that are reasonably available. For these reasons, we determine that there is adequate industry support for initiating these investigations. Accordingly, we find that the Petitions have met the requirements of sections 702(c)(4)(A) and 732(c)(4)(A) of the Act.

---

[44] We note that, even if we conservatively assume that companies that tablet should be included in the industry support calculation, Petitioner still has the requisite level of industry support for the Petitions. According to Petitioner, approximately [            ] pounds of tableted product was produced in the United States in 2012 by companies other than Arch Chemicals and Axiall. See Volume I of the Petitions, at 3 and Exhibit GEN-2; see also General Issues Supplement, at 3. Since the 2012 production figures for Arch Chemicals and Axiall include production of tableted calcium hypochlorite, if we add this [            ] pounds of production of tableted calcium hypochlorite to the denominator of the industry support calculation, Petitioner accounts for [    ] percent of total production of the domestic like product in 2012 ([         ]/[                ] = [     ]). See id. and Table 1 below.

Filed By: kabir archuletta, Filed Date: 1/10/14 9:01 AM, Submission Status: Approved

**Attachment III**

**Analysis of Allegations and Evidence of Material Injury and Causation for the
Antidumping and Countervailing Duty Petitions Covering Calcium Hypochlorite
from the People's Republic of China**

## I.      Introduction

When making a determination regarding the initiation of antidumping duty and countervailing duty investigations, the Department of Commerce ("the Department") examines, on the basis of sources readily available to the Department, whether the petitions allege the elements necessary for the imposition of antidumping and countervailing duties and contain information reasonably available to the petitioner that supports the allegations.[1]  This attachment analyzes the sufficiency of the allegations and supporting evidence regarding material injury and causation.

## II.      Definition of Domestic Industry

The domestic industry is described with reference to producers of the domestic like product, as provided for in section 771(4)(A) of the Act.  The Petitions[2] define the domestic industry as U.S. producers of calcium hypochlorite.[3]  Petitioner identifies itself, Arch Chemicals, Inc., as well as one other producer of the domestic like product, as the two companies constituting the domestic industry in the United States.[4]  For a discussion of the domestic like product, see Attachment II, "Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Calcium Hypochlorite from the People's Republic of China," to this Checklist.

## III.      Evidence of Injury and Threat of Injury

To determine injury, the statute requires an evaluation of the volume, price effects, and impact of imports on the domestic industry and permits consideration of other economic factors.[5]  Specifically, in examining the impact of imports, section 771(7)(C)(iii) of the Act states that:

> In examining the impact {of imports on domestic producers} …, the {International Trade} Commission {"ITC"} shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to–
> > (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,
> > (II) factors affecting domestic prices,

---

[1] See sections 702(c)(1)(A)(i) and 732(c)(1)(A)(i) of the Tariff Act of 1930, as amended ("the Act").
[2] See Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Calcium Hypochlorite from the People's Republic of China, dated December 18, 2013 ("Petitions").
[3] See Volume I of the Petitions, at 17.
[4] See Volume I of the Petitions, at 2-3 and Exhibits GEN-1 and GEN-2.
[5] See section 771(7)(B)(i) of the Act.

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,
(IV) actual and potential negative effects on the existing development and production efforts of the domestic industry..., and
(V) in {an antidumping proceeding}…, the magnitude of the margin of dumping.

The Petitions allege that the domestic industry has experienced the following types of injury by reason of imports from the People's Republic of China ("PRC"):

- Reduced market share (Volume I of the Petitions, at 19, 22 and Exhibit INJ-3);
- Underselling and price depression or suppression (Volume I of the Petitions, at 19-20, 23-24 and Exhibits INJ-4 and INJ-6 through INJ-8);
- Lost sales and revenues (Volume I of the Petitions, at 23 and Exhibit INJ-4);
- Reduced production and capacity utilization (Volume I of the Petitions, at 24 and Exhibit INJ-7);
- Decline in production-related workers and other employment variables (Volume I of the Petitions, at 24 and Exhibit INJ-7); and
- Decline in financial performance (Volume I of the Petitions, at 19, 24-25 and Exhibit INJ-6).

The Petitions also allege that the domestic industry could be threatened with further injury by reason of imports from the PRC:

- Export-oriented production (Volume I of the Petitions, at 26 and Exhibit INJ-5);
- Continued increase of subject imports and market penetration (Volume I of the Petitions, at 26-27 and Exhibits INJ-2 and INJ-5);
- Planned capacity expansion to further increase production, despite existing unused capacity (Volume I of the Petitions, at 27-28 and Exhibit INJ-5);
- Continued underselling and price depression or suppression (Volume I of the Petitions, at 28-29 and Exhibits INJ-2 and INJ-7);
- Price sensitivity and seasonality of the calcium hypochlorite market makes the domestic industry particularly vulnerable to unfair imports during the peak demand season  (Volume I of the Petitions, at 29); and
- Countervailable subsidies from the Chinese Government (Volume I of the Petitions, at 29).

The information from the Petitions provides the Department with a sufficient basis to conclude that the allegations of material injury and threat of material injury as a result of imports of subject merchandise are adequately supported.

## IV.    Negligibility

Section 771(24)(A)(i) of the Act states that "imports from a country of merchandise corresponding to a domestic like product identified by the Commission are 'negligible' if such imports account for less than 3 percent of the volume of all such merchandise imported into the

2

United States in the most recent 12-month period for which the data are available . . ."
According to ITC Dataweb import data provided by Petitioner for the 12-month period of
October 2012 through September 2013, the volume of calcium hypochlorite imports from the
PRC accounted for 94 percent of total imports.[6]  Since the volume of imports from the PRC
exceeds the negligibility threshold, Petitioner submits that subject imports are not negligible.[7]

## V.      Causation of Material Injury or Threat of Material Injury

Petitioner contends that the material injury and the threat of material injury to the domestic
industry were caused by the impact of the allegedly dumped and subsidized imports from the
PRC.  In support of its argument, Petitioner provides information on the historical trend of the
volume of the allegedly dumped and subsidized imports, focusing on the period beginning with
2010 and ending with the year-to-date data for September 2013 (the most recently available
quarterly data).[8]  In the Petitions, Petitioner describes the effect of these import volumes, and
their respective values, on market share and domestic prices, and the consequent impact on the
domestic industry, specifically on financial performance, sales and revenue.[9]  Petitioner argues
that this evidence reflects the injurious effects on the U.S. industry's financial performance and
market share caused by increasing imports of the subject calcium hypochlorite at prices
substantially lower than price offers from Petitioner, thereby resulting in significant incidents of
lost sales and revenues.[10]

In making a determination regarding causation of material injury, the ITC is directed to evaluate
the volume of subject imports (section 771(7)(B)(i)(I) of the Act), the effect of those imports on
the prices of domestically-produced products (section 771(7)(B)(i)(II) of the Act) and their
impact on the domestic operations of U.S. producers (section 771(7)(B)(i)(III) of the Act).
Petitioner bases its allegations of causation of current injury upon reduced market share;
underselling and price depression or suppression; lost sales and revenues; reduced production
and capacity utilization; decline in production-related workers and other employment variables;
and decline in financial performance.[11]

In regard to the threat of material injury, Petitioner bases its allegations on export-oriented
production and continued increase of exports; continued increase of subject imports and market
penetration; planned capacity expansion to increase production; continued underselling and price
depression or suppression; the price sensitivity and seasonality of the calcium hypochlorite
market; and countervailable subsidies from the Chinese Government.[12]

The allegations of causation of material injury and the threat of material injury are based upon
the factors indicating current injury, as well as the factors indicating threat of material injury as
noted above.  The factors related to causation presented in the injury section of the Petitions are

---

[6] See Volume I of the Petitions, at 18.
[7] Id.
[8] Id., at 17-19, 22, 26-27 and Exhibits INJ-1 and INJ-2.
[9] See Volume I of the Petitions, at 19-24 and Exhibits INJ-3, INJ-4 and INJ-6 through INJ-8.
[10] Id.
[11] See Section III above.
[12] See Volume I of the Petitions, at 24-29 and Exhibits INJ-2, INJ-5 and INJ-7.

3

Barcode:3172929-01 A-570-008 INV - Investigation  -

the types of factors that the ITC is directed to consider for the purpose of evaluating causation under sections 771(7)(C) and 771(7)(F) of the Act.

## VI.    Conclusion

In order to assess the accuracy and adequacy of the evidence relating to the allegations regarding material injury and causation, we examined the information presented in the Petitions and compared it with information that was reasonably available (e.g., import data on the ITC website and additional industry reports available online).  We have not located any information that contradicts Petitioner's assertions.

We have analyzed Petitioner's evidence regarding material injury and causation and have found that the information in the Petitions demonstrates a sufficient showing of injury or threat of injury to the U.S. industry producing calcium hypochlorite.  Therefore, we find the overall evidence of injury included in the Petitions to be adequate to initiate the investigations of calcium hypochlorite from the PRC.  Ultimately, the ITC will make the final determination with respect to material injury, or threat thereof, and causation.

Filed By: kabir archuletta, Filed Date: 1/10/14 9:01 AM, Submission Status: Approved

UNITED STATES INTERNATIONAL TRADE COMMISSION

## UNITED STATES INTERNATIONAL TRADE COMMISSION

### DIRECTOR OF INVESTIGATIONS ACTION REQUEST

| Subject | Reference Information | |
|---|---|---|
| *Investigation No. 701-TA-510 and 731-TA-1245 (Preliminary): Calcium hypochlorite from China--Notice of Institution and Proposed Work Schedule* | Control No. | INV-13-126 |

| Signature of Initiator | Director, Office of Investigations | Office | Investigations |
|---|---|---|---|
| | | Date Initiated | 12-18-13 |
| | | Date Out | Expedite |

### STAFF CONCURRENCES

| Office | Signature | Date | Office | Signature | Date |
|---|---|---|---|---|---|
| INV | Elizabeth Haines | 12/18/13 x3200 | TATA | Jim Summers | 12/18/13 |
| INV | | 12/18/13 | GC | Maureen Ayres for Marc Bernstein | 12/18/13 |

### PURPOSE OF REQUEST

To obtain approval to issue the attached draft notice of institution and the proposed draft schedule.

### BACKGROUND INFORMATION

The attached draft notice of institution and scheduling and the proposed draft schedule are in response to a petition filed on December 18, 2013, by Arch Chemicals, Inc., Atlanta, GA. The petition alleges that an industry in the United States is materially injured or threatened with material injury by reason of less-than-fair-value imports of calcium hypochlorite and subsidized imports from China.

Commission staff has not identified any significant defects in the petition with respect to injury allegations and related information.

### RECOMMENDATION

That the Director approve the attached draft notice of institution and scheduling and the proposed draft schedule.

### NATURE OF DIRECTOR'S ACTION

☑ **Approved**     ☐ **Disapproved**     Signature     Date: 12/18/13

☐ **Other**

### COMMENTS

Staff assigned to these investigations are Joanna Lo, investigator (205-1888); James Fetzer, economist (708-5403); David Boyland, accountant (708-4725); Christopher Robinson, industry analyst (205-2602); John Stephens, statistician (205-3408); John Henderson, attorney-advisor (205-2130); and Elizabeth Haines, supervisory investigator (205-3200).

## UNITED STATES INTERNATIONAL TRADE COMMISSION

Investigation Nos. 701-TA-510 and 731-TA-1245 (Preliminary)

### CALCIUM HYPOCHLORITE FROM CHINA

Institution of antidumping and countervailing duty investigations and scheduling of preliminary phase investigations.

AGENCY:    United States International Trade Commission.

ACTION:    Notice.

SUMMARY:    The Commission hereby gives notice of the institution of investigations and commencement of preliminary phase antidumping and countervailing duty investigation Nos. 701-TA-510 and 731-TA-1245 (Preliminary) under sections 703(a) and 733(a) of the Tariff Act of 1930 (19 U.S.C. §§ 1671b(a) and 1673b(a)) (the Act) to determine whether there is a reasonable indication that an industry in the United States is materially injured or threatened with material injury, or the establishment of an industry in the United States is materially retarded, by reason of imports from China of calcium hypochlorite, provided for in subheading 2828.10.00 of the Harmonized Tariff Schedule of the United States, that are alleged to be sold in the United States at less than fair value and alleged to be subsidized by the Government of China.    Unless the Department of Commerce extends the time for initiation pursuant to sections 702(c)(1)(B) or 732(c)(1)(B) of the Act (19 U.S.C. §§ 1671a(c)(1)(B) or 1673a(c)(1)(B)), the Commission must reach a preliminary determination in antidumping and countervailing duty investigations in 45 days, or in this case by Monday, February 03, 2014.    The Commission's views must be transmitted to Commerce within five business days thereafter, or by Monday, February 10, 2014.

For further information concerning the conduct of these investigations and rules of general application, consult the Commission's Rules of Practice and Procedure, part 201, subparts A through E (19 CFR part 201), and part 207, subparts A and B (19 CFR part 207).

EFFECTIVE DATE:    Wednesday, December 18, 2013.

FOR FURTHER INFORMATION CONTACT:    Joanna Lo (202-205-1888), Office of Investigations, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436. Hearing-impaired persons can obtain information on this matter by contacting the Commission's TDD terminal on 202-205-1810.    Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at 202-205-2000.    General information concerning the Commission may also be obtained by accessing its internet server (*http://www.usitc.gov*).    The public record for this investigation may be viewed on the Commission's electronic docket (EDIS) at

*http://edis.usitc.gov*.

SUPPLEMENTARY INFORMATION:

Background.--These investigations are being instituted in response to a petition filed on Wednesday, December 18, 2013, by Arch Chemicals, Inc., Atlanta, GA.

Participation in the investigation and public service list.--Persons (other than petitioners) wishing to participate in the investigations as parties must file an entry of appearance with the Secretary to the Commission, as provided in sections 201.11 and 207.10 of the Commission's rules, not later than seven days after publication of this notice in the *Federal Register*.   Industrial users and (if the merchandise under investigation is sold at the retail level) representative consumer organizations have the right to appear as parties in Commission countervailing duty investigations.   The Secretary will prepare a public service list containing the names and addresses of all persons, or their representatives, who are parties to these investigations upon the expiration of the period for filing entries of appearance.

Limited disclosure of business proprietary information (BPI) under an administrative protective order (APO) and BPI service list.--Pursuant to section 207.7(a) of the Commission's rules, the Secretary will make BPI gathered in these investigations available to authorized applicants representing interested parties (as defined in 19 U.S.C. § 1677(9)) who are parties to the investigations under the APO issued in the investigations, provided that the application is made not later than seven days after the publication of this notice in the *Federal Register*.   A separate service list will be maintained by the Secretary for those parties authorized to receive BPI under the APO.

Conference.--The Commission's Director of Investigations has scheduled a conference in connection with these investigations for 9:30 a.m. on Wednesday, January 08, 2014, at the U.S. International Trade Commission Building, 500 E Street SW, Washington, DC.   Requests to appear at the conference should be emailed to William.bishop@usitc.gov and Sharon.bellamy@usitc.gov (DO NOT FILE ON EDIS) on or before Monday, January 06, 2014. Parties in support of the imposition of countervailing and antidumping duties in these investigations and parties in opposition to the imposition of such duties will each be collectively allocated one hour within which to make an oral presentation at the conference.   A nonparty who has testimony that may aid the Commission's deliberations may request permission to present a short statement at the conference.

Written submissions.--As provided in sections 201.8 and 207.15 of the Commission's rules, any person may submit to the Commission on or before Monday, January 13, 2014, a written brief containing information and arguments pertinent to the subject matter of the investigations.   Parties may file written testimony in connection with their presentation at the conference no later than three days before the conference.   If briefs or written testimony contain BPI, they must conform with the requirements of sections 201.6, 207.3, and 207.7 of the Commission's rules.   Please consult the Commission's rules, as amended, 76 Fed. Reg.

Barcode:3172929-01 A-570-008 INV - Investigation  -

61937 (Oct. 6, 2011) and the Commission's Handbook on Filing Procedures, 76 Fed. Reg. 62092 (Oct. 6, 2011), available on the Commission's website at http://edis.usitc.gov.

In accordance with sections 201.16(c) and 207.3 of the rules, each document filed by a party to the investigations must be served on all other parties to the investigations (as identified by either the public or BPI service list), and a certificate of service must be timely filed.    The Secretary will not accept a document for filing without a certificate of service.

AUTHORITY:    These investigations are being conducted under authority of title VII of the Tariff Act of 1930; this notice is published pursuant to section 207.12 of the Commission's rules.

By order of the Commission.

Lisa R. Barton
Acting Secretary to the Commission

Issued:

3

Barcode:3172929-01 A-570-008 INV - Investigation -

## WORK SCHEDULE

Investigation Nos. 701-TA-510 and 731-TA-1245 (Preliminary)

CALCIUM HYPOCHLORITE FROM CHINA

Staff Assigned

Investigator...............................................................Joanna Lo (205-1888)
Commodity-Industry Analyst...................................Christopher Robinson (205-2602)
Economist................................................................James Fetzer (708-5403)
Accountant/Auditor ...............................................David Boyland (708-4725)
Attorney..................................................................John Henderson (205-2130)
Statistician   ...........................................................John Stephens (205-3408)
Supervisory Investigator.........................................Elizabeth Haines (205-3200)

| | : | DATE |
|---|---|---|
| | : | |
| Petition received ................................................ : | | Wednesday, December 18, 2013 |
| | : | |
| Questionnaires: | : | |
|     Drafts to Supervisory Investigator................................. : | | December 18 |
|     To Director of Investigations and OMB .......................... : | | December 19 |
|     Mail............................................................................... : | | December 20 |
|     Return........................................................................... : | | January 2 |
| | : | |
| Fieldwork ............................................................ : | | As needed |
| | : | |
| Conference .......................................................... : | | January 8 |
| | : | 9:30 a.m. |
| Briefs of Parties due[1] .......................................... : | | January 13 |
| | : | |
| Report to the Commission: | : | |
|     Draft to Supervisory Investigator ................................... : | | January 17 |
|     Draft to Senior Review .................................................... : | | January 22 |
|     To the Commission........................................................... : | | January 27 |
| | : | |
| Legal issues memorandum to the Commission............................ : | | January 28 |
| | : | |
| Briefing and vote (suggested date) ................................ : | | January 31 |
| | : | |
| Determination to Commerce ....................................... : | | February 3 |
| | : | |
| Views to Commerce..................................................... : | | Monday, February 10, 2014 |

[1] If briefs contain business proprietary information, a nonbusiness proprietary version is due the following business day.

