UNITED STATES COURT OF INTERNATIONAL TRADE
Before the Honorable Leo M. Gordon, Senior Judge

| | |
|---|---|
| _____ ) | |
| POKARNA ENGINEERED STONE LIMITED,    ) | |
| ) | |
| *Plaintiff,*    ) | |
| ) | |
| and    ) | |
| ) | |
| M S INTERNATIONAL, INC.,    ) | |
| ) | |
| *Consolidated Plaintiff,*    ) | |
| ) | |
| *v.*    ) | Consol. Court No. 20-00127 |
| ) | |
| UNITED STATES,    ) | |
| ) | |
| *Defendant,*    ) | |
| ) | |
| and    ) | |
| ) | |
| CAMBRIA COMPANY LLC,    ) | |
| ) | |
| *Defendant-Intervenor.*    ) | |
| _____ ) | |

## <u>ORDER</u>

Upon consideration of the motions for judgment on the administrative record filed by Pokarna Engineered Stone Limited ("Pokarna") and M S International Inc. ("MSI"), the responses thereto filed by the Defendant and the Defendant-Intervenor, any reply briefs, the administrative record, and all other papers and proceedings herein, it is hereby:

**ORDERED** that Pokarna's motion is **DENIED**; and it is further

**ORDERED** that MSI's motion is **DENIED**; and it is further

**ORDERED** that the U.S. Department of Commerce's final determination is sustained; and it is further

**ORDERED** that Pokarna's Complaint and MSI's Complaint are both **DISMISSED**.

It is **SO ORDERED**.

_____
Honorable Leo M. Gordon, Senior Judge
U.S. Court of International Trade

Dated:_____, 2021
         New York, New York

PUBLIC VERSION

## UNITED STATES COURT OF INTERNATIONAL TRADE
### Before the Honorable Leo M. Gordon, Senior Judge

| | |
|---|---|
| _____ ) | |
| POKARNA ENGINEERED STONE LIMITED, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| and ) | |
| ) | |
| M S INTERNATIONAL, INC., ) | |
| ) | |
| *Consolidated Plaintiff*, ) | |
| ) | |
| *v.* ) | Consol. Court No. 20-00127 |
| ) | |
| UNITED STATES, ) | **PUBLIC VERSION** |
| ) | |
| *Defendant*, ) | |
| ) | |
| and ) | |
| ) | |
| CAMBRIA COMPANY LLC, ) | |
| ) | |
| *Defendant-Intervenor.* ) | |
| _____ ) | |

## DEFENDANT-INTERVENOR CAMBRIA COMPANY LLC'S RESPONSE TO PLAINTIFF'S AND CONSOLIDATED PLAINTIFF'S MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

Roger B. Schagrin
Luke A. Meisner
SCHAGRIN ASSOCIATES
900 7th St. NW, Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for Cambria Company LLC*

Date: June 9, 2021

PUBLIC VERSION

**TABLE OF CONTENTS**

STATEMENT PURSUANT TO RULE 56.2(c)(1) .......................................................... 1

   I.  Administrative Determination Under Review.......................................................... 1

  II.  Issues Presented for Review .................................................................................. 2

ARGUMENT ............................................................................................................... 2

   I.  Standard of Review ............................................................................................... 2

  II.  Factual and Procedural Background........................................................................ 2

 III.  Commerce's Interpretation of the Term "Producer" Should Be Upheld .................. 6

 IV.  Commerce's Determination that Fabricators Are Not "Producers" Is Supported by
       Substantial Evidence ............................................................................................. 9

       A.   Commerce Analyzed All of the Record Evidence and Arguments Raised by
            MSI .......................................................................................................... 9

       B.   MSI's Attempts to Minimize the Record Evidence Regarding Fabricators'
            Production-Related Activities Should Be Rejected .................................... 10

       C.   Commerce and the Commission Can Reach Separate Determinations on
            Related Issues.......................................................................................... 13

       D.   There Was No Reason to Extend the Deadline for Initiation ..................... 15

       E.   MSI Fails to Address Commerce's Finding That Even If Fabricators Were
            Producers, There Was Still Industry Support for the Petitions................... 16

       F.   Even Assuming That Standing Was Lacking, the Investigations Should Not
            Be Nullified Because Commerce Has Authority to Self-Initiate
            Investigations ......................................................................................... 16

  V.  Pokarna's Arguments Regarding Sample Sales Should Be Rejected ....................... 18

 VI.  Conclusion.......................................................................................................... 22

PUBLIC VERSION

# <u>TABLE OF AUTHORITIES</u>

**CASES**

*Algoma Steel Corp. v. United States*, 12 C.I.T. 518 (1988), *aff'd*, 865 F.2d 240 (Fed. Cir.), *cert. denied,* 492 U.S. 919 (1989) ........................................................................... 14

*Brother Indus. (USA), Inc. v. United States*, 801 F. Supp. 751 (Ct. Int'l Trade 1992) ................. 6

*Catfish Farmers of Am. v. United States*, 33 C.I.T. 1258, (2009) ................................. 9

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ........................... 6

*Citrosuco Paulista, S.A. v. United States*, 704 F. Supp. 1075 (Ct. Int'l Trade 1988) ................. 17

*Diamond Sawblades Manufacturers' Coal. v. United States*, 301 F. Supp. 3d 1326 (Ct. Int'l Trade 2018) ...................................................................................................... 9

*Eurodif S.A. v. United States*, 411 F.3d 1355 (Fed. Cir.), *aff'd on reh'g*, 423 F.3d 1275 (Fed. Cir. 2005) ...................................................................................................... 7, 8

*Manchester Tank & Equip. Co. v. United States*, 483 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ...................................................................................................... 10