Addendum B

Barcode:3156010-01 C-570-991 INV - Investigation  -

C-570-991
Investigation
POI 1/1/12 – 12/31/12
**Public Version**
IA/NME/IX: PW

September 18, 2013

# IMPORT ADMINISTRATION
## OFFICE OF AD/CVD OPERATIONS
## COUNTERVAILING DUTY INVESTIGATION INITIATION CHECKLIST

**SUBJECT:**   Chlorinated Isocyanurates from the People's Republic of China

**CASE NUMBER:**   C-570-991

**PETITIONERS:**

Clearon Corp.
95 MacCorkle Ave, SW
South Charleston, WV 25303
Tel:  304-746-3025

Occidental Chemical Corporation
Occidental Tower
5005 LBJ Freeway, Suite 2200
Dallas, TX 75244
Tel:  972-404-3840

**COUNSEL TO PETITIONERS:**

James R. Cannon, Jr.
Thomas M. Beline
Jonathan Zielinski
Ulrika Swanson
Cassidy Levy Kent (USA) LLP
2000 Pennsylvania Avenue, NW
Suite 3000
Washington, DC 20006
Tel:  202-567-2318

Barcode:3156010-01 C-570-991 INV - Investigation -

## POTENTIAL RESPONDENTS:

A list of the producers of chlorinated isocyuranates ("chlorinated isos") in the People's Republic of China ("PRC") identified by Clearon Corp. and Occidental Chemical Corporation ("Petitioners") can be found in the "Petition for the Imposition of Countervailing Duties on Chlorinated Isocyanurates from the People's Republic of China," dated August 29, 2013 ("Petition").[1]

---

## SCOPE: *See* Attachment I – Scope of the Investigation, to this checklist.

---

## IMPORT STATISTICS:

| CHINA | 2010 | 2011 | 2012 | YTD 2012 (Jan-Jun) | YTD 2013 (Jan-Jun) |
|---|---|---|---|---|---|
| Quantity (1,000 lbs) | 34,573 | 33,393 | 63,120 | 38,131 | 25,862 |
| Value ($1,000) | 26,177 | 27,334 | 52,070 | 31,569 | 20,998 |

Source: United States International Trade Commission ("ITC") Dataweb, available at http://dataweb.usitc.gov/. Petitioners reported the volume (converted from kilograms to pounds) and landed duty-paid value of imports of chlorinated isos using Harmonized Tariff Schedule of the United States ("HTSUS") subheading 2933.69.6015.[2] Chlorinated isos may also enter under HTSUS subheadings 2933.69.6021, 2933.69.6050, 3808.50.4000, 3808.94.5000, and 3808.99.9500.[3] Petitioners contend that, for purposes of analyzing import data, HTSUS 2933.69.6015 "most accurately corresponds to the relevant imports in bulk form and includes {chlorinated isos} not blended with other additives or tableted and packaged for retail sale."[4] Petitioners further submit that the other HTSUS subheadings in the scope of the investigation are basket categories and are not limited to chlorinated isos.[5] Therefore, Petitioners did not include these other HTSUS subheadings in the above import statistics.[6]

---

[1] *See* Volume IV of the Petition, at Exhibit CVD-1.
[2] *See* Volume I of the Petition, at 115 and 130, and Volume II of the Petition, at Exhibit GEN-14.
[3] *See* Supplement to the Petition, dated September 9, 2013 ("Supplement to the Petition"), at 4.
[4] *See* Volume I of the Petition, at 19.
[5] *Id.*, at 130.
[6] *Id.*, at 113.

Filed By: matthew renkey, Filed Date: 9/20/13 2:28 PM, Submission Status: Approved

## APPROXIMATE CASE CALENDAR:

| Event | No. of Days | Date of Action | Day of Week |
|---|---|---|---|
| | | Countervailing Duty Investigation | |
| Petition Filed | 0 | August 29, 2013 | Thursday |
| Initiation Date | 20 | September 18, 2013 | Wednesday |
| ITC Preliminary Determination | 45 | October 15, 2013 | Tuesday* |
| ITA Preliminary Determination†** | 85 | November 22, 2013 | Friday |
| ITA Final Determination† | 160 | February 5, 2014 | Wednesday |
| ITC Final Determination*** | 205 | March 24, 2014 | Monday* |
| Publication of Order**** | 212 | March 31, 2014 | Monday* |

* Where the deadline falls on a weekend/holiday, the appropriate date is the next business day.
† These deadlines may be extended under the governing statute.
** This will take place only in the event of a preliminary affirmative determination from the ITC.
*** This will take place only in the event of a final affirmative determination from the International Trade Administration ("ITA").
**** This will take place only in the event of a final affirmative determination from the ITA and the ITC.
Note: The ITC final determination will take place no later than 45 days after a final affirmative ITA determination.
Note: Publication of order will take place approximately 7 days after an affirmative ITC final determination.

## INDUSTRY SUPPORT:

Do Petitioners and those expressing support for the Petition account for more than 50 percent of production of the domestic like product?

| | |
|---|---|
| ☒ | Yes |
| ☐ | No |

If No, do those expressing support account for the majority of those expressing an opinion and at least 25 percent of domestic production?

| | |
|---|---|
| ☐ | Yes |
| ☐ | No |
| ☒ | Not Applicable |

3

Describe how industry support was established - specifically, describe the nature of any polling or other step undertaken to determine the level of domestic industry support.

*See* Attachment II, Analysis of Industry Support for the Petitions Covering Chlorinated Isocyanurates from Japan and the People's Republic of China, to this checklist.

Was there opposition to the Petition?

|   |   |
|---|---|
| ☐ | Yes |
| ☒ | No |

Are any of the parties who have expressed opposition to the Petition either importers or domestic producers affiliated with foreign producers?

|   |   |
|---|---|
| ☐ | Yes |
| ☐ | No |
| ☒ | Not Applicable |

---

## INJURY TEST:

Because the PRC is a "Subsidies Agreement Country" within the meaning of section 701(b) of the Tariff Act of 1930, as amended (the "Act"), section 701(a)(2) of the Act applies to this investigation. Accordingly, the ITC must determine whether imports of the subject merchandise from the PRC materially injure, or threaten material injury to, a U.S. industry.

---

## INJURY ALLEGATION:

We received a copy of the action notice from the Director of the Office of Investigations at the ITC which was signed on September 4, 2013. It indicates that the ITC has instituted an investigation to determine whether there is a reasonable indication that the domestic industry producing chlorinated isos is materially injured or threatened with material injury.[7]

The relevant injury data can be found in Volume I of the Petition, at 96-132; Volume II of the Petition, at Exhibits GEN-2 and GEN-9 through GEN-17; and Volume IV of the Petition, at Exhibit CVD-86.[8]

Does the Petition contain evidence of causation? Specifically, does the Petition contain information relative to:

---

[7] *See* Attachment IV to this checklist.
[8] *See* Attachment III, Analysis of Allegations and Evidence of Material Injury and Causation for the Petitions Covering Chlorinated Isocyanurates from Japan and the People's Republic of China.

☒ volume and value of imports (*See* Volume I of the Petition, at 109-115 and 129-130; Volume II of the Petition, at Exhibits GEN-13 and GEN-14; and Volume IV of the Petition, at Exhibit CVD-86).

☒ U.S. market share (*i.e.*, the ratio of imports to consumption) (*See* Volume I of the Petition, at 115-116 and 127, and Volume II of the Petition, at Exhibit GEN-14).

☒ actual pricing (*i.e.*, evidence of decreased pricing) (*See* Volume I of the Petition, at 119-121 and 127-128, and Volume II of the Petition, at Exhibits GEN-12, GEN-15 and GEN-16).

☒ relative pricing (*i.e.*, evidence of imports underselling U.S. products) (*See* Volume I of the Petition, at 119-120 and 127, and Volume II of the Petition, at Exhibits GEN-12, GEN-15 and GEN-16).

---

**PETITION REQUIREMENTS:**
Does the Petition contain the following?

☒ the name, address, and telephone number of Petitioners (*See* Volume I of the Petition, at 2.)

☒ the names, addresses, and telephone numbers of all domestic producers of the domestic like product known to the petitioning companies (*See* Volume I of the Petition, at 2-3.)

☒ the volume or value of the domestic like product produced by Petitioners and each domestic producer identified for the most recently completed 12-month period for which data is available (*See* Volume I of the Petition, at 3-4, and Volume II of the Petition, at Exhibit GEN-12.)

Was the <u>entire</u> domestic industry identified in the Petition?

☒ Yes (*See* Volume I of the Petition, at 2-3, and Volume II of the Petition, at Exhibits GEN-9 and GEN-12.)

☐ No

☒ a clear and detailed description of the merchandise to be investigated, including the appropriate Harmonized Tariff Schedule numbers (*See* Volume I of the Petition, at 7-16; Volume II of the Petition, at Exhibits GEN-6 through GEN-8; and Supplement to the Petition, at 2-4.)

☒ the name of each country in which the merchandise originates or from which the merchandise is exported (*See* Volume I of the Petition, at 31.)

5

☒    the identity of each known exporter, foreign producer, and importer of the merchandise (*See* Volume I of the Petition, at 31-34 and 95; Volume II of the Petition, at Exhibits GEN-5, GEN-9, GEN-11 and GEN-13; and Volume IV of the Petition, at Exhibits CVD-1 and CVD-87.)

☒    a statement indicating that Petition was filed simultaneously with the Department of Commerce and the ITC (*See* cover letter to the Petition, at 2.)

☒    an adequate summary of the proprietary data (*See* public version of the Petition and public version of the Supplement to the Petition.)

☒    a statement regarding release under administrative protective order (*See* cover letter to the Petition, at 1-3 and Supplement to the Petition, at 1, 22 and 23.)

☒    a certification of the facts contained in Petition by an official of the petitioning firm(s) and its legal representative (if applicable) (*See* Petition cover letter and Supplement to the Petition attachment.)

☒    import volume and value information for the most recent two-year period (*See* Volume I of the Petition, at 95, 111-115, and 129-130; Volume II of the Petition, at Exhibit GEN-14; and Volume IV of the Petition, at Exhibit CVD-86.)

---

**COUNTERVAILING DUTY ALLEGATIONS:**

The proposed period of investigation ("POI") is January 1, 2012, through December 31, 2012.

The Petition was filed on August 29, 2013. On September 4 & 5, 2013, the Department of Commerce (the "Department") sought clarification on certain issues in the Petition. Petitioners filed their responses to the Department's request on September 9, 2013, in the Supplement to the Petition.

---

**CONSULTATIONS:**

In accordance with Article 13.1 of the Agreement on Subsidies and Countervailing Measures, and section 702(b)(4)(a)(ii) of the Act, on August 30, 2013, we invited the Government of the PRC ("GOC") for consultations regarding the countervailing duty ("CVD") petition. Consultations were held with the GOC's Ministry of Commerce by conference call on September 12, 2013. The points raised in the consultations are described in the September 12, 2013, memorandum entitled, "Countervailing Duty Petition on Chlorinated Isocyanurates from the People's Republic of China: Consultations with the Government of the People's Republic of China," which is available through Import Administration's Antidumping and Countervailing Duty Centralized Electronic Service System ("IA ACCESS").

**COUNTERVAILING DUTY INVESTIGATION INITIATION STANDARD:**

Section 702(b) of the Act states that Petitioners must allege the elements necessary for the imposition of a CVD proceeding under section 701(a) of the Act, *i.e.*, they must show the existence of countervailable subsidies and material injury, or threat of material injury, by reason of the subsidized imports. Section 702(b)(1) of the Act requires that these allegations be supported by information reasonably available to Petitioners.

Petitioners contend that producers of certain chlorinated isos in the PRC have benefited from countervailable subsidies bestowed by the GOC and by various provincial and municipal governments within the PRC.

The Department recommends initiating an investigation of the alleged programs listed in Section I below, "Programs on which the Department is Initiating an Investigation." For each program, Petitioners have properly alleged the elements of a subsidy as identified by sections 771(5) and (5A) of the Act, *i.e.*, financial contribution, benefit, and specificity. The Department finds that Petitioners' allegations are supported by adequate and accurate information that was reasonably available to them. In Section II, "Alleged Programs on which the Department is Not Initiating an Investigation," the Department lists those programs that it does not recommend for initiation, describing the Department's decision under "Recommendation."

**ALLEGED SUBSIDY PROGRAMS**

Note: A number of the allegations presented by Petitioners involve particular provinces, localities, or special economic development zones. Petitioners have provided information demonstrating that potential respondents are located within these provinces or localities. Petitioners provided a list of PRC producers of chlorinated isos and the provinces in which they are located.[9] Some of the allegations below, as noted, indicate that a particular corporate status is required to be eligible for benefits. Petitioners have provided information indicating that several potential respondents hold such status, such as foreign invested enterprises or state-owned enterprises."

**I.   PROGRAMS ON WHICH THE DEPARTMENT IS INITIATING AN INVESTIGATION**

**A.   Government Provision of Goods and Services for Less Than Adequate Remuneration**

   1.   Provision of Electricity for Less Than Adequate Remuneration

*Description*: Petitioners allege that the GOC, through the National Development and Reform Commission ("NDRC"), regulates the power rates for certain industries, including the chemical

---

[9]  *See* Volume I of the Petition at 32, Table 8.

industry.  Petitioners note that a report by the U.S. Energy Information  Administration
("USEIA") indicates that the NDRC is the primary policymaking  and regulatory authority in the
PRC's energy sector, and is charged with approving new energy projects, setting domestic
wholesale energy prices, and implementing  the GOC's energy policies.  Petitioners argue that
electricity  prices are determined and capped by the NDRC.  Petitioners also note that the USEIA
Report indicates that the NRDC is a department of China's State Council, the highest organ of
executive power in the country.

*Financial Contribution*: The provision  of electricity  is a government financial contribution  in
the form of a provision  of a good or service.

*Specificity*:  The GOC has provided  preferential electricity  pricing for companies located within
a defined geographic  area. Subsidy programs limited  to certain geographic areas within a
government's  jurisdiction  are specific under section 771(5A)(D)(iv) of the Act.

*Benefit*: This program confers a benefit to recipients because electricity  is being sold for less
than adequate remuneration  ("LTAR"), pursuant to section 771(5)(E)(iv) the Act.

*Support*: The Department has previously  determined that this program confers a countervailable
subsidy under U.S. law[10], and that the Department would continue  to investigate  the provision  of
electricity  in future investigations. [11]   In addition,  Petitioners provided the following:  "China to
Introduce  Power Rates for High Energy Consuming  Sectors," *AsianPulse News*

(September 25, 2006); *China Country Report*, U.S. Energy Information  Administration  (revised
April 22, 2013). [12]

  2.  Provision  of Urea for Less Than Adequate Remuneration

*Description*:  Petitioners argue that the GOC provides  urea to domestic producers of chlorinated
isos at LTAR.  Petitioners note that in 2012, the world price for urea grew to $527 per ton, and
reached nearly $800 per ton in the United States.  Petitioners state that the domestic price of urea
in the PRC was considerably  lower, reaching only $379 per ton in 2012.  According to
Petitioners,  given that urea is a major raw material for the production  of chlorinated  isos,
accounting for approximately  one-third of total raw material costs, the government provision  of
urea at LTAR confers a substantial net benefit on producers of chlorinated  isos in the PRC.
Petitioners note that there are several state owned enterprises ("SOEs") in the PRC that produce
urea, including  the China National Petroleum Corp, China Blue Chemical Ltd. and the China

---

[10]  *See, e.g., Drawn Stainless Steel Sinks from the People's Republic of China:  Final Affirmative Countervailing
Duty Determination*, 78 FR 13017 (February 26, 2013),  and accompanying Issues and Decision Memorandum at
Section I.B; *Multilayered Wood Flooring from the People's Republic of China:  Final Affirmative Countervailing
Duty Determination*, 76 FR 64313 (October 18, 2011),  and accompanying Issues and Decision Memorandum at
Section I.4; *Utility Scale Wind Towers from the People's Republic of China: Final Affirmative Countervailing Duty
Determination*, 77 FR 75978  (December 26, 2012) ("*Wind Towers*"), and accompanying Issues and Decision
Memorandum at Section V.A.7.
[11]  *See Circular Welded Carbon Quality Steel Line Pipe: Final Affirmative Countervailing Duty Determination*, 73
FR 70961  (November 24, 2008) ("*Line Pipe*") , and accompanying Issues and Decision Memorandum at 29.
[12]  *See* Volume IV of the Petition at Exhibits CVD-3 & 5, respectively.

8

Barcode:3156010-01 C-570-991 INV - Investigation  -

Petroleum and Chemical Corporation.  Petitioners also provide evidence that agricultural fertilizer users, as well as artificial boards, melamine, cyanuric acid and SCD vesicant producers represent the majority of urea consumers.

*Financial Contribution:*  The sale of urea at LTAR constitutes a financial contribution from a government authority in the form of providing goods and services pursuant to section 771(5)(D)(iii) of the Act.

*Specificity*:  The program is specific because it is provided to a limited number of industries, pursuant to section 771(5A)(D)(iii)(I) of the Act.

*Benefit*:  Under section 771(5)(E)(iv) of the Act, the government provision of a good provides a benefit equal to the difference between the amount paid for the goods (if any) and a market price determined.

*Support*:  Petitioners provided the following: "China's Urea Prices Rose in H1—Expected to Dip in H2," *China Chemical Reporter* (October 6, 2012); "Overgrown," *China Economic Review* (September 1, 2010).[13]

       3.       <u>Land and Land Usage for Foreign Invested Enterprises ("FIEs") in National Economic and Technological Zones at Preferential Rates</u>

*Description*:  Petitioners claim that Article 8 of the National Economic and Technological Zone Incentives provides that FIEs within these zones may be provided with land use rights at discounted prices of up to 6 million RMB.

*Financial Contribution*:  The sale of land or land-use rights at LTAR constitutes a financial contribution in the form of providing goods and services pursuant to section 771(5)(D)(iii) of the Act.

*Specificity*:  Sales of land-use rights by the national GOC are specific because the program is limited to FIEs located within a designated geographical region pursuant to section 771(5A)(D)(iv) of the Act.

*Benefit*:  The sale of land or land-use rights at below-market prices (*i.e.*, for LTAR) constitutes a benefit pursuant to 19 CFR 351.511(a).

*Support*:  The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[14]  Moreover, Petitioners provided the following:  "State-owned Construction Land Use Right Transfer Price Evaluation Technical Specification," *State*

---

[13]  *See* Volume IV of the Petition at Exhibits CVD-7 & 8, respectively; *see also* Supplement to the Petition at 14-16.
[14]  *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances*, 77 FR 63788 (October 17, 2012) ("*Solar Cells*"), and accompanying Issues and Decision Memorandum at Section VI. A.4. (for land located in the province of Jiangsu).