*P.T. Pindo Deli Pulp & Paper Mills v. United States*, 825 F. Supp. 2d 1310 (Ct. Int'l Trade 2012) ...................................................................................................... 10

*Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ...................................................................................................... 6

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978 (Fed. Cir. 1994) ...... 17

*Torrington Co. v. United States*, 14 C.I.T. 648, 650, (1990), *aff'd*, 938 F.2d 1278 (Fed. Cir. 1991) ...................................................................................................... 14

*U.S. Steel Corp. v. United States*, 36 C.I.T. 1172 (2012) ........................................... 10

*USEC Inc. v. United States*, 27 C.I.T. 489 (2003) ...................................................... 6

**STATUTES**

19 U.S.C. § 1673a(a)(1) ............................................................................... 16

19 U.S.C. § 1673a(c)(4)(A) ............................................................................ 6

19 U.S.C. § 1673a(c)(4)(E) ............................................................................ 10

19 U.S.C. § 1675(a)(2)(B)(iv)(I-VII) ................................................................. 20

19 U.S.C. §§ 1673a(b)(1) ............................................................................... 6

Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125, 130 Stat. 122 (2016) ...................................................................................................... 18

**OTHER AUTHORITIES**

*Certain Pasta from Turkey*, 83 Fed. Reg. 6516 (Dep't Commerce Feb. 14, 2016) (final results) 21

PUBLIC VERSION

*Certain Quartz Surface Products from India,* 85 Fed. Reg. 25,391 (Dep't of Commerce May 1, 2020) ............................................................................................................... 2

Commerce Final Remand Determination, *USEC Inc. v. United States* (June 23, 2003) .......... 7, 12

H.R. Doc. No. 103-316 (1994) .............................................................................. 14, 15

*Multilayered Wood Flooring from the People's Republic of China*, 81 Fed. Reg. 74393 (Dep't Commerce Oct. 26, 2016) (final results) ............................................................ 20

*Quartz Surface Products from India and Turkey*, Inv. Nos. 701-TA-624-625 and 731-TA-1450-1451, USITC Pub. 5061 (June 2020) (Final) ....................................................... 2, 5

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**Before the Honorable Leo M. Gordon, Senior Judge**

| | |
|---|---|
| _____ ) | |
| POKARNA ENGINEERED STONE LIMITED, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| and ) | |
| ) | |
| M S INTERNATIONAL, INC., ) | |
| ) | |
| *Consolidated Plaintiff,* ) | |
| ) | |
| *v.* ) | Consol. Court No. 20-00127 |
| ) | |
| UNITED STATES, ) | **PUBLIC VERSION** |
| ) | |
| *Defendant,* ) | |
| ) | |
| and ) | |
| ) | |
| CAMBRIA COMPANY LLC, ) | |
| ) | |
| *Defendant-Intervenor.* ) | |
| _____ ) | |

**DEFENDANT-INTERVENOR CAMBRIA COMPANY LLC'S**
**RESPONSE TO PLAINTIFF'S AND CONSOLIDATED PLAINTIFF'S**
<u>**MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**</u>

Pursuant to USCIT Rule 56.2 and the Court's April 27, 2021 amended scheduling order (ECF 43), Defendant-Intervenor Cambria Company LLC ("Cambria" or "Petitioner") submits its response to the motions for judgment on the agency record filed by Pokarna Engineered Stone Limited ("Pokarna") and M S International Inc. ("MSI").

<u>**STATEMENT PURSUANT TO RULE 56.2(c)(1)**</u>

**I.    Administrative Determination Under Review**

The administrative determination under review is the final determination of the Department of Commerce ("Commerce") in the antidumping duty investigation of certain quartz

1

surface products ("QSP") from India. *Certain Quartz Surface Products from India,* 85 Fed. Reg.

25,391 (Dep't of Commerce May 1, 2020) (Final Determination), and the accompanying Issues

and Decision Memorandum (P.D. 367) ("Final IDM").

## II.   Issues Presented for Review

1.   Whether the Court should uphold Commerce's interpretation of the term "producer" as meaning an entity that has sufficient production-related activities in the United States such that it has a stake in the domestic industry and should thus be considered a domestic producer when calculating industry support. Cambria's Position: Yes.

2.   Whether substantial evidence supports Commerce's decision that fabricators of quartz surface products ("QSP") do not perform sufficient production-related activities to be considered "producers." Cambria's Position: Yes.

3.   Whether Commerce's determination not to exclude Pokarna's paid sample sales as non *bona fide* sales is supported by substantial evidence and otherwise in accordance with law. Cambria's Position: Yes.

4.   Whether Commerce correctly found that there was sufficient industry support to initiate the investigation even if fabricators were treated as "producers." Cambria's Position: Yes.

## <u>ARGUMENT</u>

## I.   Standard of Review

Cambria agrees with the standard of review discussed in Defendant's response brief and

incorporates this discussion by reference into its own brief. *See* Defendant's Resp. to Mtns. for J.

on Agency Rec. (May 26, 2021) ("Def't. Br.").

## II.   Factual and Procedural Background

QSP are a compacted stone composite material used for countertop surfaces and other

surface applications. *Quartz Surface Products from India and Turkey*, Inv. Nos. 701-TA-624-625

and 731-TA-1450-1451, USITC Pub. 5061 (June 2020) (Final) ("USITC Pub. 5061") at I-13.