9

*Preferential Policies for Supporting State-Level Economic and Technology Development Zones*, Ministry of Land and Resources Notice, Guo Tu Zi Fa (April 8, 2013).[15]

*Recommendation*: We recommend initiating an investigation with regards to the provision of land in Economic and Technological Zones by the national government. We note that the Department is not initiating the provincial components of this program. *See* Section II, below. Furthermore, based on the information developed over the course of this investigation, the Department may analyze the provision of the financial contribution as revenue forgone under section 771(5)(D)(ii) of the Act.

## B.   Programs Available to Foreign Invested Enterprises

### 1.   "Two Free/Three Half" Program for FIEs

*Description:* Petitioners assert that under the Foreign Invested Enterprises Tax Law, an FIE that is productive and is scheduled to operate for not less than ten years may be exempted from income tax in the first two years of profitability, and pay income taxes at half the standard rate for the next three years. According to Petitioners, this tax measure is reported to have been terminated at the end of 2007; however, according to the transitional rules, unutilized tax holidays may continue until expiry. Petitioners maintain that five years of preferential tax treatment begins with the year in which the company records a profit, or in 2008, whichever is earlier, and as a result, companies may be exempt from enterprise income taxes for the years 2008 and 2009, and may benefit from a 50 percent reduction in 2010, 2011 and 2012.

*Financial Contribution:* This exemption/reduction in the income tax paid by productive FIEs is considered a financial contribution in the form of revenue forgone by the GOC within the meaning of section 771(5)(D)(ii) of the Act.

*Specificity:* This tax incentive is specific because it is limited to a group of enterprises, *i.e.*, productive FIEs, pursuant to section 771(5A)(D)(i) of the Act.

*Benefit:* This tax incentive confers a benefit equal to the amount of revenue foregone by the government under 19 CFR 351.509. Petitioners note that the statutory income tax rate in the PRC is 25 percent, and the benefit conferred by this program on an FIE that produces goods in the PRC will be equal to 25 percent of the company's taxable income during the first two years after the FIE begins to make a profit, and 12.5 percent during the next three years.

*Support:* The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[16] Additionally, Petitioners provided the following: *Income Tax Law of the People's Republic of China for Enterprises with Foreign Investment and Foreign*

---

[15] *See* Volume IV of the Petition at Exhibits CVD-9, 10 & 11, respectively; *see also* Supplement to the Petition at 16 - 17.

[16] *See, e.g.*, *Wind Towers*, and accompanying Issues and Decision Memorandum at Section V.A.2; s*ee also Aluminum Extrusions from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 76 FR 18521 (April 4, 2011) ("*Aluminum Extrusions*"), and accompanying Issues and Decision Memorandum at Section VII.C.

*Enterprises*, Article 8, Lehman, Lee & Xu (1991); *Rules for the Implementation of the Income Tax Law of the People's Republic of China for Enterprises with Foreign Investment and Foreign Enterprises*, Chapter 6 ("Tax Preference"), Lehman, Lee & Xu (1991); *Notice of the State Council on the Implementation of the Transitional Preferential Policies in respect of Enterprise Income Tax*, No. 39 of the State Council (2007); *China Alert 2008*, Issue No. 1, KPMG; *China Alert 2008*, Issue No. 11, KPMG.[17]

     2.     Income Tax Benefits for FIEs Based on Geographic Location

*Description:*  Petitioners state there are three location based preferential income tax rates for FIEs:  (1) 15 percent for FIEs in special economic zones; (2) 24 percent for productive FIEs in coastal economic open areas, and in the old districts of the cities where the special economic zones or economic and technological development zones are located; and, (3) 15 percent for FIEs in encouraged industries located in designated areas.  Petitioners note that although this program was terminated at the end of 2007, according to the Transitional Preferential Enterprise Tax Law Policies, all three provisions are subject to a transitional application.  As such, companies enjoying a 15 percent tax rate in 2007 are subject to 18, 20, 22, 24 and 25 percent tax rates in 2008, 2009, 2010, 2011, and 2012, respectively.  Petitioners also note that the 24 percent benefit was normalized to 25 percent in 2008 under the transitional policies.

*Financial Contribution:*  The reduced income tax rate is a financial contribution in the form of revenue forgone by the GOC, pursuant to section 771(5)(D)(ii) of the Act.

*Specificity:*  This subsidy is limited to enterprises located in designated geographic regions and is specific under section 771(5A)(D)(iv) of the Act.

*Benefit:*  Enterprises located in designated geographic regions receive a benefit in the amount of the tax savings, pursuant to 19 CFR 351.509(a)(1).

*Support:*  The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[18]  Furthermore, Petitioners provided the following:  *Foreign Invested Enterprise and Foreign Enterprise Income Tax Law* (April 9, 2011); *Income Tax Law of the People's Republic of China on Enterprises with Foreign Investment and Foreign Enterprises, Order No. 45* (April 9, 2011).[19]

     3.     Value Added Tax and Tariff Exemptions for FIEs and Certain Domestic Enterprises using Imported Equipment in Encouraged Industries

*Description:*  Petitioners claim that FIEs and certain domestic enterprises need not pay import tariffs and value added taxes ("VAT") on imported equipment provided that these goods are not for resale.  Petitioners assert that the objective of the program is to encourage foreign investment

---

[17]  *See* Volume IV of the Petition at Exhibits CVD-12 – 16, respectively.

[18]  *See, e.g.*, *Certain Tow-Behind Lawn Groomers from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 74 FR 29180, 29183 (June 19, 2009) and accompanying Issues and Decision Memorandum at Section V.A.5.

[19]  *See* Volume IV of the Petition at Exhibits CVD-14 & 17, respectively.

and to introduce foreign, advanced technology equipment, and industry technology upgrades. Petitioners argue that FIEs, and certain domestic enterprises, are exempted from the VAT and tariffs on imported equipment used for development projects, which are encouraged by the GOC in their production as long as the equipment does not fall into prescribed lists of non-eligible items.

*Financial Contribution:* This VAT and tariff exemption provides a financial contribution in the form of government revenue foregone under section 771(5)(D)(ii) of the Act.

*Specificity:* This VAT and tariff exemption has been found to be specific because it is limited to a group of enterprises, *i.e.*, FIEs and certain domestic enterprises, under section 771(5A)(D)(i) of the Act.

*Benefit:* This VAT and tariff exemption confers a benefit equal to the amount of revenue foregone by the government under 19 CFR 351.510. The standard VAT rate in the PRC is 17 percent, and the import tariff will depend on the specific equipment imported. The benefit conferred by this program on an FIE that produces goods in the PRC, and uses imported equipment, will be equal to 17 percent of the value of the imported equipment plus the tariff on the imported equipment.

*Support:* The Department has previously determined that this VAT and tariff exemption confers a countervailable subsidy under U.S. law.[20] Also, Petitioners provided the following: *Circular of the State Council on Adjusting Tax Policies on Imported Equipment*, Guo Fa No. 37 (1997); *Taxation FAQs*, Lehman Brown.[21]

    4.    <u>VAT refunds for FIEs on purchases of Chinese-made equipment</u>

*Description*: FIEs enjoy refunds of the VAT on their purchases of Chinese-made equipment.

*Financial Contribution:* The VAT refund provides a financial contribution in the form of government revenue forgone under section 771(5)(D)(ii) of the Act.

*Specificity:* The VAT refund is specific because it is contingent upon the use of domestic goods over imported goods under section 771(5A)(C) of the Act.

*Benefit:* The benefit is an amount equal to the amount of revenue forgone by the government under 19 CFR 351.510. The standard VAT rate in the PRC is 17 percent. The benefit conferred by this program on an FIE that produces goods in the PRC will be equal to 17 percent of the value of the PRC-made equipment it purchases.

---

[20] *See Aluminum Extrusions* IDM at Section VII.D.
[21] *See* Volume IV of the Petition at Exhibits CVD-18 & 19, respectively.

*Support*: The Department has previously determined that this program constitutes a countervailable subsidy under U.S. law.[22] Additionally, Petitioners provided the following: Interim Administrative Measures on Purchase of Domestic Equipment Projects with Foreign Investment, Guo Shui Fa, No. 171, Articles 3 & 4 (December 29, 1999).[23]

5.   Preferential direct tax treatment on purchases of domestically produced equipment for FIEs

*Description*: Petitioners allege that preferential tax treatment under this program applies to FIEs with investment projects listed in the encouraged category. Petitioners assert that FIEs may deduct 40 percent of their expenses on purchases of domestically produced equipment; however, the deduction shall not exceed the increase in income tax liability from the year before. Petitioners claim that excess deductible may be carried forward for five years. Petitioners note that the GOC's public notice confirms that this program came to an end at the end of 2007; however, this program appears to have been given a transitional application. According to Petitioners, this transitional application allows companies to claim the deductibility for purchases made before January 1, 2008, and any remaining carry-forward amount could have been used in 2012 (5 years from and including 2008). Additionally, equipment that was purchased at preferential tax rates, and is still in use, continues to provide a benefit to companies that utilized this program.

*Financial Contribution:* This program provides a financial contribution in the form of government revenue foregone under section 771(5)(D)(ii) of the Act.

*Specificity:* This program is specific because it is limited to FIEs with investment projects in encouraged categories.

*Benefit:* The tax reduction confers a benefit equal to the amount of revenue foregone by the government under 19 CFR 351.510.

*Support:* Petitioners provided the following: Ministry of Finance (MOF) Circular Cai Shui, No.49 ( 2000 expired); State Administration of Taxation (SAT) Circular Guo Shui Fa, No.90 (2000 expired); MOF Circular Cai Shui, No.1 (2008, articles 1 and 9 expired); Circular Guo Shui Fa, No.52 (2008); SAT Guo Shui Han, No. 69 (February 12, 2010); Guo Shui Fa, No. 52 (May 16, 2008); "Enterprises to Purchase Domestic Equipment Investment no Longer Enjoy the Enterprise Income Tax Policies," *Xinhua News* (February 18, 2009).[24]

---

[22]   *See Coated Free Sheet Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 72 FR 60645 (October 25, 2007) ("*CFS Paper*"), and accompanying Issues and Decision Memorandum at Section I.E.
[23]   *See* Volume IV of the Petition at Exhibit CVD-20.
[24]   *See* Volume IV of the Petition at Exhibits CVD-22 - 26, respectively.

## C.     Other National Programs

### 1.     Policy Loans under the Chlor-alkali Industry Second Five Year Plan

*Description*: Petitioners maintain that the GOC provides policy loans through its policy banks and state-owned banks. Petitioners argue that these loans were found to have been made pursuant to the GOC directives found in national and provincial five-year plans, industrial plans, catalogues of encouraged industries, and other laws and regulations. Petitioners contend that commercial banks in the PRC are government entities, and all senior bank officers for PRC banks are members of the Chinese Communist Party and are appointed by the Party. These officers are also assigned ranks in the PRC government's hierarchy. According to Petitioners, the GOC, at times, will pressure the banks to align their credit allocation along with national economic policy. Moreover, Petitioners assert that the PRC's banking regulation authority, the CBRC, issued a guideline that governs, among other things, banks' board membership and mandates that banks support national policies on industrial transformation and environmental protection, protect and save resources, and promote sustainable development of the society. Petitioners assert that in the *Chlor-alkali Industry "Second Five Year Plan,"* the government is encouraged to finance measures to vigorously promote the chlor-alkali industry and that the GOC should provide "financial, tax and other aspects of subsidies and incentives." Petitioners note that the 2011 catalogue lists "chemical products" under encouraged projects.

*Financial contribution:* The Department has determined that government loans provide a direct financial contribution by the GOC, pursuant to sections 771(5)(B)(i) and (D)(i) of the Act, and that state-owned commercial banks are considered government authorities.

*Specificity:* The PRC's state-owned banks have generally directed policy loans to industries favored by the government, such as the chlor-alkali industry. As such, Petitioner claims that the GOC's preferential loans and directed credit are granted on a specific basis, pursuant to section 771(5A)(D) of the Act.

*Benefit:* Government policy lending provides benefits to recipients equal to the difference between what the recipients paid on loans from government-owned banks, and the amount they would have paid on comparable commercial loans, pursuant to section 771(5)(E)(ii) of the Act.

*Support*: The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[25] In addition, Petitioners provided the following: *China's Banking System: Issues for Congress*, Michael F. Martin, Congressional Research Service (February 20, 2012) at 28-36; *Chlor-Alkali Industry, "Second Five Year Plan"* (July 26, 2011); *China's*

---

[25]  *See, e.g., Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Negative Determination of Critical Circumstances,* 73 FR 40480 (July 15, 2008) ("*Tires*"), and accompanying Issues and Decision Memorandum at Section IV.A.2; *Citric Acid and Certain Citrate Salts from the People's Republic of China: Final Results of Countervailing Duty Administrative Review,* 76 FR 77206 (December 12, 2011) ("*Citric Acid*") and accompanying Issues and Decision Memorandum at Section I.A (including policy loan in the Shandong province for promotion of key industries).

Barcode:3156010-01 C-570-991 INV - Investigation  -

*Chemical Industry: Flying Blind;* "China to Encourage Increased Private Investment in Banking Sector," Song Shengxia, *Global Times* (June 28, 2012).[26]

2.   Stamp Tax exemption on share transfers under Non-Tradable Share Reform

*Description*: Petitioners assert that the GOC waives stamp taxes otherwise due upon the transfer of bonus shares. Petitioners argue that the underlying criterion for participation in non-tradable share reform ("NTSR") is that listed companies must have non-tradable shares, regardless of what entity issued the non-tradable shares.

*Financial contribution:* The waiver of stamp taxes constitutes a financial contribution within the meaning of section 771(5)(D)(ii) of the Act in the form of revenue foregone.

*Specificity:* In *Tires,* the Department found that the NTSR, including the stamp tax exemption, is specific within the meaning of section 771(5A)(D)(i) of the Act, in that it is limited to only those that participated in the NTSR.[27]

*Benefit:* The GOC confers a benefit in the form of tax savings to the extent that the stamp tax was not paid, pursuant to section 771(5)(E) of the Act.

*Support*: The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[28]

3.   State Key Technology Renovation Project Fund

*Description*: Petitioners speculate that the State Key Technology Renovation Project Fund ("Key Technology Program") was created to promote technologies in targeted sectors, and operates under the regulatory guidelines provided in the circular. Petitioners assert that the purpose of this program is to promote: (1) technological renovation in key industries, key enterprises, and key products; (2) facilitation of technology upgrades; (3) improvement of product structure; (4) improvement of quality; (5) promotion of domestic production; (6) increase of supply; (7) expansion of domestic demand; and, (8) promotion of continuous and healthy development of the state economy. Petitioners maintain that under the Key Technology Program, companies can apply for funds to cover the cost of financing specific technological renovation projects. Petitioners state that the funds cover two years of interest payments on loans to fund the project, or up to three years for enterprises located in the northeast, central, or western areas of the PRC.

Petitioners note that chlorinated isos producers are located in the northeast of the PRC.[29] Petitioners also note that the chlor-alkali industry has its own five-year plan.

---

[26] *See* Volume V of the Petition at Exhibits CVD-28, 29, 50 & 31, respectively; *see also* Supplement to the Petition at 18.
[27] *See Tires*, and accompanying Issues and Decision Memorandum at Section IV.A.5.
[28] *Id.* at Section IV.A.5 and Comment G.1.
[29] *See* Volume I of the Petition at 32, Table 8.

Filed By: matthew renkey, Filed Date: 9/20/13 2:28 PM, Submission Status: Approved

*Financial contribution:* In *Tires* the Department determined that this program provided countervailable subsidies within the meaning of section 771(5)(D)(i) of the Act.

*Specificity:* This program has been found to be specific because it is limited to a group of enterprises under section 771(5A)(D)(i) of the Act, specifically, the group of enterprises that are financing specific renovation projects under this program.

*Benefit:* Key Technology Program grants are a direct transfer of funds, within the meaning of section 771(5)(D)(i) of the Act, and therefore, provide a benefit equal to the amount of the funds provided under 19 CFR 351.504.

*Support*: The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[30] Moreover, Petitioners provided the following: *Chlor-Alkali Industry "Second Five Year Plan"* (July 26, 2011); Notice Concerning the Promulgation and Circulation of "Measures for the Administration of National Key Technological Renovation Projects" at paragraphs 4 and 7, and "Measures for the Administration of Treasury Bond Special Fund for National Key Technological Renovation Projects," Guo Jing Mao Touzi, No. 886 (September 10, 1999).[31]

4.   Shareholder loans (debt forgiveness)

*Description*: Petitioners argue that certain wholly state-owned non-bank financial institutions have provided loans to companies. Petitioners attempted to obtain names of shareholders for chlorinated isos producers, and found results for three companies. Petitioners also consulted annual reports and general research into the three companies; however, they were unable to determine who the shareholders are and whether they are state owned. Petitioners note that the second-largest shareholder of Jiheng, a producer of chlorinated isos, is Shenzhen Ping An Innovation Capital Investment Co., the private equity arm of the Ping An Insurance Group, which, though classified as private, it is believed that there is state involvement. Petitioners assert that other producers may have state-owned non-bank financial institutions as shareholders, but extensive research into the producers was not conclusive.

*Financial contribution:* The forgiven portion of the loan is treated as a grant bestowed at the point of the loan forgiveness, providing a financial contributions in the form of direct transfers of funds under section 771(5)(D)(i) of the Act.

*Specificity:* The program is specific under section 771(5A)(D)(iii)(l) because it is limited to companies which have state-owned non-bank financial institutions as shareholders .

*Benefit:* The benefit is equal to the amount the government has assumed or forgiven under 19 CFR 351.508(a).

---

[30] *See*, *e.g.*, *Tires*, and accompanying Issues and Decision Memorandum at Section IV.A.7.
[31] *See* Volume V of the Petition at Exhibits CVD-29, 30, respectively.

*Support*: The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[32]

5.      Discounted Loans for Export-Oriented Enterprises

*Description*: Petitioners suggest that the PRC designates certain "honorable enterprises for collection of export receipts of foreign exchange" to encourage large-scale enterprises to export, if their annual export value reached $200 million, their ratio of exports to foreign exchange is above 85 percent, and their ratio of surrendered verification forms of export receipts are above 80 percent. In addition, Petitioners maintain that the lending rates of RMB loans extended by commercial banks to "honorable" companies can be lowered up to 10 percent on the basis of the lending rates fixed by the People's Bank of China but can be raised up to 30 percent for high-risk enterprises. Petitioners argue that although the PRC repealed this practice in 2007, preferential loans received in earlier years would be countervailable based on their repayment schedule.