QSP compete with other stone products and surfaces such as granite or marble. *Id.* Producers of

QSP invest in the development of new collections and designs to attract customers. *Id.* These

patterns require specialized machinery and design by teams of engineers whose end products are copyrighted as intellectual property. *Id.* After developing new designs and patterns and configuring their production equipment to make these designs, QSP production plants produce QSP in a large rectangular slab form. *See* Cambria Standing Response (May 28, 2019) ("CSR") at 6 and Ex. 2 (PD 42). Production plants for QSP require highly complex and interconnected machinery and engineering processes, and the actual production process – excluding steps such as developing designs and retooling equipment to make these designs – involves seven separate steps: (1) mixing raw materials, (2) combining, (3) dispensing and molding, (4) pressing, (5) curing, (6) cooling, and (7) polishing. *Id.*; *see also* Initiation Checklist, Att. II, pg. 15 (PD 46). The capital investment for a new QSP production plant ranges from $40 million to hundreds of millions of dollars. Initiation Checklist, Att. II, pg. 11 (PD 46).

Most QSP slabs, including imported QSP, are sold to fabricators. USITC Pub. 5061 at 19. Fabricators cut slabs to their final shape and dimensions so that the QSP can be installed in an end-use application such as a kitchen countertop. In addition to QSP, fabricators stock and sell other products such as granite, marble, soapstone, and porcelain. CSR at 6 and Exhibit 2 (PD 42). Fabricators consult with the end-use customer about the dimensions of the surface needed prior to installation and draw a diagram reflecting these dimensions. Initiation Checklist, Att. II, pg. 15 (PD 46, CD 33). Fabricators then cut the rectangular slab and perform edge and surface finishing operations so that it is ready for installation. *Id.* Fabrication does not alter the fundamental physical properties of the underlying QSP in any way. CSR at 6 and Exhibit 2 (PD 42). All of those essential physical characteristics are imparted in the slab production process. *Id.* While the capital investment required for the largest and most sophisticated fab shops can range

up to [            ], a typical fab shop can be established for as little as $50,000 to $100,000. *Id.* at

7-8.

     In May 2019, Cambria filed a petition for the imposition of antidumping duties on QSP

from India. *See* Petition, (May 8, 2019) (PD 1-5, CD 1-5). The petition included the support of

Cambria [                                                    ]. *Id.* at Ex. I-4. Cambria

subsequently provided a declaration of support from Trend Group USA, [

   ]. Amendment to Petitions (May 24, 2019) at 1 and Ex. 1 (PD 41). Based on this

support, Cambria was able to show that producers accounting for [     ]% of domestic

production supported the filing of the petition. Initiation Checklist, Att. II, pg. 8 (PD 46, CD 34).

     On May 24, 2019, MSI, a large U.S. importer of QSP, filed comments arguing that

Cambria had failed to show that that there was sufficient industry support for the petition. MSI

Standing Challenge at 2-6 (PD 39, CD 18-30). In its challenge, MSI argued that fabricators

should be considered "producers" for purposes of calculating industry support, and that the

petition did not account for the opposition of the fabricators to the provision of relief. *Id.* MSI's

submission included [     ] declarations from fabricators stating that they [

     ] and therefore opposed the petition. *Id.* at Exhibit

6. On May 28, 2019, Cambria submitted a response to MSI's standing challenge with a wide

variety of evidence showing that fabricators do not perform sufficient production-related

activities to qualify as domestic producers to be included in the domestic industry for standing

purposes. *See generally* CSR at Exhibits 1-9 (PD 42, CD 33).

     On May 28, 2019, Commerce initiated the antidumping duty investigation on QSP from

China. Initiation Checklist, at Attachment II (PD 46, CD 34). After reviewing the record

evidence relating to fabricators, Commerce found that fabricators did not perform sufficient

production-related activities to constitute "producers" for purposes of determining industry

support. *Id.* at Att. II, pp. 1, 9-16. Commerce found there are significant differences in the level

of complexity and capital investment, employment, training and technical expertise, production

processes, and type of equipment, between quartz surface product slab producers and fabricators.

*Id.* at Att. II, pp. 4-18. In particular, Commerce found that "fabricators simply convert an

existing slab into a geometrical form for its end use or application" and noted that "many

fabricators rely on imported slabs to produce final fabricated products." *Id.* at 14.

The U.S. International Trade Commission (the "Commission") also examined whether

fabricators should be considered "producers," albeit for a different purpose – *i.e.*, to determine

whether the domestic industry had suffered material injury by reason of subject imports of QSP.

USITC Pub. 5061 at 9-12. After gathering information relevant to this question, the Commission

determined that fabricators are "producers" for purpose of determining material injury, and it

invited the fabricators to participate in the investigation as producers by responding to its U.S.

Producers' Questionnaire. *See id.* In the end, however, although the Commission found that there

are thousands of fabricators, only two independent fabricators provided questionnaire responses

in the Commission's investigation. *Id*. at 23.

During the course of the investigation at Commerce, Pokarna reported that it made

sample sales of QSP to its U.S. customers. Final IDM at 12-14. Pokarna argued that Commerce

should exclude these sales from the calculation of its dumping margin on the basis that they were

not *bona fide* sales. *Id.* In the final determination, Commerce rejected this argument and included

the sample sales in the calculation of Pokarna's dumping margin. *Id.*

**III.    Commerce's Interpretation of the Term "Producer" Should Be Upheld**

For a firm to have standing to file an antidumping petition, it must be a "manufacturer, producer, or wholesaler" of the domestic like product. 19 U.S.C. §§ 1673a(b)(1), 1677(9)(C). In addition, Commerce will determine that the petition has been filed on behalf of the domestic industry when: (i) the domestic producers or workers who support the petition account for at least 25 percent of the total production of the domestic like product; and (ii) the domestic producers or workers who support the petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition. 19 U.S.C. § 1673a(c)(4)(A).  In the underlying investigation, Commerce interpreted the term "producer" to mean an entity that performs sufficient production-related activities to be considered a producer for the purpose of being a member of the domestic industry when calculating industry support. Initiation Checklist at Att. II (PD 46). As demonstrated below, Commerce's interpretation of the statute is reasonable and should be upheld.