*Financial contribution:* The Department has determined that these loans constitute a direct financial contribution from the government in the form of a direct transfer of funds, pursuant to section 771(5)(D)(i) of the Act.

*Specificity:* This program are specific under section 771(5A)(A) of the Act because receipt of the financing is contingent upon exporting.

*Benefit:* The benefit of this program is the amount of interest paid against the loans compared to the amount of interest that would have been paid on a comparable commercial loan.

*Support*: The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[33] Furthermore, Petitioners provided the following: Circular of the People's Bank of China, the State Administration of Foreign Exchange, the Ministry of Foreign Trade and Economic Cooperation and the State Administration of Taxation Concerning Printing and Distributing Detailed Rules on Rewarding and Punishment Concerning Provisional Regulations over Examination of Export Collections of Foreign Exchange, YinFa, No. 58 (February 17, 2000); Request for Consultations by the United States (Addendum), *China – Certain Measures Granting Refunds, Reductions or Exemptions from Taxes and Other Payments*, WT/DS358/1/Add.1.[34]

6.      Income tax credits on purchases of domestically produced equipment by domestically owned companies

*Description*: Petitioners argue that tax credits are available to domestic companies that purchase domestically produced equipment. Petitioners state that a domestic PRC company may claim tax credits on the purchase of PRC made equipment if the project is compatible with the industrial

---

[32] *See Lightweight Thermal Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 73 FR 57323 (October 2, 2008) ("*Lightweight Thermal Paper*"), and accompanying Issues and Decision Memorandum at Section I.B; *see also* Supplement to the Petition at 18.

[33] *See Line Pipe*, and accompanying Issues and Decision at Section V.A.6.

[34] *See* Volume V of the Petition at Exhibits CVD-31 & 32, respectively.

policies of the GOC. Petitioners maintain that a tax credit of up to 40 percent of the purchase price of domestic equipment may apply to the incremental increase in tax liability from the previous year. Petitioners note that this tax measure was allegedly terminated at the end of 2007; however, in *Steel Wheels* the Department found that companies were still benefiting under this provision during 2010.

*Financial contribution:* Under this program, the Department determined that the income tax reductions constitute a financial contribution in the form of revenue forgone, under section 771(5)(D)(i) of the Act.

*Specificity:* This program is specific because the receipt of the tax savings is contingent upon the use of domestic over imported goods under section 771(5A)(A) of the Act.

*Benefit:* The benefit is an amount equal to the tax savings under section 771(5)(E) of the Act.

*Support*: The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[35] Also, Petitioners provided the following: New and Full Notification Pursuant to Article XVI:1 of the GATT 1994 and Article 25 of the Agreement on Subsidies and Countervailing Measures, G/SCM/N/155/CHN; G/SCM/N/186/CHN (October 21, 2011) at 94.[36]

7.     VAT rebate on domestically produced equipment

*Description*: Petitioners contend that for both domestic and FIE projects, which are in the encouraged category, equipment purchased for self-use shall be exempted from tariff and import VAT. According to Petitioners, this program was terminated at the end of 2008; however, in *Solar Cells* the Department found this program countervailable during 2010. As such, there is a reason to believe that this program is still on-going in its original or modified form.

*Financial contribution:* These VAT exemptions provide a financial contribution in the form of government revenue forgone under section 771(5)(D)(ii) of the Act.

*Specificity:* The VAT exemptions are specific because they are limited to a group of encouraged enterprises or industries under section 771(5A)(D)(i) of the Act.

*Benefit:* The benefit is an amount equal to the amount of revenue forgone by the government under 19 CFR 351.510.

*Support*: The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[37] In addition, Petitioners provided the following: MOF Circular Cai Shui, No. 290 (1999); MOF Circular Cai Shui, No.1; SAT Circular Guo Shui Fa, No.52 (2008); Circular of the Ministry of Finance, State Development and Reform Commission, General

---

[35] *See Certain Steel Wheels from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 77 FR 17017 (March 23, 2012) ("*Steel Wheels*"), and accompanying Issues and Decision Memorandum at Section VII.D.
[36] *See* Volume IV of the Petition at Exhibit CVD-21.
[37] *See Solar Cells*, and accompanying Issues and Decision Memorandum at Section VI.A.10.

Barcode:3156010-01 C-570-991 INV - Investigation  -

Administration of Customs and State Administration of Taxation on Import Taxation Policies to Implement the Opinions of the State Council of Invigorating Equipment Manufacturing, Cai Guan Shui, No. 11 (2007); Circular of the State Administration of Taxation Concerning Transmitting the Interim Measure for the Administration of Tax Refund to Enterprises with Foreign Investment for Their Domestic Equipment Purchases, Guo Shui Fa, No.171 (September 20, 1999).[38]

### 8.     VAT exemption on imports by encouraged industries

*Description*: Petitioners argue that both domestic and FIEs established in western regions, and those engaged in industries encouraged by the GOC, are eligible for this program. Petitioners note that for domestic enterprises, they must be those industries encouraged by the GOC as found in the "Catalogue of the Industries Products and Technologies Particularly Encouraged by the State," and these listed items must account for over 70 percent of the enterprise's total revenue in order to qualify. In addition, Petitioners also note that for FIEs, industries encouraged by the GOC are those listed in the "Catalogue for the Guidance of the Foreign Investment Industries," and listed in the "Catalogue for the Guidance of the Advantageous Industries in Central and Western Regions for Foreign Investment," and that these listed items must comprise over 70 percent of the enterprise's total revenue.

*Financial contribution:* These VAT exemptions provide a financial contribution in the form of government revenue forgone under section 771(5)(D)(ii) of the Act.

*Specificity:* These VAT exemptions, under section 771(5A)(D)(i) of the Act, are specific because they are limited to FIEs established in western regions, and those engaged in industries encouraged by the GOC[39], .

*Benefit:* The benefit is an amount equal to the amount of revenue forgone by the government under 19 CFR 351.510.

*Support*: The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[40] Moreover, Petitioners provided the following: State Planning Commission, Catalogue of the Industries Products and Technologies Particularly Encouraged by the State (December 31, 1997); National Development and Reform Commission (NDRC) and Ministry of Commerce (MOC), Catalogue for the Guidance of the Foreign Investment Industries (Amended in 2011) (Decree of the NDRC and MOC No. 12); National Development and Reform Commission (NDRC) and Ministry of Commerce (MOC), Catalogue for the Guidance of the Foreign Investment Industries (Amended in 2011) (Decree of the NDRC and MOC No. 12); national Development and Reform Commission (NDRC), Midwest Industrial Catalogue for Foreign Investment.[41]

---

[38] *See* Volume V of the Petition at Exhibits CVD-40 - 44, respectively.
[39] As noted above, under the *Chlor-alkali Industry "Second Five Year Plan,"* chemical products are encouraged projects.
[40] *See High Pressure Steel Cylinders from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 77 FR 26738 (May 7, 2012), and accompanying Issues and Decision Memorandum at Section V.D.
[41] *See* Volume V of the Petition at Exhibits CVD-45 - 47, respectively.

Filed By: matthew renkey, Filed Date: 9/20/13 2:28 PM, Submission Status: Approved

Barcode:3156010-01 C-570-991 INV - Investigation  -

9.    Preferential lending for industrial readjustment

*Description*: Petitioners note that in April of 2011, the NDRC released a new version of the *Directory Catalogue on Readjustment of Industrial Structure*. Petitioners state that the projects listed in the "encouraged" category qualify for preferential treatment from the government, including receiving priority in the allocation of credit by state-owned banks. Petitioners maintain that the 2011 catalogue lists "chemical products" under encouraged projects. Petitioners state that the chemical industry in the PRC receives preferential loans and financing from state-owned banks. According to Petitioners, chemical companies also have preferential access to capital, making it easier for them to deal with supply shortages, price increases, and volatility.

*Financial contribution:* The loans provide a financial contribution in the form of the direct transfer of funds from government-owned banks under section 771(5)(D)(i) of the Act.

*Specificity:* The loans are specific because they are limited by law to a group of encouraged industries under section 771(5A)(D)(i) of the Act.

*Benefit:* Under section 771(5)(E)(ii) of the Act, the loans confer a benefit equal to the difference between the amount the recipient paid on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could obtain on the market.

*Support*: The Department has previously has relied on an industry's classification as encouraged in the *Directory Catalogue on Readjustment of Industrial Structure* to support countervailing loans from state-owned banks on the grounds that such loans are preferential policy loans.[42] Also, Petitioners provided the following: "China's Chemical Industry: Flying Blind?," A.T. Kearney (2012) at 11; *Directory Catalogue on Readjustment of Industrial Structure*, NDRC; *Guidance Catalogue on Readjustment of Industrial Structure*, NDRC (2011).[43]

10.    Export credit insurance from China Export and Credit Insurance Corporation

*Description*: Petitioners assert that the PRC provides generous export credit insurance through the China Export and Credit Insurance Corporation ("Sinosure"), a state-owned financial institution. According to Petitioners, Sinosure has grown rapidly since it was created in 2001, and in 2009 Sinosure underwrote $98.7 billion in export credit insurance for the year. Petitioners contend that due to the inadequate premiums charged by Sinosure, the company is unable to cover its costs and losses. Petitioners note that Sinosure's annual reports from 2003-2011 reveal a cumulative operating loss of RMB 3.5 billion, and in 2010, despite the fact that the rate of default and claims paid was likely to have grown during the global financial crisis, Sinosure announced it would be reducing its premium rates to even lower levels.

---

[42] *See Tires*, and accompanying Issues and Decision Memorandum at Comment E. l.
[43] *See* Volume VI of the Petition at Exhibits CVD-49 - 52, respectively.

Filed By: matthew renkey, Filed Date: 9/20/13 2:28 PM, Submission Status: Approved

Barcode:3156010-01 C-570-991 INV - Investigation  -

*Financial contribution:* Export insurance provides a financial contribution in the form of the potential direct transfer of funds from a government-owned financial institution under section 771(5)(D)(i) of the Act.

*Specificity:* This program is specific because it is contingent on export performance under section 771(5A)(B) of the Act.

*Benefit:* This program confers a benefit on the recipient pursuant to 19 CFR 351.520, equal to the difference between what the recipient paid for insurance premiums and the amount received by the firm under the insurance program.

*Support:* Petitioners provided the following: "China Export and Credit Aims for Growth in 2010," Rebecca Ng, InsuranceNewsNet.com (April 27, 2010); Sinosure Annual Reports 2003-2011, and summary table.[44]

11.  Corporate Income Tax Law Article 33: reduction of taxable income for the revenue derived from the manufacture of products that are in line with State industrial policy and involve synergistic utilization of resources

*Description*: Petitioners argue that when calculating its taxable income, a company may take into account 90 percent of the revenue derived from the use of raw materials of the prescribed resources included in the *Catalogue of Preferential Corporate Income Tax Treatments for Synergistic Utilization of Resources.* According to Petitioners, the prescribed resources are associated minerals and by-products, waste water or liquid, waste gas, and waste residue, and recyclable resources. Petitioners maintain that the chemical industry falls under the first of these categories, and that resources used by chlorinated isos producers that are listed in the catalogue include fertilizers (urea) and sulfuric acid.

*Financial contribution:* This program provides a financial contribution in the form of government revenue foregone under section 771(5)(D)(ii) of the Act.

*Specificity:* The program is specific for purposes of section 771(5A)(D)(iii)(I) because the recipients of the subsidy are limited in number, and under section 771(5A)(D)(iii)(II) because the chemical industry is a predominant user of the subsidy.

*Benefit:* The tax reduction confers a benefit equal to the amount of revenue foregone by the government under 19 CFR 351.510.

*Support*: Petitioners provided the following: KPMG, Corporate Income Tax Law Article 33; KPMG, The Implementation Rules for the Corporate Income Tax Law, Article 99; Notice of the Issuance of the Catalogue of Preferential Corporate Income Tax Treatments for Synergistic Utilization of Resources (2008 version), Cai Shui, No. 117, jointly issued by the Ministry of Finance, State Administration of Taxation and the State Development and Reform Committee (August 26, 2008); China Tax Alert, Issue 31, KPMG (2008).[45]

---

[44] *See* Volume VI of the Petition at Exhibits CVD-51 & 52, respectively.
[45] *See* Volume VI of the Petition at Exhibits CVD-62 - 65, respectively.

21

12.   Export Seller's Credits and Export Buyer's Credits from the Export-Import Bank of China

*Description*: Petitioners state that China ExIm has increased its export credit activities significantly in recent years. Petitioners note that, according to its annual report, in 2003 China ExIm had RMB 102.6 billion outstanding on its balance sheet, compared to the RMB 600.8 billion it had outstanding in 2009. Petitioners contend that in 2011, the U.S. ExIm Bank estimated that China ExIm issued $48.5 billion in new medium- and long-term export credits, more than twice the value of such credits newly issued by the U.S. ExIm Bank in 2011, and that total export credit financing from the GOC likely exceeds $100 billion per year.

Petitioners maintain that the China ExIm provides support to exporters through a variety of means, including the export seller's credit and the export buyer's credit. Petitioners note that China ExIm explains that the purpose of its programs is to support the export of PRC products and improve their competitiveness in the international market, and it describes the export seller's credit as a loan with a large amount, long maturity, and preferential interest rate. Petitioners state that although China ExIm reveals little information about the rates that are charged under these programs, there are various second-hand reports indicating that the terms of this financing are highly concessional.

Additionally, Petitioners maintain that the China Development Bank also appears to extend its own export credits at volumes that may approach or even exceed the export credits reported by China ExIm.

*Financial contribution:* This program provides a financial contribution in the form of a direct transfer of funds from a government owned financial institution under section 771(5)(D)(iii) of the Act.

*Specificity:* This program is specific within the meaning of section 771(5A)(B) of the Act because it is contingent upon export activity.

*Benefit:* Under section 771(5)(E)(ii) of the Act, export financing confers a benefit equal to the difference between the amount the recipient pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market.

*Support*: The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[46] Additionally, Petitioners provided the following: *2009 Annual Report*, Export-Import Bank of China, at 21; *Report to the U.S. Congress on Export Credit Competition and the Export Import Bank of the United State*s, Export-Import Bank of the United States at 17 (June 2012); *Export-Import Bank of China*, Ryan J. Orr and Jeremy R. Kennedy "Introduction" and "Export Seller's Credit;" "Highlights of Recent Trends in Global Infrastructure: New Players and Revised Game Rules," *Transnational Corporations*, Vol. 17, No. 1, at 108-109 (April 2008); *Export-Import Bank of the United States, Report to the U.S. Congress on Export Credit Competition and the Export Import Bank of the United States* (June 2011) at 113; *China's*

---

[46]  *See Wind Towers*, and accompanying Issues and Decision Memorandum at 25.

Barcode:3156010-01 C-570-991 INV - Investigation  -

*African Aid:  Transatlantic Challenges*, Deborah Brautigam,  The German Marshall Fund of the United States (April 2008) at 25-26. [47]

13.   Preferential loans provided by the Export-Import Bank "Going-out"  for Outbound Investments

*Description*: According to Petitioners, the GOC has promoted its "Going-out"  strategy in the *Tenth Five-Year Plan , 2001-2005* and *Twelfth Five-Year Plan, 2011-2015*.  Petitioners contend that these loans and other means of preferential financial assistance provide chlorinated isos producers with the ability to establish subsidiaries  or warehouses overseas, improving  their distribution  channels and granting them greater access to the export market, as well as provide producers with the ability to purchase inputs from overseas.

Petitioners note that the China ExIm's 2011 Annual Report states that it seized opportunities offered by global economic readjustment to support PRC companies to invest overseas and facilitate domestic products, services, brands and standards to go global.  Petitioners state that China ExIm's primary policy objective in carrying out the strategy is reported to be "the promotion of foreign trade and diplomacy by capitalizing  domestic exporters and exporting credit to potentially  profitable foreign projects."  Petitioners claim that with this objective, China ExIm is "able to provide preferential loans with very flexible  payment schedules at less than half the interest offered by any of the commercial banks."  Petitioners note that it has been reported that China ExIm issued a total of USD $500 billion  in loans under the "going out" projects as of the end of 2010.

*Financial contribution:*  These programs provide a direct financial contribution  by the GOC under section 771(5)(D)(i) of the Act.

*Specificity:*  This program targets particular industries for international  promotion,  and is thus specific, pursuant to section 771(5A)(B) of the Act.

*Benefit:*  Government policy lending  provides benefits to the recipients equal to the difference between the amount paid on loans from government-owned banks and the amount that would have paid on comparable commercial loans, pursuant to section 771(5)(E)(ii) of the Act.

*Support*: Petitioners provided the following: Ting Xu, "Destination Unknown: Investment in China's 'Go Out' Policy," *China Brief*, Volume 11 Issue: 17 (September 16, 2011); Export-Import Bank of China, 2011 Annual Report at 10; China's Policy Banks (September 9, 2009); *Twelfth Five-Year Plan, 2011-2015* (July 26, 2011). [48]

14.   Foreign Trade Development  Fund

*Description*: Petitioners note that this national grant program provides firms, with an annual export value of USD $1,000,000  to $5,000,000,  grants from the Ministry of Foreign Trade and Economic Cooperation.  Moreover, Petitioners note that the Department also investigated  similar

---

[47]  *See* Volume V of the Petition at Exhibits CVD-33, 34, 36 - 39, respectively.
[48]  *See* Volume VI of the Petition at Exhibits CVD-68 – 70, & 55, respectively.

Filed By: matthew renkey, Filed Date: 9/20/13 2:28 PM, Submission Status: Approved

programs administered by a number of different local authorities.  According to Petitioners, there is evidence that a similar program exists in Jiangsu Province, where the provincial government created a special fund to promote foreign trade.

*Financial contribution:*  These government programs constitute financial contributions in the form of a direct transfer of funds under section 771(5)(D)(i) of the Act.

*Specificity:*  This program is specific within the meaning of section 771(5A)(B) of the Act because it is contingent upon export activity.

*Benefit:*  These programs confer a benefit equal to the amount of the funds provided under 19 CFR 351.504.

*Support*: The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[49]  Moreover, Petitioners provided the *Circular on Issuance of Management Methods for Foreign Trade Development Support Fund*, Department of Finance, Jiangsu Province, Jiangsu Foreign Trade Development Fund Management Interim Measures Guide, Su Cai Qi, No. 182 (2008).[50]

## D.  Provincial Programs

### 1.  "Famous Brands" program

*Description*: Petitioners contend that this program provides grants to an exporting company that wins the "Famous Brand" or "Top Brand" award from a local or provincial government for meeting high international standards.  Petitioners argue that the PRC's "Famous Brands" program is administered at the national, provincial, and local government levels.  According to Petitioners, enterprises must provide information concerning their export ratio as well as the extent to which their product quality meets international standards.  Petitioners maintain that awards and criteria vary by province and by city, for example, Jiheng, located in Hebei Province, has been awarded the "Hebei Famous Brand Certificate."