This Court has repeatedly recognized that the statute does not define the term "producer." *USEC Inc. v. United States*, 27 C.I.T. 489, 508 (2003) (recognizing that the term "producer" is not statutorily defined); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1346 (Ct. Int'l Trade 2017) (same); *Brother Indus. (USA), Inc. v. United States*, 801 F. Supp. 751, 757 (Ct. Int'l Trade 1992) (same). Thus, because the statute is silent with respect to the definition of "producer," the question for the court is "whether the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

6

The Federal Circuit's decision in *Eurodif S.A. v. United States* decides this question as conclusively as any case ever could. 411 F.3d 1355 (Fed. Cir.), *aff'd on reh'g*, 423 F.3d 1275 (Fed. Cir. 2005). In *Eurodif*, certain utility companies challenged Commerce's initiation of investigations on low enriched uranium ("LEU") because Commerce had excluded their opposition to the petitions in the calculation of industry support based on the finding that the utility companies were not "producers." *Id.* at 1358. In assessing whether the utility companies were "producers," Commerce applied the same "sufficient production related activities" test that it applied in this case. *See* Commerce Final Remand Determination, *USEC Inc. v. United States* (June 23, 2003) at 3-4 ("USEC Remand"). On appeal, the respondents argued that Commerce's interpretation of the statute using this test was erroneous. The Federal Circuit resoundingly and decisively rejected this challenge:

> Commerce's determination that domestic utilities were not "producers" of LEU is consistent with the purpose of § 1673a(c)(4)(A). Section 1673a(c)(4) speaks of "industry support" and, as expressed in legislative history, Congress intended the industry support statute "to provide an opportunity for relief for an adversely affected industry and to prohibit petitions filed by persons with no stake in the result of the investigation." S. Rep. No. 249, 96th Cong., 1st Sess. 47 (1979). . . . Commerce interpreted having a "stake" as requiring that a company "perform some important or substantial manufacturing operation." . . . There is no basis to conclude that Commerce's interpretation in this context is unreasonable or not in accordance with law.

*Id.* at 1360-61. Commerce's interpretation of the statute in the underlying investigation in this case – which is identical to its interpretation of the statute in *Eurodif* – is thus reasonable and should be upheld.

Cambria agrees with Defendant that, in arguing that Commerce misinterpreted the statute when it did not include fabricators in the domestic industry, MSI "fails to grapple with an important aspect of the problem" because it sidesteps the question of "which entities constitute domestic 'producers' under the statute." *See* Def't Br. at 10. MSI asserts that Commerce first

7

decided that fabricators are "producers" and then excluded them from the domestic industry by applying its production-related activities test. *See, e.g.,* MSI Br. at 9 ("Commerce acknowledged that fabricators produce the domestic like product, but then qualified their production so as to exclude fabricators from its consideration of industry support."). This is a gross mischaracterization of Commerce's decision. Commerce did not find that fabricators are "producers" and then exclude them from the domestic industry. Commerce found that fabricators are not "producers" at all. Thus, MSI's argument that Commerce violated the statute by ignoring the opposition of "a subset of producers" completely misunderstands Commerce's decision. MSI Br. at 10. Commerce took into account the position of all companies that it determined were "producers" under the statute. Commerce did not take into account the fabricators' positions because it determined that they are not "producers."

MSI also argues that Congress has prescribed a limited set of circumstances in which Commerce may exclude "producers" from the industry support calculation, and that none of the circumstances applied to the fabricators. *See* MSI Br. at 12. This argument suffers from the same fundamental flaw as MSI's other statutory argument. Commerce did not exclude fabricators after finding they are producers. Commerce found that fabricators are not producers.

In sum, Commerce's interpretation of the term "producer" is reasonable and should be upheld. Indeed, in *Eurodif,* the Federal Circuit has already spoken decisively on this issue, and MSI has not raised a single argument in its opening brief that would shake this bedrock precedent. In fact, MSI does not even cite *Eurodif* in its brief, let alone provide any basis to distinguish *Eurodif* from this case.

IV.   **Commerce's Determination that Fabricators Are Not "Producers" Is Supported by
       Substantial Evidence**

In its notice of initiation, Commerce applied its production-related activities test to

determine that fabricators are not "producers" for purposes of calculating industry support. *See*

Initiation Checklist at Att. II, pp. 4-18 (PD 46). As discussed below, the Court should reject

MSI's arguments that this determination was not supported by substantial evidence.

   A.   **Commerce Analyzed All of the Record Evidence and Arguments Raised by MSI**

As an initial matter, Cambria agrees with Defendant that MSI's evidentiary challenge to

Commerce's determination that fabricators are not producers "boil{s} down to disagreement

with Commerce's weighing of the record evidence, which is not a basis to overturn Commerce's

determination."  Def't Br. at 17. *See also Diamond Sawblades Manufacturers' Coal. v. United

States*, 301 F. Supp. 3d 1326, 1355 (Ct. Int'l Trade 2018) ("the mere fact that the record may

support a different choice of financial statement does not mean Commerce's choice is

unsupported by substantial evidence"). In this regard, MSI's challenge is no different than the

"garden variety request to reweigh evidence" that the Court has routinely rejected. *Catfish

Farmers of Am. v. United States*, 33 C.I.T. 1258, 1269-70 (2009).