*Financial contribution:*  This government grant constitutes a financial contribution in the form of a direct transfer of funds under section 771(5)(D)(i) of the Act.

*Specificity:*  This program is specific under section 771(5A)(B) of the Act because it is contingent upon export activity.

*Benefit:*  The benefit is an amount equal to the amount of funds provided under 19 CFR 351.504.

---

[49] *See, e.g., Pre-Stressed Concrete Steel Wire Strand from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 75 FR 28557 (May 21, 2010) ("*PC Strand*"), and accompanying Issues and Decision Memorandum at Section I.F.
[50] *See* Volume VI of the Petition at Exhibit CVD-73.

*Support*: The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[51] Furthermore, Petitioners provided the following: General Administration of Quality Supervision, Inspection and Quarantine Bureau of Works Council, Measures for the Administration of Chinese Top-Brand Products, AQSIQ Decree No. 12 (December 18, 2009); Hebei Famous Brand Certificate.[52]

2.    Preferential policies to attract foreign investment in Jiangsu Province

*Description*: Petitioners state that FIEs and foreign enterprises are subject to the following types of taxes: corporate income tax, local income tax, VAT, consumption tax, business tax, personal income tax, urban real estate tax, plate tax for vehicle and vessel usage, and stamp duty. Petitioners contend that Jiangsu Province provides preferential rates to foreign enterprises and FIEs to attract foreign investment. Petitioners note that China Salt Changzhou Chemical Co. is located in Jiangsu Province.[53] Among the preferential tax policies offered by Jiangsu Province to FIEs and foreign enterprises are: multi-year exemptions from the corporate tax rate; a reduced local income tax rate; tax rebates on reinvested profits; no tax on the export share of profits; and no value-added tax, consumption tax, or business tax.

*Financial contribution:* This program provides a financial contribution in the form of government revenue foregone under section 771(5)(D)(ii) of the Act.

*Specificity:* This program is limited to FIEs and foreign enterprises in Jiangsu Province, and is specific within the meaning of section 771(5A)(D)(i) of the Act.[54]

*Benefit:* The tax reductions confer a benefit equal to the amount of revenue foregone by the government under 19 CFR 351.510.

*Support*: Petitioners provided the following: China Council for the Promotion of International Trade, Jiangsu Sub-Council, Preferential Policies to Attract Foreign Investment in Jiangsu Province (October 2, 2008).[55]

3.    Outline of light industry restructuring and revitalization plan in Jiangsu Province

*Description*: Petitioners maintain that this plan proposes to accelerate the restructuring and revitalization of light industry in Jiangsu Province. Petitioners contend that specified within this plan is the promotion of the chlor-alkali industry, for which the province is promoting an "industrial clustering" to build economies of scale. Petitioners argue that key enterprises included in this plan can receive governmental support in terms of "land, capital and other elements of supply." Petitioners contend that also included in the plan are "various provincial

---

[51] *See, e.g., Certain Frozen Warmwater Shrimp from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 78 FR 50391 (August 19, 2013), and accompanying Issues and Decision Memorandum Section VI.A.2.

[52] *See* Volume VI of the Petition at Exhibits CVD-74 & 75, respectively.

[53] *See* Volume I of the Petition at 32, Table 8.

[54] Though this program has many similar tax policies to the Two Free Three Half program and FIE Income Tax Law Article 7, *supra*, those programs are administered at the national level, while this one is administered at the provincial level.

[55] *See* Volume VI of the Petition at Exhibit CVD-76.

25

funds to support light industries" and the encouragement of expanded financing channels. Petitioners state that at least one major producer and exporter of chlorinated isos, China Salt Changzhou Chemical Co., is located in Jiangsu Province.[56]

*Financial contribution:* The provision of funds is a financial contribution under section 771(5)(D)(i) of the Act. To the extent land is provided, it qualifies as a financial contribution in the form of the provision of a good for LTAR under section 771(5)(D)(iii) of the Act.

*Specificity:* This program is limited to particular industries targeted for development and is *de jure* specific pursuant to section 771(5A)(D)(i) of the Act.

*Benefit:* The provision of funds confers a benefit equal to the amount of the funding provided by the government. To the extent land is provided, the sale or provision of land at below-market prices (*i.e.*, for LTAR) constitutes a benefit pursuant to 19 CFR 351.511(a).

*Support*: Petitioners provided the following: Jiangsu Development and Reform Commission, Jiangsu Province Light Industry Adjustment and Revitalization Plan, Su Zheng Fa, No. 87 (May 31, 2009).[57]

4.    Jiangsu province grants for legal fees in foreign trade remedy proceedings

*Description*: Petitioners maintain that, according to *Key Points to Report on the Business Development Special Fund to Support the Transformation and Upgrading of Foreign Trade*, Jiangsu Province subsidizes PRC companies to defend various trade remedy cases abroad under the "Export-Import Fair Trade" program. Petitioners note that PRC producers and exporters of chlorinated isos have been subject to a U.S. antidumping order and have actively participated in administrative reviews (and litigation) since 2005. Further, Petitioners note that at least one major producer and exporter of chlorinated isos, China Salt Changzhou Chemical Co., is located in Jiangsu Province.[58]

*Financial contribution:* This government grant constitutes a financial contribution in the form of a direct transfer of funds under section 771(5)(D)(i) of the Act.

*Specificity:* The benefits are awarded only to a small number of enterprises or industries and therefore is specific within the meaning of sections 771(5A)(D)(iii)(I) of the Act.

*Benefit:* This grant program confers a benefit equal to the amount of the funds provided under 19 CFR 351.504.

*Support*: The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[59] Moreover, Petitioners provided the following: Jiangsu Province

---

[56] *See* Volume I of the Petition at 32, Table 8.
[57] *See* Volume VI of the Petition at Exhibit CVD-77.
[58] *See* Volume I of the Petition at 32, Table 8.
[59] *See*, *e.g.*, *Raw Flexible Magnets from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 73 FR 39667 (July 10, 2008) and accompanying Issues and Decision Memorandum at 8.

Barcode:3156010-01 C-570-991 INV - Investigation -

Department of Finance, Special Funds to Support Foreign Trade Transformation and Upgrading of the Implementation Details of the Notification, Choi Su-regulation No. 40 (2010).[60]

### 5. Shandong Province: grants to enterprises exporting key products

*Description*: Petitioners contend that Shandong Province has policies to encourage trade and exportation growth, which include: (1) interest discounts on loans to "productive exportation enterprises" used for the R&D of export products; (2) subsidies for export credit insurance; and, subsidies to entities having made "remarkable contributions to the foreign economic cooperation and international trade development of the province." Petitioners note that four major producers and exporters of chlorinated isos, Heze Huayi, Liaocheng London, Kangtai, and Zhucheng Taisheng, are located in Shandong Province.[61]

*Financial contribution:* This government grant constitutes a financial contribution in the form of a direct transfer of funds under section 771(5)(D)(i) of the Act.

*Specificity:* This program is specific because it is contingent upon export activity, pursuant to section 771(5A)(B) of the Act.

*Benefit:* This program provides a benefit in the amount of the grant received under 19 CFR 351.504(a).

*Support:* Petitioners provided the following: Notice of Making Efforts to Accomplish the Work of Applying the Trade Promotion Capital for Agricultural, Light Industry and Textile Products in 2006, No. 747 (LWJMFZ 2006); 2006 Shandong Province Policies on Encouraging Trade and Exportation Expansion, Lu Cai Qi, No. 5(2006).[62]

## E.    Local and Municipal Programs

### 1. Grants for export credit insurance

*Description*: Petitioners assert that this program reimburses PRC companies for export credit insurance fees that they have paid to Sinosure. Petitioners contend that companies report fees paid to their local authorities and receive a grant when approved. Petitioners state that Chinese Premier Wen mentioned increasing the use of export credit insurance in August 2012.

*Financial contribution:* This government grant constitutes a financial contribution in the form of a direct transfer of funds under section 771(5)(D)(i) of the Act.

*Specificity:* These programs are specific because they are limited to companies that export, pursuant to section 771(5A)(B) of the Act.

---

[60] *See* Volume VI of the Petition at Exhibit CVD-78.
[61] *See* Volume I of the Petition at 32, Table 8.
[62] *See* Volume VI of the Petition at Exhibits CVD-80 & 81, respectively.

Filed By: matthew renkey, Filed Date: 9/20/13 2:28 PM, Submission Status: Approved

*Benefit:* This program provides a benefit in the amount of the grant received under 19 CFR 351.504(a).

*Support*: The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[63] Moreover, Petitioners provided the following: "Wen called for faster payment of export tax rebates, greater use of export credit insurance and reduced inspections and fees to ease the burden on companies," Bloomberg News (August 26, 2012).[64]

2.    Special Fund for Energy Saving Technology Reform

*Description*: Petitioners state that according to the *Circular of the MOF and NDRC on Printing and Distributing Interim Measures of Energy Saving Technology Reform Awards Fiscal Funds*, Article 1, the special fund was in place during the 11th 5-Year period. Petitioners speculate that the GOC distributed the funds to enterprises (Article 14) in order to encourage energy-saving technology renovation projects (Article 5). Petitioners contend that the funds were arranged by the GOC (Articles 5 and 14), but the local governments were mandated to play a role in supervision of the implementation (Article 15). Petitioners note that the Department countervailed this program in *Citric Acid*, and that the Department found that enterprises whose energy-saving innovation projects result in energy savings that exceed 10,000 tons of coal will receive an award. Petitioners also note that the standard award is RMB 200 per ton of coal for the eastern PRC provinces (RMB 250 for those in mid-west provinces). According to Petitioners, currently available enabling documents, this program was in place during the 11th 5-Year period, which lapsed by the end of 2010, however, given the non-recurring character of the grant, the benefits should be allocated over the average useful life of assets.

*Financial contribution:* This government grant constitutes a financial contribution in the form of a direct transfer of funds under Section 771(5)(D)(i) of the Act.

*Specificity:* This program is specific because it is limited to a group of enterprises under section 771(5A)(D)(i) of the Act, specifically, the group of enterprises with energy-saving innovation projects resulting in energy savings that exceed 10,000 tons of coal.

*Benefit:* This grant program confers a benefit equal to the amount of the funds provided under 19 CFR 351.504.

*Support:* The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[65] In addition, Petitioners provided the following: Guangdong Provincial Department of Finance, the Provincial Economic and Trade Commission Office of Guangdong Province on the issuance of special funds for energy management Interim Measures, Guangdong Cai Gong {2008} No. 126, (July 9, 2008); NDRC, MOF on the issuance of "Energy-Saving

---

[63]  *See Steel Wheels*, and accompanying Issues and Decision Memorandum at Section VII.O; *PC Strand*, and accompanying Issues and Decision Memorandum at Section I.H.
[64]  *See* Volume VI of the Petition at Exhibit CVD-82.
[65]  *See Citric Acid*, and accompanying Issues and Decision Memorandum at Section I.T.

Technological Transformation of Financial Incentives Fund Management Interim Measures," Cai Jian {2007} No. 371 (August 10, 2007).[66]

### 3. The Clean Production Technology Fund

*Description*: Petitioners note that according to Article 21 of the *Provisional Measures on Clean Production Inspection*, funds are granted to enterprises that voluntarily undertake "clean production inspection with remarkable achievement after the implementation of clean production plans, development and reform commissions and environmental protection administration." Petitioners further note that Article 22 provides that the "development and reform commissions" have the power to designate clean production projects among the clean production implementation plans undertaken by the enterprises for energy saving, water saving, comprehensive utilization, increasing energy utilization rates, and preventing pollution. Petitioners maintain that based on currently available information, this program is discretionary and it is awarded only to those who are deemed to have had a "remarkable achievement."

*Financial contribution:* This government grant constitutes a financial contribution in the form of a direct transfer of funds under section 771(5)(D)(i) of the Act.

*Specificity*: This program is provided to a limited number of recipients, specifically, recipients with projects related to energy or water conservation or pollution control that qualify for benefits. Accordingly, the program is specific within the meaning of section 771 (5A)(D)(iii)(I) of the Act.

*Benefit:* This grant program confers a benefit equal to the amount of the funds provided under 19 CFR 351.504.

*Support*: The Department has previously determined that the purpose of this program "is to provide incentives and rewards . . . to encourage enterprises to conduct clean production inspection."[67] Also, Petitioners provided the following: Ministry of Environmental Protection, State Environmental Protection Administration Order No. 16 (August 16, 2004).[68]

## II. ALLEGED PROGRAMS ON WHICH THE DEPARTMENT IS NOT INITIATING AN INVESTIGATION

### 1. Land and Land Usage at Preferential Rates Provided by Jiangsu and Shandong Provinces

*Description*: Petitioners claim that the price of state-owned land usage may be reduced by 10,000 to 50,000 RMB per hectare depending on the scale of the investment. Petitioners contend that in Jiangsu Province, eligible priority development projects can obtain land for a transfer fee of no less than 70 percent of the minimum price. Petitioners assert that for this reason, the

---

[66] *See* Volume VI of the Petition at Exhibits CVD-83 & 84.
[67] *See CFS Paper*, and accompanying Issues and Decision Memorandum at Section III.B (determining that the potential benefit is less than 0.005 percent and not including that potential benefit in respondent's CVD rate).
[68] *See* Volume VI of the Petition at Exhibit CVD-85; *see also* Supplement to the Petition at 18 - 19.

authorities in Jiangsu Province have discretion to provide land at a discount, as low as 30 percent below the minimum price.

Petitioners also contend that Shandong Province may provide up to a 30 percent discount on the land leases for energy saving and environmental protection industrial projects. Petitioners suggest that eligible priority development projects can obtain the land for a transfer fee of no less than 70 percent of the minimum price, and for this reason, the authorities in Shandong Province have discretion to provide land at a discount, as low as 30 percent below the minimum price.

*Financial Contribution*: The sale of land or land-use rights at LTAR constitutes a financial contribution in the form of providing goods and services pursuant to section 771(5)(D)(iii) of the Act.

*Specificity*: Sales of land-use rights are specific because they are limited to enterprises or an industry located within a designated geographical region pursuant to section 771(5A)(D)(iv) of the Act.

*Benefit*: The sale of land or land-use rights at below-market prices (*i.e.*, for LTAR) constitutes a benefit pursuant to 19 CFR 351.511(a).

*Support*: The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[69] Moreover, Petitioners provided the following: "State-owned Construction Land Use Right Transfer Price Evaluation Technical Specification," *State Preferential Policies for Supporting State-Level Economic and Technology Development Zones*, Ministry of Land and Resources Notice, Guo Tu Zi Fa (April 8, 2013); "Jiangsu Provincial Department of Jiangsu Provincial Development and Reform Commission on the Adjustment of Industrial Land Price Policy to Inform the Implementation of Standards," Guo Tu Zi Fa, No. 56 (June 26, 2009); "Shandong Adjust Industrial Land Premium Policy," *Shandong Provincial Department's Ministry of Land and Natural Resources' Forward on Adjusting the Minimum Price Standards for Industrial Land Policy*, Ministry of Land and Resources (August 20, 2009).[70]

*Recommendation*: First, we note that the Department did not find this program countervailable in *Solar Cells*. The decision in *Solar Cells* to countervail the provision of land was made specifically with respect to two respondents and we note for one of the respondents, only for the land use rights provided outside of Jiangsu Province. Thus, based on the examination of the information provided in the petition, the referenced documents do not show that there is a program in either province providing 30 percent discounts on land use rights. The documents state that the entities responsible for providing land use rights within the respective province cannot provide leases for industrial land at prices lower than the corresponding land prices. These documents indicate that the provincial government is not setting discounted land prices but is setting administrative guidelines and a floor so that land authorities cannot lease land below these prices.. Thus, the evidence provided by Petitioners does not substantiate the

---

[69] *See Solar Cells*, and accompanying Issues and Decision Memorandum at Section VI. A.4. (for land located in the province of Jiangsu).
[70] *See* Volume IV of the Petition at Exhibits CVD-9, 10 & 11, respectively; *see also* Supplement to the Petition at 16 - 17.

allegation that Jiangsu Province and Shandong Province provide land for LTAR. Accordingly, we recommend finding that with regard to this component of the allegation Petitioners have failed to support their allegation of a countervailable subsidy.

      2.    <u>Exemption from Land-Use Taxes and Fees</u>

*Description*: Petitioners maintain that certain companies do not pay land-use taxes and fees, *i.e.*, these companies never paid taxes or fees and no such taxes or fees were owed. Additionally, Petitioners note that the taxes reported by a producer of chlorinated isos are substantially lower than the taxes reported by other producers. Petitioners maintain that although this program was discontinued in 2007, companies who took advantage of it are still accruing benefits in terms of possessing land that they otherwise would not have. Although in a prior case the respondent argued that its exemption was due to its status as an FIE, there is nothing to indicate that this program was limited to FIEs. Petitioners state that at least one producer of chlorinated isos, Sino-Korea Anhui Suzhou, is an FIE.

*Financial contribution:* The exemption from land-use taxes and fees confers a countervailable subsidy and is a financial contribution in the form of revenue forgone by the GOC pursuant to section 771(5)(D)(ii) of the Act.

*Specificity:* The exemption/reduction by this program is limited as a matter of law to certain enterprises, FIEs, and is therefore specific under section 771(5A)(D)(i) of the Act.

*Benefit:* The benefit received is in the amount of the tax savings, pursuant to 19 CFR 351.509(a)(l).

*Support*: The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[71]

*Recommendation*: We found this program countervailable in *Thermal Paper* (2008), but we noted that the exemption which applied to FIEs ended in 2007. We found this exemption to be a recurring subsidy. We would recommend not initiating since the only possible benefit from this program is the tax saving incurred from the land use-tax and fee exemption. These ended after 2007, so no possible benefit. As a result, we recommend finding that Petitioners have failed to support their allegation of a countervailable subsidy.

      3.    <u>Corporate Income Tax Law Article 26.1: Income tax exemption from State Treasury debt</u>

*Description*: According to Petitioners, under the Corporate Income Tax Law Article 26.1, interest from State treasury debt is exempt from income tax for industries and projects that are eligible for key support from the GOC.

*Financial contribution:* This tax exemption provides a financial contribution in the form of government revenue foregone under section 771(5)(D)(ii) of the Act.