Furthermore, there is no basis for MSI's contention that Commerce did not engage with

the evidence that MSI submitted in its standing challenge. MSI Br. at 17. The initiation

documents that Commerce issued at the time of initiation show that the agency acknowledged,

analyzed, and addressed all of the arguments and evidence submitted by MSI in its challenge.

Initiation Checklist at Att. II, pp. 9-15 (PD 46). Just as Commerce did not exhaustively discuss

each piece of evidence submitted by Cambria, the agency did not dissect every single little piece

of evidence submitted by MSI. However, the "substantial evidence" standard does not impose

such a demanding and unrealistic burden on the agency. As the Court has recognized,

PUBLIC VERSION

"Commerce is not 'required to explicitly address every piece of evidence presented by the parties,' but only 'significant arguments and evidence which seriously undermines its reasoning and conclusions.'" *Manchester Tank & Equip. Co. v. United States*, 483 F. Supp. 3d 1309, 1317 (Ct. Int'l Trade 2020) (quoting *U.S. Steel Corp. v. United States*, 36 C.I.T. 1172, 1174 (2012)).

MSI also takes issue with Commerce for not addressing certain arguments that it made in its case brief prior to the final determination. MSI Br. at 18. There arguments are largely duplicative of arguments that MSI raised in its standing objection prior to initiation. *See* MSI Case Brief (Mar. 27, 2020) at 10 (PD 355). In any event, "Commerce is prohibited from reconsidering industry support after the initiation of an investigation." *P.T. Pindo Deli Pulp & Paper Mills v. United States*, 825 F. Supp. 2d 1310, 1323 (Ct. Int'l Trade 2012) (citing 19 U.S.C. § 1673a(c)(4)(E)). Thus, to the extent there was anything novel in the arguments that MSI raised in its case brief, Commerce could not have reversed its industry support finding in the final determination based on these arguments.

### B. MSI's Attempts to Minimize the Record Evidence Regarding Fabricators' Production-Related Activities Should Be Rejected

The Court should reject MSI's attempts to minimize the evidence supporting Commerce's determination that fabricators are not producers because they do not perform sufficient production-related activities. *See* MSI Br. at 21-22. In its moving brief, MSI created a chart that characterizes in a superficial and misleading way the exhibits that Cambria submitted in its response to MSI's standing challenge. *Id.* As demonstrated below, each of these exhibits supported Commerce's determination.

In Exhibit 2, Cambria submitted an affidavit from Brian Scoggin, the Executive Vice President of Operations at Cambria who is responsible for operations both at the company's production plant and its fabrication facilities, and he thus has expertise regarding both QSP slab

production and the fabrication process. CSR at Ex. 2 (PD 42, CD 33). This affidavit provided

evidence relevant to each of the factors that Commerce analyzes as part of its production-related

activities test. *Id.* In particular, the affidavit provided evidence showing that:

(1) The capital investment required to establish a slab production plant is many multiples
    of the investment required to establish a fabrication shop. Cambria's slab plant
    required [                    ] of investment. Cambria's fabrication shop, which
    is large and relatively sophisticated compared to a typical fabrication shop, required
    only [          ]. *Id.*

(2) The technical expertise for QSP slab production is much greater than that required for
    fabrication.  Slab production involves larger and more complex equipment,
    knowledge of the specific raw materials, chemistry, recipes, and processes required to
    produce different designs of slabs, and highly technical engineers.  In contrast,
    fabrication involves tools for cutting and polishing stone that are not specific to QSP
    but can also be used on other materials such as marble, granite, or even wood. *Id.*

(3) There are far more employees required to produce a QSP slab than to fabricate one.
    Cambria employs over [     ] full time employees in its slab production plant, while
    its related fabrication shops employ [                              ].

(4) The value added by fabrication is less significant than the value of the QSP slab, with
    over [     ] of the cost of a fabricated product being directly related to the slab. *Id.*

(5) QSP production plants and the equipment they use are dedicated solely to the
    production of QSP.  In contrast, fabrication shops can fabricate any type of stone slab
    of any origin – whether QSP or granite, whether domestic or imported.  *Id.*

(6) QSP slab producers invest significant resources in research and development to create
    new designs in quartz surface products, which have been an important factor in
    growing demand for QSP.  In contrast, fabrication shops fabricate the offerings
    developed and produced at the QSP plant as well as other types of stone surfaces. *Id.*

The other exhibits provide additional evidence supporting Commerce's determination.

Exhibit 3 shows that Caesarstone, a second domestic producer of QSP, invested $70 to $100

million to establish a new QSP slab plant. Exhibit 4 shows that LG Hausys, a third domestic

producer of QSP, invested $50 million for its first slab production line and $40 million to

establish a second one. Exhibit 5 shows that a typical fab shop can be established for as little as

$50,000 to $100,000. Exhibit 6 depicts the large and complex equipment included in a QSP slab

production line. Exhibit 7 discusses the business operations of a successful fabrication business, the relatively simple equipment that it uses, the smaller number of workers employed, and the sources of the different surfaces that are fabricated, which include many imported products. Exhibit 8 shows how slab producers provide fabricators with manuals containing step-by-step instructions on how to fabricate their product, and that these manuals tend to focus as much on measuring and installing QSP as they do on the actual fabrication process. Finally, Exhibit 9 shows how the fabricators who were opposed to the petitions see themselves as part of an industry of "importers" instead of part of a domestic industry with manufacturing operations in the United States. In particular, Alan Jorgenson, the CEO of Bedrock Quartz, an "importer/fabricator of quartz surfaces," circulated a letter to other fabricators after Cambria filed the petition that stated the following:

> Our industry didn't come together strongly on the Chinese case. Many of you figured your businesses would be better off if imports were curtailed from China. But do you really think that shutting down China, India and Turkey and maybe Spain will benefit *our industry of fabricators, importers and suppliers?*

*Id.* at Exhibit 9 (emphasis added).