---

[71]  *See Thermal Paper*, and accompanying Issues and Decision Memorandum at Section I.M.

*Specificity:* This program is specific because it is limited to an eligible group of enterprises under section 771(5A)(D)(i) of the Act.

*Benefit:* The income tax exemption confers a benefit equal to the amount of revenue foregone by the government under 19 CFR 351.510.

*Support*: Petitioners provided the following: Corporate Income Tax Law Article 26.1; The Implementation Rules for the Corporate Income Tax Law Article 82, KPMG; *Twelfth Five-Year Plan, 2011-2015* (July 26, 2011).[72]

*Recommendation*: There is nothing in either the Corporate Income Tax Law or the Implementation Rules that limit this exemption for industries and projects that are eligible for key support from the State, because any company that purchases or holds State treasury debt receives this tax exemption. Consequently, we recommend finding that Petitioners have failed to support their allegation of a countervailable subsidy.

    4.    <u>Corporate Income Tax Law Article 26.2: income tax exemption for qualified dividends, profit distribution and other returns on equity investments derived by a resident enterprise from another resident enterprise</u>

*Description*: Petitioners claim that, according to Corporate Income Tax Law Article 26.2, qualified investment income is exempt from income tax for industries that are eligible for support from the GOC. Petitioners note that a qualified investment (dividends, profit distributions, and other returns on equity investments) refers to the investment return derived by a resident enterprise from its direct investment in another resident enterprise, which are held for at least 12 months. The 2011 Guiding Catalog of Industrial Structural Adjustment lists "chemical products" under encouragement projects, indicating that producers of chlorinated isos receive key support from the GOC.

*Financial contribution:* This program provides a financial contribution in the form of government revenue foregone under section 771(5)(D)(ii) of the Act.

*Specificity:* The program is specific within the meaning of section 771(5A)(D)(ii) of the Act because the tax legislation establishes objective criteria governing the eligibility for, and the amount of, the subsidy. In addition, the program is specific under section 771(5A)(D)(iii)(I) of the Act because the actual recipients of the subsidy are limited in number.

*Benefit:* The tax reduction confers a benefit equal to the amount of revenue foregone by the government under 19 CFR 351.510.

*Support*: Petitioners provided the following: Corporate Income Tax Law Article 26.2, KPMG; Implementation Rules for the Corporate Income Tax Law, Article 83, KPMG; *Twelfth Five-Year Plan, 2011-2015* (July 26, 2011).[73]

---

[72] *See* Volume VI of the Petition at Exhibits CVD-53 - 55, respectively.
[73] *See* Volume VI of the Petition at Exhibits CVD-71, 72 & 55, respectively.

32

Barcode:3156010-01 C-570-991 INV - Investigation   -

*Recommendation*: Although Petitioners allege that this program is specific because it is limited to certain types of qualified investment and limited to enterprises that receive key support from the State, there is no information provided in the tax law and implementing rules that restricts access to this exemption to enterprises that receive key support from the State. Thus, this exemption is available to all companies. Therefore, we recommend finding that Petitioners have failed to support their allegation of a countervailable subsidy.

5.    <u>Corporate Income Tax Law Article 32:  accelerated depreciation of fixed assets</u>

*Description*: Petitioners maintain that enterprises are allowed to accelerate the depreciation of fixed assets if they are: (1) fixed assets that are upgraded and replaced frequently due to advancement in technologies; or (2) fixed assets that are exposed to constantly high levels of vibration or corrosion. The minimum amortization period is 60 percent of the prescribed period, and the assets must be depreciated using the double-declining-balance or sum-of-the-year-digits method. To produce chlorinated isos, cyanuric acid is reacted with caustic soda, resulting in a sodium cyanurate salt which is then reacted with chlorine. This is a highly corrosive process, and as a result the equipment used in its manufacture is susceptible to corrosion. This program is tailored to the chemical industry, particularly those firms using chemicals such as acids and caustic soda, because of the nature of its manufacturing processes.

*Financial contribution:* This program provides a financial contribution in the form of government revenue foregone under section 771(5)(D)(ii) of the Act.

*Specificity:* This program is specific under section 771 (5A)(D)(iii)(I) of the Act because the recipients of the subsidy are limited in number and under section 771(5A)(D)(iii)(II) of the Act because the chemical industry is the predominant user of the subsidy.

*Benefit:* The income tax exemption confers a benefit equal to the amount of revenue foregone by the government under 19 CFR 351.510.

*Support*: The Department has previously determined that similar accelerated depreciation provisions confer a countervailable subsidy under U.S. law.[74] Moreover, Petitioners provided the following:  Corporate Income Tax Law Article 32; KPMG, The Implementation Rules for the Corporate Income Tax Law Article 98.[75]

*Recommendation*: This program applies to all assets that need to be upgraded or frequently replaced and those assets which are exposed to high levels of vibration or corrosion. While assets used by the chemical industry could fall under this definition, Petitioners have failed to support their specificity allegation because the types of assets falling under this definition would fall into a wide array of industries. As a result, we recommend finding that Petitioners have failed to support their allegation of a countervailable subsidy.

---

[74] *See Certain Oil Country Tubular Goods from the People's Republic of China: Final Affirmative Countervailing Duty Determination, Final Negative Critical Circumstances Determination,* 74 FR 64045 (December 7, 2009) and accompanying Issues and Decision Memorandum at Section I.I.
[75] *See* Volume VI of the Petition at Exhibits CVD-56 & 57, respectively.

Filed By: matthew renkey, Filed Date: 9/20/13 2:28 PM, Submission Status: Approved

6.      Zhanjiang (Shanghai) Municipality and Zhanjiang Economic & Technological
        Development Zone export related assistance

*Description*: Petitioners contend that Zhanjiang Municipality and Zhanjiang Economic &
Technological Development Zone provided export assistance in the form of grants. At least one
major producer and exporter of chlorinated isos, Sino-Korea Anhui Suzhou SDF, is located in
Shanghai.[76]

*Financial contribution:* These grants are a financial contribution under section 771(5)(D)(i) of
the Act.

*Specificity:* The amount of the grant is contingent upon export performance, and therefore the
subsidy is specific under section 771(5A)(B) of the Act.

*Benefit:* This program provides a benefit equal to the amount of a grant, pursuant to 19 CFR
351.504(a).

*Support*: The Department has previously determined that this program confers a countervailable
subsidy under U.S. law.[77]

*Recommendation*: While Petitioners have correctly stated that the Department has found this
program countervailable, they have allege that this program provides benefits to companies in
Shanghai; however, the Zhangjiang program we countervailed is in Guangdong Province, not in
Shanghai. Therefore, Petitioners have incorrectly alleged this program and the information
provided in the Petition does not show that any producers of the subject merchandise are located
in Guangdong Province. Thus, we recommend finding that Petitioners have failed to support
their allegation of a countervailable subsidy.

7.      Zhanjiang (Shanghai) environmental subsidies

*Description*: Petitioners assert that according to Zhanjiang (Shanghai) Finance Bureau's award
notice listing grant recipients in 2006, awards were made to "aquaculture and processing key
industries" for environmental protection projects. This assistance is a direct transfer of funds.
Among the specific goals of the *Twelfth Five-Year Plan, 2011-2015* is to reduce ammonia
nitrogen and nitrogen oxide emissions by 10 percent. Consistent with these targets, it is
reasonable to conclude that chlor-alkali and chlorinated isos producers will receive benefits in
connection with reductions in such emissions. According to Zhangjiang (Shanghai) Finance
Bureau's award notice listing grant recipients in 2006, awards were made to "aquaculture and
processing key industries." At least one major producer and exporter of chlorinated isos, Sino-
Korea Anhui Suzhou SDF, is located in Shanghai.[78]

---

[76] *See* Volume I of the Petition at 32, Table 8.
[77] *See Thermal Paper*, and accompanying Issues and Decision Memorandum at Section I.K.
[78] *See* Volume I of the Petition at 32, Table 8.

34

*Financial contribution:*  This program is a direct transfer of funds and is a financial contribution under section 771 (5)(D)(i) of the Act.

*Specificity:*  The subsidy is specific because the recipients are limited in number under section 771 (5A)(D)(iii) of the Act.

*Benefit:*  This program provides a benefit in the amount of a grant pursuant to 19 CFR 351.504(a).

*Support*:  The Department has previously determined that this program confers a countervailable subsidy under U.S. law.[79]  Also, Petitioners provided the *Twelfth Five-Year Plan, 2011-2015* (July 26, 2011).[80]

*Recommendation*:  While Petitioners have correctly stated that the Department has found this program countervailable, they have alleged that this program provides benefits to companies in Shanghai; however, the Zhangjiang program we countervailed is in Guangdong Province, not in Shanghai.  Therefore, Petitioners have incorrectly alleged this program and the information provided in the Petition does not show that any producers of the subject merchandise are located in Guangdong Province.  Therefore, we recommend finding that Petitioners have failed to support their allegation of a countervailable subsidy.

8.  Corporate Income Tax Law Article 34:  tax credit for the purchase of special equipment for the purpose of environmental protection, energy and water conservation or production safety

*Description*:  Petitioners note that ten percent of investments or expenses made for the purchase of special equipment for the purpose of environmental protection, energy and water conservation, or production safety may be credited against income tax payable, provided that the equipment is kept for at least five years.  This equipment is listed in the Catalogue of Preferential Corporate Income Tax Treatments for Specialized Equipment in Energy or Water Conservation and the Catalogue of Preferential CIT Treatments for Specialized Equipment in Environmental Protection.  If the company transfers or leases the equipment within five years of purchase, the amount of the tax credit must be repaid.

*Financial contribution:*  This program provides a financial contribution in the form of government revenue foregone under section 771(5)(D)(ii) of the Act.

*Specificity:*  This program is limited to companies that purchase specific equipment.  Thus, the program is specific under section 771(5A)(D)(iii)(I) of the Act because the recipients of the subsidy are limited in number.

---

[79] *See Thermal Paper*, and accompanying Issues and Decision Memorandum at Section I.L.
[80] *See* Volume VI of the Petition at Exhibit CVD-55.

*Benefit:* The tax reduction confers a benefit equal to the amount of revenue foregone by the government under 19 CFR 351.510.

*Support*: Petitioners provided the following: Corporate Income Tax Law Article 34; The Implementation Rules for the Corporate Income Tax Law, Article 100; Notice of Issuance of the Catalogue of Preferential Corporate Income Tax Treatments for Specialized Equipment in Energy or Water Conservation (2008 Version) and the Catalogue of Preferential CIT Treatments for Specialized Equipment in Environmental Protection (2008 Version), Caishui, No. 115, Jointly Issued by the Ministry of Finance, the State Administration of Taxation and the State Development and Reform Committee (August 20, 2008); Notice of Issuance of the Catalogue of Preferential Corporate Income Tax Treatments for Specialized Equipment in Safe Production (2008 Version), Caishui, No. 118, Jointly Issued by the Ministry of Finance, the State Administration of Taxation, and the State Administration of Work Safety (August 28, 2008).[81]

*Recommendation*: Upon review of the catalogues listing the equipment for Energy and Water Savings Equipment and Environmental Protection Equipment, this equipment (*e.g.*, air conditioning equipment, ventilators, pumps, industrial boilers, air pollution prevention equipment, environmental monitoring instrumentation) appears to be able to be used by a wide array of enterprises and industries. Consequently, we recommend finding that Petitioners have failed to support their allegation of a countervailable subsidy.

9.  <u>Trade financing services from China's Export-Import Bank</u>

*Description*: Petitioners note that, according to its website, the Export-Import Bank of China ("China ExIm") provides various services to borrowers, including packing loans, export bill purchases, opening letters of credit, opening letters of guarantee, inward bill advance, delivery against guarantee, factoring, forfeiting and other services. Petitioners maintain that the stated objective of these programs is to fulfill China ExIm's duties entrusted by the GOC.

*Financial contribution:* These programs provide a direct financial contribution by the GOC under sections 771(5)(B)(i) and (D)(i) of the Act.

*Specificity:* These programs are specific because they are limited to companies that export, pursuant to section 771(5A)(B) of the Act.

*Benefit:* The benefit is an amount equal to the amount of revenue forgone by the government under 19 CFR 351.510, or equal to the amount of the funds provided under 19 CFR 351.504.

*Support*: Petitioners provided the following: Export-Import Bank of China, Trade Financing; Export-Import Bank of China, 2012 Annual Report at 19.[82]

*Recommendation*: Petitioners' alleged benefit is revenue forgone and grants, however, the alleged financial contribution is direct transfer of funds which would include loans. Thus, the evidence provided by Petitioners does not support the allegation of loans being provided under

---

[81]  *See* Volume VI of the Petition at Exhibits CVD-58 - 61, respectively; *see also* Supplement to the Petition at 18.
[82]  *See* Volume VI of the Petition at Exhibits CVD-66 - 67, respectively.

terms that would confer a benefit to producers of subject merchandise. Petitioners have failed to provide information to support an allegation that pre-shipment packing loans and the discounts of trade bill are provided at preferential rates. Furthermore, there is no information explaining or detailing the financial contribution and benefit for export and import factoring services provided by the bank. Therefore, we recommend finding that Petitioners have failed to support their allegation of a countervailable subsidy.

## RECOMMENDATION:

We have examined the accuracy and adequacy of the evidence provided in the Petition as discussed in this checklist and attachments, and recommend determining that the evidence is sufficient to justify the initiation of a CVD investigation with regard to the PRC. We also recommend determining that the Petition has been filed by, or on behalf of, the domestic industry.

## ATTACHMENTS:

I.    Scope of the Investigation
II.   Analysis of Industry Support
III.  Analysis of Allegations and Evidence of Material Injury and Causation
IV.   Action Letter from the ITC

Filed By: matthew renkey, Filed Date: 9/20/13 2:28 PM, Submission Status: Approved

**Attachment I**

**Scope of the Investigation**

The products covered by this investigation are chlorinated isocyanurates.  Chlorinated isocyanurates are derivatives of cyanuric acid, described as chlorinated s-triazine triones.  There are three primary chemical compositions of chlorinated isocyanurates:  (1) trichloroisocyanuric acid ("TCCA") ($Cl_3(NCO)_3$), (2) sodium dichloroisocyanurate (dihydrate) ($NaCl_2(NCO)_3$ X $2H_2O$), and (3) sodium dichloroisocyanurate (anhydrous) ($NaCl_2(NCO)_3$).  Chlorinated isocyanurates are available in powder, granular and solid (*e.g.,* tablet or stick) forms.

Chlorinated isocyanurates are currently classifiable under subheadings 2933.69.6015, 2933.69.6021, 2933.69.6050, 3808.50.4000, 3808.94.5000, and 3808.99.9500 of the Harmonized Tariff Schedule of the United States ("HTSUS").  The tariff classification 2933.69.6015 covers sodium dichloroisocyanurates (anhydrous and dihydrate forms) and trichloroisocyanuric acid.  The tariff classifications 2933.69.6021 and 2933.69.6050 represent basket categories that include chlorinated isocyanurates and other compounds including an unfused triazine ring.  The tariff classifications 3808.50.4000, 3808.94.5000 and 3808.99.9500 cover disinfectants that include chlorinated isocyanurates.  The HTSUS subheadings are provided for convenience and customs purposes. The written description of the scope of the investigation is dispositive.

## Attachment II

## Analysis of Industry Support for the Petitions Covering
## Chlorinated Isocyanurates from Japan and the People's Republic of China

**Background**

Sections 702(c)(4)(A) and 732(c)(4)(A) of the Tariff Act of 1930, as amended ("the Act"), state that the administering authority shall determine that a petition has been filed by or on behalf of the industry if the domestic producers or workers who support the petition account for: (1) at least 25 percent of the total production of the domestic like product; and (2) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the petition.  The above-referenced Petitions[1] contain data supporting a finding that Petitioners'[2] share is at least 25 percent of total production of the domestic like product and more than 50 percent of the domestic like product production of those producers expressing support for, or opposition to, the Petitions.

Section 771(4)(A) of the Act defines "industry" as the producers of a domestic like product.  Thus, to determine whether a petition has the requisite industry support, the Act directs the Department of Commerce ("the Department") to look to producers and workers who produce the domestic like product.  The International Trade Commission ("ITC"), which is responsible for determining whether "the domestic industry" has been injured, must also determine what constitutes a domestic like product in order to define the industry.  While both the Department and the ITC must apply the same statutory definition regarding the domestic like product (section 771(10) of the Act), they do so for different purposes and pursuant to a separate and distinct authority.  In addition, the Department's determination is subject to limitations of time and information.  Although this may result in different definitions of the like product, such differences do not render the decision of either agency contrary to law.[3]

Section 771(10) of the Act defines the domestic like product as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle."  Thus, the reference point from which the domestic like product analysis begins is "the article subject to an investigation," *i.e.*, the class or kind of merchandise to be investigated, which normally will be the scope as defined in the petition.  While the Department is not bound by the criteria used by the ITC to determine the domestic like product in answering this question, we have reviewed these factors as presented by Petitioners.  The criteria are: (1) physical characteristics and uses; (2) interchangeability; (3) channels of distribution; (4) customer and producer perceptions; (5) common manufacturing facilities, processes, and employees; and (6) price.[4]  With regard to the domestic like product, Petitioners

---

[1] *See* Petitions for the Imposition of Antidumping Duties on Chlorinated Isocyanurates from Japan and Countervailing Duties on Chlorinated Isocyanurates from the People's Republic of China, dated August 29, 2013 ("Petitions").

[2] Petitioners are Clearon Corp. ("Clearon") and Occidental Chemical Corporation ("OxyChem").

[3] *See USEC, Inc. v. United States*, 132 F. Supp. 2d 1, 8 (CIT 2001) (citing *Algoma Steel Corp. Ltd. v. United States*, 688 F. Supp. 639, 644 (CIT 1988), *aff'd* 865 F.2d 240 (Fed. Cir. 1989)).

[4] *See Fujitsu Ltd. v. United States*, 36 F. Supp. 2d 394, 397-98 (CIT 1999); *Torrington Co. v. United States*, 747 F. Supp. 744, 748-49 (CIT 1990), *aff'd*, 938 F.2d 1278 (Fed. Cir. 1991); *see also Antidumping and Countervailing*

1

do not offer a definition of domestic like product distinct from the scope of the investigations.[5] Petitioners note that "{t}he Commission looks for clear dividing lines among possible like products and disregards minor variations. Where there is a 'continuum' of products slightly distinguishable from each other, the Commission treats the merchandise as a single product."[6] As a result, Petitioners contend that there is a single like product co-extensive with the scope of the investigations.  For a detailed analysis and discussion, see the "Analysis of Domestic Like Product" section below.