MSI takes issue with Commerce's observation that "many fabricators rely on imported slabs to produce final fabricated products." MSI Br. at 12.  However, this fact is relevant to the question of whether fabricators should be considered domestic producers. As the Federal Circuit recognized in *Eurodif*, consistent with Congress's intent, Commerce has determined for industry support purposes "that in order to be a producer, *an entity must have a 'stake' in the domestic industry* in question." 411 F.3d at 1360 (emphasis added).  Thus, while "producers" may be excluded from domestic industry under the related party provisions of the statute because they are importers, Commerce also examines the extent of a company's imports to determine if it is a "producer" in the first place. *See* USEC Remand at 3-4. Here, every single fabricator included in

PUBLIC VERSION

MSI's standing objection stated that it opposed the petition because it [

]. MSI Standing Challenge at Ex. 6 (PD 39, CD 18-

30). Furthermore, while the stock affidavit provided by MSI did not prompt the fabricators to

disclose if they are importers, many fabricators [                                    ]. *Id.* [



]. [



]. *Id.* (emphasis added). It is thus no wonder

that the fabricators aligned with MSI were opposed to the petitions. By their own admission, they

had a [                                    ] – not a stake in the domestic industry.

     The bottom line is that there was compelling evidence on the record supporting

Commerce's determination that fabricators do not perform sufficient production-related activities

to be producers for purposes of determining industry support. MSI's attempts to minimize the

weight and significance of this evidence should be rejected.

### C.  Commerce and the Commission Can Reach Separate Determinations on Related Issues

     MSI contends that the Commission's finding that fabricators are part of the domestic

industry for assessing material injury undermines Commerce's finding that fabricators are not

part of the domestic industry for calculating industry support. MSI Br. at 20, 24. Cambria agrees

with Defendant that Commerce and the Commission may "reach different determinations

regarding the composition of the domestic industry for their respective purposes of determining

industry support and injury."  Def't Br. at 23. Indeed, this Court and the Federal Circuit have

repeatedly recognized that Commerce and the Commission may "reach distinct decisions on the

same or similar issues based on their separate responsibilities under the statute." *Torrington Co.*

*v. United States*, 14 C.I.T. 648, 650, (1990), *aff'd*, 938 F.2d 1278 (Fed. Cir. 1991); *Algoma Steel Corp. v. United States*, 12 C.I.T. 518 (1988), *aff'd*, 865 F.2d 240 (Fed. Cir.), *cert. denied,* 492 U.S. 919 (1989) ("This division of labor has been upheld even where it has resulted in decisions which are difficult to reconcile, as when the class of merchandise found by ITA to be sold at LTFV affects several industries, not all of which are found by ITC to be materially injured."). In affirming *Algoma*, the Federal Circuit stated that the relationship between the Commission and Commerce "should be one for the agencies to resolve between themselves, and not for the courts." 865 F.2d at 241.

As shown in the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"), Congress specifically contemplated that Commerce and the Commission could reach different decisions regarding which entities should be considered part of the domestic industry. Specifically, in discussing the definition of related parties in Section 771(4)(B) of the Act, the SAA states:

> In this regard, Commerce and the Commission utilize section 771(4)(B) for different purposes: Commerce to eliminate any conflicts of interest that may distort its consideration of the level of industry support for an antidumping or countervailing duty petition, and the Commission to reduce any distortion in industry data caused by the inclusion in the domestic industry of a related producer who is being shielded from the effects of the subject imports. For this reason, each agency will have discretion to apply this provision to accomplish these different purposes, even where this may lead to somewhat different results in individual cases.

SAA, H.R. Doc. No. 103-316 (1994) at 858. While this discussion pertains to the agencies' application of the related party provisions of the statute to determine whether a company is part of the domestic industry, the rationale applies equally to the agencies' interpretation of the term "producer" when determining whether a company is part of the domestic industry.  Commerce interprets the term "producer" with the goal of ensuring that only entities with a stake in the

domestic industry are included in the domestic industry.  The Commission interprets the term

"producer" with the goal of assessing material injury to the domestic industry in an undistorted

way.  These different goals can lead to different results in individual cases.

### D.  There Was No Reason to Extend the Deadline for Initiation

MSI also suggests that Commerce should have extended the initiation deadline to gather

additional evidence regarding the composition of the domestic industry. MSI Br. 25-26. In this

regard, Cambria agrees with Defendant that Commerce had all the evidence it needed to make a

determination with respect to industry support "such that the petition requirements to initiate an

investigation were met."  Def't Br. at 26. Furthermore, the legislative history cited by MSI does

not support its argument that Commerce should have extended the deadline for initiation. To the

contrary, the legislative history shows that Congress intended for the standing requirement to be

interpreted liberally in support of a finding of industry support, that Commerce should initiate

investigations as expeditiously as possible, and that Commerce should only extend the deadline

for initiation when it is necessary to avoid negative initiation determinations:

> The Administration expects that, in the vast majority of cases, the determination
> of industry support will be made within the initial twenty-day period. The ability
> to extend the initiation determination will avoid negative initiation determinations
> simply because Commerce was unable to gather the required support information
> in twenty days. The Administration intends that Commerce will use this extension
> authority only in exceptional circumstances where the industry support issue
> cannot be decided in twenty days, and the initiation determination will be
> extended only for the additional time necessary to make a determination regarding
> industry support.

SAA, H.R. Doc. No. 103-316 (1994) at 863. Thus, Commerce was following both the letter and

the spirit of the law when it declined to extend the deadline for initiation to gather additional

information regarding industry support.  The agency had all the information it needed to initiate.