**Analysis of Domestic Like Product**

### A.  Chlorinated Isocyanurates

Petitioners address the six criteria used by the ITC to determine the domestic like product in Volume I of the Petitions, at 96-108.  Petitioners note that "{i}n the 2005 investigation of *Chlorinated Isocyanurates from China and Spain*, the Commission found that chlorinated {isocyanurates} constituted a single like product coextensive with the scope of the petition and Commerce investigations.  The Commission considered and rejected three arguments for subdividing chlorinated {isocyanurates} into different like products."[7]  Petitioners urge the Department to find a single like product co-extensive with the scope for purposes of these investigations.  Petitioners make the following arguments:

### 1)  Physical Characteristics and Uses

Chlorinated isocyanurates ("chlorinated isos"), as defined by the scope of the investigations, consist of sodium dichloroiscyanurates ("dichlor") and trichoroisocyanuric acid ("trichlor"). According to Petitioners, both dichlor and trichlor are produced by chlorinating cyanuric acid and have similar chemical compositions.[8]  Petitioners note that both dichlor and trichlor are white granular or powder products, when sold in bulk, and may be pressed into tablets.[9] Petitioners further note that both dichlor and trichlor "are chemically stable means of storing and delivering chlorine, which is released when the product is introduced into water."[10]  According to Petitioners, both products are primarily used as pool water disinfectants and for sanitization, but can also be used in sanitizers, detergents, cleaners, scouring powders, bleaches, and for water treatment applications.[11]  Although dichlor and trichlor have slightly different applications due to their differing available chlorine percentages, Petitioners argue that these differences do not create clear dividing lines.[12]

---

*Duty Handbook*, Twelfth Edition, United States International Trade Commission, Publication 3916 (April 2007), at II-33.

[5] *See* Volume I of the Petitions, at 96.

[6] *Id.,* at 97 (citations omitted).

[7] *Id.,* at 96 (citation omitted), and Volume II of the Petitions, at Exhibit GEN-10; *see also Chlorinated Isocyanurates from China and Spain*, Inv. Nos. 731-TA-1082 and 1083 (Final), USITC Pub. 3782 (June 2005) (*"Chlorinated Isocyanurates from China and Spain"*) at 6-10.

[8] *See* Volume I of the Petitions, at 97.

[9] *Id.*

[10] *Id.*

[11] *Id.*, at 98.

[12] *Id*., at 97.

2

Petitioners also contend that powdered chlorinated isos have the same physical characteristics and uses as other chlorinated isos.  According to Petitioners, powdered chlorinated isos differ from granular chlorinated isos only in the size of the individual particles; in terms of chemical composition, powdered and granular chlorinated isos are identical.[13]  In fact, Petitioners note that granular chlorinated isos are produced by granulation of powdered chlorinated isos.[14]

In addition, Petitioners also contend that blended chlorinated isos tablets have the same or very similar physical characteristics to other forms of chlorinated isos.  According to Petitioners, blended chlorinated isos tablets contain trichlor or dichlor and other active ingredients that provide (or are advertised to provide) additional functions.[15]  As an example, Petitioners note that dichlor may be blended with additional components, such as an effervescent, to cause the tablet to dissolve faster.[16]  Petitioners argue that the blended tablets compete with other forms of chlorinated isos for the same customer applications because blending chlorinated isos with other components, such as algaecides or clarifiers, does not alter the end uses of the product.[17]  According to Petitioners, there are no "'clear dividing lines' based on whether the subject merchandise is in granular, tablet, blended tablet, or another form."[18]

## 2)  Interchangeability

Petitioners note that, although both dichlor and trichlor have similar uses, dichlor tends to be used for "shock treatments" (where chlorine levels need to be increased quickly to combat bacteria and algae attacks), while trichlor is used as a "maintenance product because of its slower release and lower solubility characteristics."[19]  However, Petitioners note that both trichlor and dichlor are chemically equivalent once dissolved in water.[20]

According to Petitioners, powdered chlorinated isos have no substantial independent end-use or separate market.  Petitioners note that the majority of chlorinated isos powder is used to make granular products and a small percentage of trichlor powder is used as "shock" product for swimming pools since powder dissolves faster.[21]

With respect to blended tablets, Petitioners argue that blended tablets compete with "pure" dichlor and trichlor tablets, as well as other forms of chlorinated isos, for the same customer applications.  According to Petitioners, although blended tablets may be marketed as having additional properties, blending the tablets with additional components does not alter the end uses of the product.[22]

---

[13] *Id.*, at 103.
[14] *Id.*
[15] *Id.*, at 100.
[16] *Id.*
[17] *Id.*, at 101.
[18] *Id.* (citation omitted).
[19] *Id.*, at 98.
[20] *Id.*
[21] *Id.*, at 103-104.
[22] *Id.*, at 101.

3

Barcode:3156010-01 C-570-991 INV - Investigation  -

### 3)  Channels of Distribution

Petitioners note that both dichlor and trichlor are marketed and sold through the same channels of distribution (repackagers (that also may be tableters), wholesale distributors, retailers, pool service professionals, consumers, and commercial swimming pool and spa operators).[23] Likewise, Petitioners state that powdered chlorinated isos and blended tablets are distributed through the same channels of distribution as other chlorinated isos.[24]

### 4)  Customer and Producer Perceptions

Petitioners contend that all chlorinated isos are advertised and perceived by customers and producers as sanitizing products.[25]

### 5)  Common Manufacturing Facilities, Processes, and Employees

Petitioners state that production of both dichlor and trichlor involves the same basic chemical process even though different equipment is used to make the two products.  According to Petitioners, "{f}or at least one domestic producer, manufacturing takes place in the same facilities, using the same employees."[26]

Petitioners also note that all chlorinated isos manufacturers produce both powdered and granular trichlor, with powdered product being produced first and then granulated to produce the granular product.  According to Petitioners, if there is demand for powdered trichlor, domestic producers will sell that product.  If there is no demand for powdered trichlor, "any powder that falls through the sizing operation during granulation is simply recycled back through the granulation process and recovered as granular product."[27]

With respect to blended tablets, Petitioners note that blended tablets are produced in the same facilities that produce trichlor tablets and repackage granular trichlor and dichlor.  In fact, Petitioners state that the raw material for the production of blended tablets is primarily granular chlorinated isos.  Furthermore, Petitioners state that blended tablets are produced on the same presses that produce trichlor tablets.[28]

### 6)  Pricing

Petitioners note that "the price differential between dichlor and trichlor follows no standard pattern and is quite changeable.  Hence, at times, prices for both chlorinated isos may be the same or the price of trichlor may be even higher than the price of dichlor."[29]  However, in general, Petitioners contend that the price of dichlor tends to be higher because the volume

---

[23] *Id.*, at 98.
[24] *Id.*, at 101 and 104.
[25] *See* Volume I of the Petitions, at 98 and Volume II of the Petitions, at Exhibits GEN-3, GEN-4, and GEN-5.
[26] *Id.*, at 98.
[27] *Id.*, at 104.
[28] *Id.*, at 101.
[29] *Id.*, at 99.

4

produced is lower and there are more production steps.[30]  Petitioners also note that blended tablets are sold at higher prices than bulk granular trichlor to account for the additional costs of blending and tableting.[31]

**Department's Position:**

We have analyzed the criteria presented by Petitioners and have found there is reason to conclude that all chlorinated isos comprise a single domestic like product.  We note that Petitioners' domestic like product definition is consistent with the domestic like product defined by the ITC in the previous antidumping duty investigations of chlorinated isos.[32]  Furthermore, unless the Department finds Petitioners' definition of the domestic like product to be inaccurate, we will adopt the domestic like product definition set forth in the Petitions.  While the statute defines the "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation," pursuant to section 771(10) of the Act, Petitioners have presented the Department with information pertaining to the factors the ITC traditionally analyzes.  Based on our analysis of the information submitted in the Petitions, all chlorinated isos (including powdered chlorinated isos and blended tablets) have common physical characteristics and uses; compete with each other for certain end uses; are sold through the same channels of distribution; are produced using similar production processes, in common manufacturing facilities, using common employees; and are priced similarly.

## B.   Tableting and Repackaging

Petitioners also contend that, consistent with the ITC's examination in *Chlorinated Isocyanurates from China and Spain*, the domestic industry producing the domestic like product should not include processors that take bulk trichlor, press it into tablets, and repackage it for retail sale.[33]  To support their argument, Petitioners address the six factors normally considered by the ITC in analyzing whether production-related activities are sufficient to constitute "production," with references to the ITC's consideration of this issue in *Chlorinated Isocyanurates from China and Spain*.[34]

Petitioners note that Petitioner Clearon's capital investment in tableting and packaging equipment is [          ] than the company's total book value of property, plant, and equipment utilized in chlorinated isos operations in 2012.[35]  Petitioners further contend that there are substantial differences in the training and technical expertise of the workforce involved in producing dichlor/trichlor and the technical expertise of the tableters and re-packers.  For support, Petitioners note that the majority of labor used in Clearon's tableting and packaging

---

[30] *Id.*
[31] *Id.*, at 102.
[32] *Id.* at 96, 99, 102-103, 104-105, and Volume II of the Petitions, at Exhibit GEN-10; *see also Chlorinated Isocyanurates from China and Spain*, at 6-10.
[33] *See* Volume I of the Petitions, at 105 and Volume II of the Petitions, at Exhibit GEN-10; *see also Chlorinated Isocyanurates from China and Spain*, at 10-14.
[34] *See* Volume I of the Petitions, at 105-108 and Volume II of the Petitions, at Exhibit GEN-10; *see also Chlorinated Isocyanurates from China and Spain*, at 10-14.
[35] *See* Volume I of the Petitions, at 105.

5

Barcode:3156010-01 C-570-991 INV - Investigation  -

facility consists of unskilled, low-wage contract workers.[36]  Furthermore, Petitioners state that
Clearon employed [    ] production and related workers in 2012, [       ] of which are involved in
the tableting operations.[37]  With respect to value added to the product in the United States,
Petitioners state that "tableting trichlor adds [    ] percent to the cost of granular trichlor sold in
the U.S. market."[38]  Petitioners also note that prices for trichlor vary along a continuum
depending on the type of packaging (bulk versus retail) and the form of the product (granular
versus tablet).  According to Petitioners, prices range from [         ] for trichlor 90 granular to
[      ] for trichlor in 3-inch tablets, packaged in pails for retail sale.[39]  Finally, Petitioners note
that major tableters in the United States are also importers of chlorinated isos from China and
Japan.[40]

Petitioners also note that the Department found that tableting imported chlorinated isos in
Canada was not sufficient to change the country of origin of the imported chlorinated isos.[41]
Furthermore, Petitioners contend that, in other cases where chemical products were manipulated
into different forms without chemical reaction, the Department has determined that merely
changing the form of the subject chemicals did not sufficiently alter the essential character of the
products to change the country of origin.[42]

**Department's Position:**

We have analyzed the criteria presented by Petitioners and have found there is reason to
conclude that the domestic industry should not include tableters.  Significantly, we note that
Petitioners' definition of the domestic industry in these Petitions is consistent with the
determination of three ITC Commissioners to exclude companies that only tablet and repackage
chlorinated isos from the domestic industry in the previous antidumping duty investigations of
chlorinated isos.[43]  Based on our analysis of the information submitted in the Petitions, the facts
remain very similar to the facts examined by the ITC in *Chlorinated Isocyanurates from China
and Spain*.  Data provided by Petitioners indicate that tableting does not require significant
capital investment, technical production expertise, or employment levels when compared to the
capital investment, technical expertise, and employment levels required to establish an integrated
chlorinated isos operation.

**Industry Support Calculation**

In determining whether Petitioners have standing (*i.e.*, those domestic workers and producers
supporting the Petitions account for (1) at least 25 percent of the total production of the domestic
like product and (2) more than 50 percent of the production of the domestic like product

---

[36] *Id.*, at 106.
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*, at 106-107, Volume III of the Petitions, at Exhibit AD-17, and Volume IV of the Petitions, at Exhibit CVD-87.
[41] *Id.*, at 108 and Volume II of the Petitions, at Exhibit GEN-7.
[42] *See* Volume I of the Petitions, at 108.
[43] *Id.* at 107, and Volume II of the Petitions, at Exhibit GEN-10; *see also Chlorinated Isocyanurates from China and Spain*, at 10-14.

Filed By: matthew renkey, Filed Date: 9/20/13 2:28 PM, Submission Status: Approved

produced by that portion of the industry expressing support for, or opposition to, the Petitions), we conducted the following analysis.

We considered the industry support data contained in the Petitions with reference to the domestic like product as defined in Attachment I, "Scope of the Investigation," to this Checklist and discussed above. We also considered Petitioners arguments regarding the definition of the domestic industry, also discussed above. Petitioners state that there are three producers of chlorinated isos in the United States: Clearon, OxyChem, and BioLab, Inc. ("BioLab").[44] To support their claim, Petitioners provided an affidavit from Jeffrey L. Williams, the Senior Business Manager, ACL, Chlorite & Silicates, OxyChem, who has worked for OxyChem since 1986. Mr. Williams states that, based on his knowledge of the market, his company's [

], and feedback from OxyChem's customers in the U.S. market, OxyChem, Clearon, and BioLab are the three manufacturers of chlorinated isos in the United States.[45] Furthermore, Petitioners provided a marketing research report on chlorinated isocyanurates, from SRI Consulting, which also identifies the same three producers of chlorinated isocyanurates in the United States.[46]

To establish industry support, Petitioners provided their own production of the domestic like product for calendar year 2012.[47] In addition, Petitioners estimated BioLab's 2012 production of the domestic like product.[48]

Petitioners note that [

].[49] According to Petitioners, [

].[50] To estimate the BioLab's 2012 production of the domestic like product, Petitioners first calculated [

].[51] Petitioners contend that [

].[52] Next, Petitioners applied [

] to calculate BioLab's estimated trichlor production in 2012.[53] To calculate total 2012 production of the domestic like product, Petitioners added their own 2012 production to the estimated 2012 production of BioLab.[54]

Petitioners compared their own 2012 production volume to the estimated 2012 production volume of the entire domestic industry.[55] Based on information provided in the Petitions, Petitioners account for [    ] percent of total production of the domestic like product.

[44] *See* Volume I of the Petitions, at 2-3.
[45] *See* Volume II of the Petitions, at Exhibit GEN-12.
[46] *Id.*, at Exhibit GEN-9 (E. Linka, H. Janshkar, C. Funada, "CEH Marketing Research Report, Chlorinated Isocyanurates," (Chemical Economics Handbook – SRI Consulting, 2012), at 5, 12.)
[47] *See* Volume I of the Petitions, at 4.
[48] *Id*. and Volume II of the Petitions, at Exhibit GEN-12.
[49] *See* Volume I of the Petitions, at 3.
[50] *See* Volume II of the Petitions, at Exhibit GEN-12.
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *See* Volume I of the Petitions, at 4.
[55] *Id.*

7

Barcode:3156010-01 C-570-991 INV - Investigation -

**Table 1**
**Calculation of Industry Support**

| Petitioners | 2012 Production of Chlorinated Isos (1,000 lbs) |
|---|---|
| Clearon | [      ] |
| OxyChem | [      ] |
| **Other U.S. Producers** | |
| BioLab | [      ] |
| **Total 2012 U.S. Production of Chlorinated Isos** | [      ] |
| **Total Industry Support** | [      ]% |
| | |

**Challenge to Industry Support**

None.

**Findings**

We relied on information provided by Petitioners, as described above, to establish total 2012 production of chlorinated isos. Using these data, as demonstrated above, we find that the domestic producers who support the Petitions account for at least 25 percent of the total production of the domestic like product. We further find that the domestic producers who support the Petitions account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petitions. Therefore, we find that there is adequate industry support within the meaning of sections 702(c)(4)(A) and 732(c)(4)(A) of the Act.

We conducted a search of the internet and have been unable to locate information that contradicts Petitioners' assertions. We find that Petitioners have provided data that are reasonably available. For these reasons, we determine that there is adequate industry support for initiating these investigations. Accordingly, we find that the Petitions have met the requirements of sections 702(c)(4)(A) and 732(c)(4)(A) of the Act.

Filed By: matthew renkey, Filed Date: 9/20/13 2:28 PM, Submission Status: Approved

Barcode:3156010-01 C-570-991 INV - Investigation -

**Attachment III**

**Analysis of Allegations and Evidence of Material Injury and Causation for the Petitions Covering Chlorinated Isocyanurates from Japan and the People's Republic of China**

## I.      Introduction

When making a determination regarding the initiation of antidumping duty and countervailing duty investigations, the Department of Commerce ("the Department") examines, on the basis of sources readily available to the Department, whether the petitions allege the elements necessary for the imposition of antidumping and countervailing duties and contain information reasonably available to the petitioner that supports the allegations.[1]  This attachment analyzes the sufficiency of the allegations and supporting evidence regarding material injury and causation.

## II.      Definition of Domestic Industry

The domestic industry is described with reference to producers of the domestic like product, as provided for in section 771(4)(A) of the Act.  The Petitions[2] define the domestic industry as U.S. producers of chlorinated isocyanurates ("chlorinated isos").[3]  Petitioners[4] identify themselves, as well as one other producer of the domestic like product, as the companies constituting the domestic industry in the United States.[5]  For a discussion of the domestic like product, *see* Attachment II, "Analysis of Industry Support for the Petitions Covering Chlorinated Isocyanurates from Japan and the People's Republic of China," to this Checklist.

## III.      Evidence of Injury and Threat of Injury

To determine injury, the statute requires an evaluation of the volume, price effects, and impact of imports on the domestic industry and may consider other economic factors.[6]  Specifically, in examining the impact of imports, section 771(7)(C)(iii) of the Act states that:

> In examining the impact {of imports on domestic producers} …, the {International Trade} Commission {"ITC"} shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to–
>> (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

---

[1] *See* sections 702(c)(1)(A)(i) and 732(c)(1)(A)(i) of the Tariff Act of 1930, as amended ("the Act").
[2] *See* Petitions for the Imposition of Antidumping Duties on Chlorinated Isocyanurates from Japan and Countervailing Duties on Chlorinated Isocyanurates from the People's Republic of China, dated August 29, 2013 ("Petitions").  Petitioners filed the Supplement to the AD/CVD Petitions, dated September 9, 2013, in response to the Department's request for additional information regarding the Petitions.
[3] *See* Volume I of the Petitions, at 105-108.
[4] The petitioners are Clearon Corp. and Occidental Chemical Corporation (collectively, "Petitioners").
[5] *See* Volume I of the Petitions, at 2-3 and Exhibits GEN-9 and GEN-12.
[6] *See* section 771(7)(B)(i) of the Act.