PUBLIC VERSION

**E.   MSI Fails to Address Commerce's Finding That Even If Fabricators Were Producers, There Was Still Industry Support for the Petitions**

In its initiation notice, Commerce stated that even were it to include the fabricators' opposition in its calculation of industry support, Cambria still had the requisite level of industry support to initiate the investigations. Initiation Checklist, Att. II, pg. 16, n.129 (PD 46, CD 34). MSI's standing challenge included 11,913,520 square feet of fabrication from the fabricators who opposed the petition. When Commerce calculated industry support based on both the fabrication quantity in MSI's challenge and the production quantity in Cambria's petition, the domestic producers who supported the petition still accounted for [       ] percent of total U.S. production (including fabricators) and [       ] percent of U.S. production by those producers (including fabricators) expressing support for, or opposition to, the India Petitions. *Id.* Thus, even assuming that every claim in MSI's moving brief is correct and that Commerce should have included the fabricators' opposition in the calculation of industry support, there was still sufficient support for the petitions to initiate the investigation. This fact provides a separate and independent basis to uphold Commerce's decision to initiate the investigation, and MSI completely fails to account for this fact in its moving brief.

**F.   Even Assuming That Industry Support Was Lacking, the Investigations Should Not Be Nullified Because Commerce Has Authority to Self-Initiate Investigations**

Even if the Court were to find that there was insufficient industry support at the time of the filing of the petitions, there would still be no need to nullify the investigations, because Commerce has the authority to initiate an antidumping investigation *sua sponte* whenever it has reason to believe that unfairly traded imports are causing material injury to a domestic industry. *See* 19 U.S.C. § 1673a(a)(1). For example, in *Citrosuco Paulista, S.A. v. United States*, the Court held that once Commerce has determined to initiate an antidumping investigation, even where

16

there may have been a defect in standing at the time of the filing of the petition, it would "elevate{} form over substance" to require Commerce to dismiss the petition and require the petitioners to file a new petition to achieve the same result. 704 F. Supp. 1075, 1083 (Ct. Int'l Trade 1988). There, a group of processors challenged Commerce's decision to initiate an antidumping duty investigation on frozen concentrated orange juice ("FCOJ") from Brazil on the basis that the petitioners were not producers of the like product but were instead producers of oranges for processing into FCOF. After the petitions were filed, Commerce had allowed the addition of other domestic producers of FCOJ as co-petitioners and proceeded to initiate an antidumping investigation. After final determinations were reached and an antidumping duty order was issued, the processors and the Brazilian respondent challenged Commerce's initiation of the investigation for lack of standing. The Court rejected this challenge, finding that it would be unreasonable to impose a judicial requirement that Commerce terminate the investigation based on a flaw with standing at the time of the filing of the petition, because Commerce "is authorized to commence an antidumping duty investigation *sua sponte* whenever it determines that an investigation is warranted based upon available information." *Id.* Had Commerce determined to self-initiate, it would have possessed the authority to continue the investigation on the same timetable that it had originally followed. Thus, Commerce was not required to start a new investigation based on any flaw with standing at the time of initiation.

Similarly, in *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978 (Fed. Cir. 1994), the Court of International Trade had found that a petition was not filed on behalf of the domestic industry, and the "ensuing investigation was therefore declared a nullity." The Federal Circuit reversed the Court. In so doing, it explained:

> Commerce can initiate a countervailing or antidumping duty investigation completely on its own, without any petition having been filed by an "interested

party." 19 U.S.C. § 1671a(a), 1673a(a). Commerce need only determine, from information available to it, "that a formal investigation is warranted." 19 U.S.C. § 1671a(a); 1673a(a). … There is no indication whatever that the phrase "from information available to it" is to be given a narrower meaning than the plain meaning of the words — Commerce could use information made "available to it" by a petition filed by one who is not "an interested party," or by a petition filed by "an interested party" but not "on behalf of an industry." There is no requirement that Commerce had to acquire on its own the information leading to a self-started investigation, or that Commerce must ignore or cannot rely on information made available by a petition which may for some reason fall short of the statutory requirements for a petition-induced investigation.

*Id.* Based on this reasoning, the Federal Circuit ultimately found that "Commerce has broad discretion in deciding when to pursue an investigation, and when to terminate one," and reversed the Court for finding fault with Commerce's initiation of the investigation. *Id.*

Here, even if there was any defect in standing at the time of filing of the petitions on QSP from India, that does not mean that Commerce's initiation of the investigation should be nullified, because Commerce has the authority to self-initiate investigations, and it could have done so in the underlying proceeding based on the information before it.

## V.    Pokarna's Arguments Regarding Sample Sales Should Be Rejected

The Court should reject Pokarna's claim that its sample sales should have been excluded from the company's dumping margin on the basis that they were not *bona fide* sales. Cambria agrees with Defendant that Commerce's practice is to examine whether a sale is *bona fide* only in reviews of existing antidumping duty orders and not in investigations before an order has been issued, because the entire purpose of the *bona fide* analysis is to ensure that respondents are not making non-*bona fide* sales after an order has issued to fraudulently reduce their dumping margin. *See* Def't Br. at 28. In the Trade Facilitation and Trade Enforcement Act of 2015 Congress codified Commerce's totality of the circumstances test to analyze whether a transaction is *bona fide*. Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125, 130

18

PUBLIC VERSION

Stat. 122 (2016). In doing so, Congress noted that the purpose of conducting a *bona fide* sale

determination is to prevent companies from committing fraud on Commerce to lower their

dumping margins:

> Another area of abuse in new shipper reviews is for an exporter or producer to
> enter into a scheme to structure a few sales to show little or no dumping or
> subsidization when those sales are reviewed by the Department of Commerce
> during a new shipper review, resulting in a low or zero antidumping or
> countervailing duty rate for that producer or exporter. . . . This provision would
> prevent such arrangements by requiring that the U.S. sales in a new shipper
> review be bona fide sales and setting out criteria for identifying *bona fide* sales,
> reflecting the Department of Commerce's current regulations and practices in this
> area.