Barcode:3156010-01 C-570-991 INV - Investigation  -

(II) factors affecting domestic prices,
(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,
(IV) actual and potential negative effects on the existing development and production efforts of the domestic industry..., and
(V) in {an antidumping proceeding}…, the magnitude of the margin of dumping.

The Petitions allege that the domestic industry has experienced the following types of injury by reason of imports from Japan and the People's Republic of China ("China"):

- Reduced market share (Volume I of the Petitions, at 115, 116 and 127, and Volume II of the Petitions, at Exhibit GEN-14);
- Declining production, capacity utilization, and shipments (Volume I of the Petitions, at 115 and 123-127, and Volume II of the Petitions, at Exhibits GEN-9, GEN-12, and GEN-14);
- Underselling and price depression or suppression (Volume I of the Petitions, at 119-121 and 127-128, and Volume II of the Petitions, at Exhibits GEN-11, GEN-15 and GEN-16);
- Lost sales and revenues (Volume I of the Petitions, at 119-121, and Volume II of the Petitions, at Exhibit GEN-16);
- Negative impact on employment, hours worked, and wages paid (Volume I of the Petitions, at 125-127, and Volume II of the Petitions, at Exhibit GEN-14); and
- Decline in financial performance (Volume I of the Petitions, at 121, and 126-128, and Volume II of the Petitions, at Exhibit GEN-14).

The Petitions also allege that the domestic industry could be threatened with further injury by reason of imports from Japan and China:

- Countervailable subsidies from the Government of China (Volume I of the Petitions, at 128);
- Continued increase of subject imports and market penetration (Volume I of the Petitions, at 128-131);
- Substantial existing capacity to increase production (Volume I of the Petitions, at 119, 129 and 131, and Volume II of the Petitions, at Exhibits GEN-9, GEN-11 and GEN-17);
- Continued underselling and price depression or suppression (Volume I of the Petitions, at 130-131, and Volume II of the Petitions, at Exhibit GEN-11); and
- Substantial inventories of subject merchandise in the U.S. market (Volume I of the Petitions, at 131).

The information from the Petitions provides the Department with a sufficient basis to conclude that the allegations of material injury and threat of material injury as a result of imports of subject merchandise are adequately supported.

Filed By: matthew renkey, Filed Date: 9/20/13 2:28 PM, Submission Status: Approved

## IV.    Cumulation

Section 771(7)(G)(i) of the Act requires the ITC to cumulate imports from all countries for which petitions were filed on the same day if such imports compete with each other and with the domestic like product in the United States market.  On August 29, 2013, Petitioners filed the Petitions against the two subject countries.  Citing to import data and the ITC's affirmative injury determination in the antidumping duty investigations of chlorinated isos from China and Spain,[7] Petitioners argue that cumulation is appropriate.[8]

In determining whether cumulation is appropriate, the ITC uses a framework of four factors.[9] These factors, along with the sections of the Petitions in which they are addressed, are listed below.

- The degree of fungibility between imports from the two subject countries and between the imports and the domestic like product.

  Petitioners submit that "chlorinated isos from China, Japan and the United States are highly fungible chemical commodities… {and} are fully interchangeable in the market."[10]  Moreover, Petitioners contend that market conditions do not differ from those in the *2005 Chlorinated Isos from China and Spain Investigations*, in which the ITC found that "{s}ome producers, importers and purchasers reported that as long as the product is registered with the EPA, regardless of where it is produced, it is always interchangeable."[11]

- Whether the imports and the domestic like product are handled in common or similar channels of distribution.

  Petitioners contend that imports and the domestic like product are sold through similar channels of distribution.  Petitioners submit that "mass market retailers…purchase subject imports and domestically produced chlorinated isos…{and} sell the subject imports and domestic chlorinated isos on a nationwide basis."[12]  Petitioners also note that subject imports and domestically produced chlorinated isos are sold through distributors.[13]

- The presence of sales or offers for sale of the imports and the domestic like product in the same geographic markets.

---

[7] *See* U.S. International Trade Commission, *Chlorinated Isocyanurates from China and Spain*, Inv. Nos. 731-TA-1082 and 1083 (Final), USITC Pub. 3782 (June 2005) (hereinafter, *2005 Chlorinated Isos from China and Spain Investigations*).

[8] *See* Volume I of the Petitions, at 109-112, and Volume II of the Petitions, at Exhibits GEN-2, GEN-10, GEN-11.

[9] *See Certain Cast-Iron Pipe Fittings from Brazil, the Republic of Korea, and Taiwan*, Inv. Nos. 731-TA-278-280 (Final), USITC Pub. 1845 (May 1986); *see also Fundicao Tupy, S.A. v. United States*, 678 F. Supp. 898, 902 (Ct. Int'l Trade 1988), *aff'd,* 859 F.2d 915 (Fed. Cir. 1988).

[10] *See* Volume I of the Petitions, at 109-110, and Volume II of the Petitions, at Exhibits GEN-2, GEN-10, and GEN-11.

[11] *See* Volume I of the Petitions, at 109-110, and Volume II of the Petitions, at Exhibits GEN-10 and GEN-11.

[12] *See* Volume I of the Petitions, at 110, and Volume II of the Petitions, at Exhibit GEN-10.

[13] *Id.*, and Volume II of the Petitions, at Exhibit GEN-13.

Barcode:3156010-01 C-570-991 INV - Investigation  -

Petitioners submit that subject imports and the domestic like product are sold in overlapping geographic markets.  Petitioners argue that, as demonstrated by import data, "96.4% of the volume of subject imports entered through the same Customs Districts… {and}{t}he vast majority of imports arrive through Los Angeles or New York and are distributed nationally from either coast."[14]

- Whether the imports are present in the U.S. market simultaneously.

    Petitioners submit that imports from China and Japan have been simultaneously present in the U.S. market over the three year period of investigation ("POI").[15]  Furthermore, Petitioners argue that subject imports "have continued to enter through Los Angeles and New York in 2013."[16]

## V.      Negligibility

Section 771(24)(A)(i) of the Act states that "imports from a country of merchandise corresponding to a domestic like product identified by the Commission are 'negligible' if such imports account for less than 3 percent of the volume of all such merchandise imported into the United States in the most recent 12-month period for which the data are available . . ." According to ITC Dataweb import data provided by Petitioners for the most recent 12-month period for which the data were available (July 2012 through June 2013), the volume of chlorinated isos imports from China and Japan accounted for 50.4 percent and 42 percent of total imports, respectively.[17]  Petitioners submit that "it is clear from these data that imports from China and Japan were not negligible."[18]  Petitioners further contend that the volume of subject imports from the two countries, whether measured cumulatively or individually, is significant.[19]

## VI.      Causation of Material Injury or Threat of Material Injury

Petitioners contend that the material injury and the threat of material injury to the domestic industry were caused by the impact of the allegedly dumped and subsidized imports from Japan and China.  In support of their argument, Petitioners provide information on the historical trend of the volume of the allegedly dumped and subsidized imports, focusing on the period beginning with 2010 and ending with the year-to-date data for June 2013 (the most recently available data).[20]  In the Petitions, Petitioners demonstrate the effect of these import volumes, and their respective values, on domestic prices, market share, production, shipments, capacity utilization, employment, hours worked, wages paid, and the consequent impact on the domestic industry,

---

[14] *See* Volume I of the Petitions, at 110-111.
[15] *Id.*, at 111-112.
[16] *Id.*, at 112, and Volume II of the Petitions, at Exhibit GEN-13.
[17] *See* Volume I of the Petitions, at 112-113; Volume III of the Petitions, at Exhibit AD-2; and Volume IV of the Petitions, at Exhibit CVD-86.
[18] *See* Volume I of the Petitions, at 112.
[19] *Id.*, at 114.
[20] *Id.*, at 109-115 and 129-130; Volume II of the Petitions, at Exhibits GEN-13 and GEN-14; Volume III of the Petitions, at Exhibit AD-2; and Volume IV of the Petitions, at Exhibit CVD-86.

4

specifically on financial performance, sales and revenue.[21]  Petitioners argue that this evidence reflects the injurious effects on the U.S. industry's financial performance and market share caused by increasing imports of the subject chlorinated isos at prices substantially lower than price offers from Petitioners, thereby resulting in significant incidents of lost sales and revenues.[22]

In making a determination regarding causation of material injury, the ITC is directed to evaluate the volume of subject imports (section 771(7)(B)(i)(I) of the Act), the effect of those imports on the prices of domestically-produced products (section 771(7)(B)(i)(II) of the Act) and their impact on the domestic operations of U.S. producers (section 771(7)(B)(i)(III) of the Act). Petitioners base their allegations of causation of current injury upon their reduced market share; decline in production, capacity utilization, and shipments; underselling and price depression or suppression; negative impact on employment, hours worked, and wages paid; lost sales and revenues; and decline in financial performance.[23]

In regards to the threat of material injury, Petitioners base their allegations on countervailable subsidies from the Government of China; continued increase of subject imports and market penetration; substantial existing capacity to increase production; continued underselling and price depression or suppression; and substantial inventory overhang.[24]

The allegations of causation of material injury and the threat of material injury are based upon the factors indicating current injury, as well as the factors indicating threat of material injury as noted above.  The factors related to causation presented in the injury section of the Petitions are the types of factors that the ITC is directed to consider for the purpose of evaluating causation under sections 771(7)(C) and 771(7)(F) of the Act.

## VII.    Conclusion

In order to assess the accuracy and adequacy of the evidence relating to the allegations regarding material injury and causation, we examined the information presented in the Petitions and the supplement to the Petitions, and compared it with information that was reasonably available (*e.g.*, import data on the ITC website and additional industry reports available online).  We have not located any information that contradicts Petitioners' assertions.

We have analyzed Petitioners' evidence regarding material injury and causation and have found that the information in the Petitions demonstrates a sufficient showing of injury or threat of injury to the U.S. industry producing chlorinated isos.  Therefore, we find the overall evidence of injury included in the Petitions to be adequate to initiate the investigations of chlorinated isos from China and Japan.  Ultimately, the ITC will make the final determination with respect to material injury, or threat thereof, and causation.

---

[21] *See* Volume I of the Petitions, at 115- 116 and 119-128, and Volume II of the Petitions, at Exhibits GEN-9, GEN-12 and GEN-14 through GEN-16.
[22] *Id.*
[23] *See* Section III above.
[24] *See* Volume I of the Petitions, at 119 and 128-132, and Volume II of the Petitions, at Exhibits GEN-9, GEN-11, GEN-14 and GEN-17.

Barcode:3156010-01 e 370-991 INV Investigation -
Attachment IV

# UNITED STATES INTERNATIONAL TRADE COMMISSION
## DIRECTOR OF INVESTIGATIONS ACTION REQUEST

| Subject | | Control No. | INV-13-079 |
|---|---|---|---|
| *Investigation Nos. 701-TA-501 and 731-TA-1226 (Preliminary):  Chlorinated Isocyanurates from China and Japan--Institution of countervailing duty and antidumping duty investigations and scheduling of preliminary phase investigations* | | Office | Investigations |
| | | Date Initiated | 09-3-13 |
| | | Date Out | 09-3-13 |
| Signature of Initiator | *Director, Office of Investigations* | Date Due | Expedite |

### STAFF CONCURRENCES

| Office | Signature | Date | Office | Signature | Date |
|---|---|---|---|---|---|
| INV | | 9/3/13 | TATA | | 9/3/13 |
| INV | | 9/3/13 | GC | | 3Sept 13 |

### PURPOSE OF REQUEST

*To obtain approval of the attached draft notice of institution and scheduling and the proposed draft schedule.*

### BACKGROUND INFORMATION

*The attached draft notice of institution and scheduling and the proposed draft schedule are in response to petition filed on August 29, 2013 by Clearon Corp., South Charleston, WV; and Occidental Chemical Corp., Dallas, TX.   The petition alleges that an industry in the United States is materially injured or threatened with material injury by reason of subsidized imports of chlorinated isocyanurates from China and less-than-fair-value imports of chlorinated isocyanurates from Japan.*

*Commission staff has not identified any significant defects in the petition with respect to injury allegations and related information.*

### RECOMMENDATION

*To obtain approval of the attached draft notice of institution and scheduling and the proposed draft schedule.*

### NATURE OF DIRECTOR'S ACTION

| ☑ Approved     ☐ Disapproved     ☐ Other | Signature | Date |
|---|---|---|
| | | 9-3-13 |

### COMMENTS

*Staff assigned to the investigation include: Joanna Lo, investigator (205-1888); John Benedetto, economist (205-3270); Mary Klir, accountant (205-3247); Christopher Robinson, industry analyst (205-2602); David Goldfine, attorney-advisor (708-5452); and, Elizabeth Haines, supervisory investigator (205-3200).*

Barcode:3156010-01 C-570-991 INV - Investigation -

UNITED STATES INTERNATIONAL TRADE COMMISSION


Investigation Nos. 701-TA-501 and 731-TA-1226 (Preliminary)

CHLORINATED ISOCYANURATES FROM CHINA AND JAPAN

Institution of antidumping and countervailing duty investigations and scheduling of preliminary phase investigations.

AGENCY:    United States International Trade Commission.

ACTION:    Notice.

SUMMARY:    The Commission hereby gives notice of the institution of investigations and commencement of preliminary phase antidumping and countervailing duty investigations Nos. 701-TA-501 and 731-TA-1226 (Preliminary) under sections 703(a) and 733(a) of the Tariff Act of 1930 (19 U.S.C. §§ 1671b(a) and 1673b(a)) (the Act) to determine whether there is a reasonable indication that an industry in the United States is materially injured or threatened with material injury, or the establishment of an industry in the United States is materially retarded, by reason of imports from chlorinated isocyanurates from China and Japan, provided for in subheadings 2933.69.60 and 3808.99.95 of the Harmonized Tariff Schedule of the United States, that are alleged to be sold in the United States at less than fair value by Japan and alleged to be subsidized by China.    Unless the Department of Commerce extends the time for initiation pursuant to sections 702(c)(1)(B) or 732(c)(1)(B) of the Act (19 U.S.C. §§ 1671a(c)(1)(B) or 1673a(c)(1)(B)), the Commission must reach a preliminary determination in antidumping and countervailing duty investigations in 45 days, or in this case by October 11, 2013.    The Commission's views are due at Commerce within five business days thereafter, or by October 22, 2013.

        For further information concerning the conduct of these investigations and rules of general application, consult the Commission's Rules of Practice and Procedure, part 201, subparts A through E (19 CFR part 201), and part 207, subparts A and B (19 CFR part 207).

EFFECTIVE DATE:    August 29, 2013.

FOR FURTHER INFORMATION CONTACT:    Joanna Lo (202-205-1888), Office of Investigations, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436. Hearing-impaired persons can obtain information on this matter by contacting the Commission's TDD terminal on 202-205-1810.    Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at 202-205-2000.    General information concerning the Commission may also be obtained by accessing its internet server (*http://www.usitc.gov*).    The public record for these

investigations may be viewed on the Commission's electronic docket (EDIS) at
*http://edis.usitc.gov*.

SUPPLEMENTARY INFORMATION:

     Background.--These investigations are being instituted in response to a petition filed on
August 29, 2013 by Clearon Corp., South Charleston, WV; and Occidental Chemical Corp. Dallas,
TX.

     Participation in the investigations and public service list.--Persons (other than
petitioners) wishing to participate in the investigations as parties must file an entry of
appearance with the Secretary to the Commission, as provided in sections 201.11 and 207.10 of
the Commission's rules, not later than seven days after publication of this notice in the *Federal
Register*.   Industrial users and (if the merchandise under investigation is sold at the retail level)
representative consumer organizations have the right to appear as parties in Commission
antidumping and countervailing duty investigations.    The Secretary will prepare a public
service list containing the names and addresses of all persons, or their representatives, who are
parties to these investigations upon the expiration of the period for filing entries of appearance.

     Limited disclosure of business proprietary information (BPI) under an administrative
protective order (APO) and BPI service list.--Pursuant to section 207.7(a) of the Commission's
rules, the Secretary will make BPI gathered in these investigations available to authorized
applicants representing interested parties (as defined in 19 U.S.C. § 1677(9)) who are parties to
the investigations under the APO issued in the investigations, provided that the application is
made not later than seven days after the publication of this notice in the *Federal Register*.   A
separate service list will be maintained by the Secretary for those parties authorized to receive
BPI under the APO.

     Conference.--The Commission's Director of Investigations has scheduled a conference in
connection with these investigations for 9:30 a.m. on September 19, 2013, at the U.S.
International Trade Commission Building, 500 E Street SW, Washington, DC.    Requests to
appear at the conference should be filed with William.Bishop@usitc.gov and
Sharon.Bellamy@usitc.gov (DO NOT FILE ON EDIS) on or before September 17, 2013.    Parties
in support of the imposition of countervailing and antidumping duties in these investigations
and parties in opposition to the imposition of such duties will each be collectively allocated one
hour within which to make an oral presentation at the conference.    A nonparty who has
testimony that may aid the Commission's deliberations may request permission to present a
short statement at the conference.

     Written submissions.--As provided in sections 201.8 and 207.15 of the Commission's
rules, any person may submit to the Commission on or before September 24, 2013, a written
brief containing information and arguments pertinent to the subject matter of the
investigations.    Parties may file written testimony in connection with their presentation at the
conference no later than three days before the conference.    If briefs or written testimony

contain BPI, they must conform with the requirements of sections 201.6, 207.3, and 207.7 of the Commission's rules.    Please be aware that the Commission's rules with respect to electronic filing have been amended.    The amendments took effect on November 7, 2011. See 76 Fed. Reg. 61937 (Oct. 6, 2011) and the newly revised Commission's Handbook on E-Filing, available on the Commission's web site at http://edis.usitc.gov.

In accordance with sections 201.16(c) and 207.3 of the rules, each document filed by a party to the investigations must be served on all other parties to the investigations (as identified by either the public or BPI service list), and a certificate of service must be timely filed.    The Secretary will not accept a document for filing without a certificate of service.

AUTHORITY:    These investigations are being conducted under authority of title VII of the Tariff Act of 1930; this notice is published pursuant to section 207.12 of the Commission's rules.

By order of the Commission.

Lisa R. Barton
Acting Secretary to the Commission

Issued:

3

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that defendant's filing in this matter complies with the Court's type-volume limitation rules and the Court's scheduling order in this matter.  According to the word count calculated by the word processing system with which the motion was prepared, the confidential version of the consolidated brief contains a total of 10,386 words.


/s/ Joshua Kurland

May 26, 2021