H.R. Rep. 114-114(I). The Court has similarly emphasized that the purpose of Commerce's *bona*

*fide* sales test remains preventing fraudulent sales to lower a dumping margin:

> {B}y definition, totality of the circumstances analyses are specific to particular
> cases, and the impact of various factors in determining whether a transaction is
> *bona fide* may vary depending on the circumstances of the transaction. *What is*
> *constant, however, is the basic Congressional rationale for requiring*
> *determinations based on* bona fide *sales: to ensure that a producer does not*
> *unfairly benefit from an atypical sale to obtain a lower dumping margin than the*
> *producer's usual commercial practice would dictate*.

*Huzhou Muyun Wood Co. v. United States*, 324 F. Supp. 3d 1364, 1376 (Ct. Int'l Trade 2018)

(emphasis added).

Given the purpose of Commerce's *bona fide* sales test, it makes no sense to apply the test

to Pokarna's paid sample sales. Pokarna does not claim that it made its paid sample sales as part

a fraudulent scheme to lower its dumping margin. In fact, Pokarna claims the polar opposite –

*i.e.*, that including the sample sales in the margin calculation *increases* Pokarna's dumping

margin. *See* Pokarna Br. at 6. But the statute does not authorize Commerce to exclude U.S. sales

from the margin calculation because the margins of dumping on those sales are too high. To find

that it did would lead to truly absurd results.

Even if the *bona fides* sales test did apply so sample sales in investigations, however, the test would show that Pokarna's paid sample sales should continue to be included in the margin calculation. When determining if sales are *bona fide*, Commerce considers the following factors: (i) the price of such sales; (ii) whether such sales were made in commercial quantities; (iii) the timing of such sales; (iv) the expenses arising from such sales; (v) whether the subject merchandise involved in such sales was resold in the United States at a profit; (vi) whether such sales were made on an arms-length basis; and (vii) any other factor that may be relevant as to whether such sales are, or are not, likely to be typical of those the exporter or producer will make in the future. *Huzhou Muyun*, 324 F. Supp. at 1376 (citing 19 U.S.C. § 1675(a)(2)(B)(iv)(I-VII)).

Pokarna does not even meaningfully analyze the factors in Commerce's *bona fide* sales assessment. But an actual analysis of these factors shows that Pokarna's paid sample sales are *bona fide* sales. With regards to price, when a respondent's "price is at the high end of a price distribution, {Commerce} has considered this to be a key factor in supporting a finding that the sale was not *bona fide*." *Multilayered Wood Flooring from the People's Republic of China*, 81 Fed. Reg. 74393 (Dep't Commerce Oct. 26, 2016) (final results) ("*MWF from China*") and accompanying IDM 6. Here, Pokarna stated that its paid sample sales are at the low end of the price distribution. Pokarna Case Brief (Mar. 27, 2020) at 8 (PD 354). Commerce will also consider the fact that merchandise is resold in the United States at a profit as evidence that the sales are *bona fide*. IDM in *MWF from China* at 11. Here, Pokarna's paid sample sales "were not resold in the U.S. at all – and certainly not at a profit." Arizona Tile and MSI Case Brief at 16 (PD 355); *see also* Pokarna Case Brief at 7 (PD 354). Commerce also considers sales that are made at arm's length – as opposed to sales between affiliates or family members – to support a finding that sales are *bona fide*. IDM in *Certain Pasta from Turkey*, 83 Fed. Reg. 6516 (Dep't

Commerce Feb. 14, 2016) (final results) at 16. Here, Pokarna did not allege that the paid sample sales were made to affiliated parties. With respect to quantity, Commerce will consider whether the quantities sold are typical or atypical of a respondent's normal business practice such that they are not representative of its future business practices. *Id.* Here, Pokarna never claimed that the sales quantities for its sample sales are atypical compared to its past or future paid sample sales. While the quantities sold may be smaller than the quantities of other merchandise sold, this is not unexpected or atypical given that they are sample sales. With respect to timing and expenses, Commerce will consider any unusual timing or expenses to be evidence that sales are not *bona fide* (*e.g.*, sales that are made at the end of a period of review with no expenses). *Id.* Here, Pokarnaa failed to point to any unusual timing or expenses associated with its sample sales.

In sum, applying Commerce's totality of the circumstances test to Pokarna's paid sample sales, there is no evidence whatsoever that these sales are not *bona fide* sales. Thus, Commerce's decision not to exclude Pokarna's paid sample sales was in accordance in law and supported by substantial evidence.

PUBLIC VERSION

## VI.    <u>Conclusion</u>

For the foregoing reasons, Cambria respectfully requests that the Court uphold

Commerce's final determination.

<div align="center" style="text-align:left; margin-left:50%">

Respectfully submitted,

/s/ Luke A. Meisner
Roger B. Schagrin
Luke A. Meisner
SCHAGRIN ASSOCIATES
900 7th St. NW Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for Cambria Company LLC*

</div>

Date: June 9, 2021

PUBLIC VERSION

### <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing reply brief contains 6,654 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in the Court's Chamber's Procedures and February 17, 2021 amended scheduling order. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


Dated: June 9, 2021                                    /s/ Luke A. Meisner
                                                        Luke A. Meisner